**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**ARNOLDO GIRON, JUAN CARLOS JAUERGUI,**          **PLAINTIFFS**
**EDVIN GIRON, ROBERTO GIRON, JOSE**
**GUTIERREZ, RUBEN DUARTE, JOSE LIAMAS,**
**FRANCISCO AREVALO, ALEJANDRO NUNEZ,**
**FLORENCIO VILLANUEVA**

**vs.**                          **CASE NO.  4:07-CV-00568 GTE**

**CITY OF ALEXANDER, ARKANSAS; CHIEF ALLEN**          **DEFENDANTS**
**SPEARS, Individually and in his capacity as the Chief of**
**Police of the Alexander, Arkansas Police Department;**
**OFFICER TOMMY LEATH, Individually and in his**
**official capacity as a police officer with the Alexander,**
**Arkansas Police Department**

**MEMORANDUM OPINION AND ORDER
ON DEFENDANTS' SUMMARY JUDGMENT MOTION**

**I.       FACTUAL BACKGROUND**

**A.       Overview**

Plaintiffs are ten individuals of Hispanic origin who allege that they were victimized by

the Defendants "routine and continuing practice of race and national origin-based traffic stops,

detentions, searches, charges, and discriminatory and oppressive vehicle towing policies."[1]

Plaintiffs claim that the Defendants' actions violated the Fourth, Fifth, and Fourteenth

Amendments to the U.S. Constitution, 42 U.S.C. § 1981, the Arkansas Civil Rights Act of 1993,

the Arkansas Constitution, and the Arkansas common law torts of trespass to chattel and

conversion.  Plaintiffs seek an award of money damages against all Defendants.  They also seek

an award of punitive damages against Defendants Spears and Leath.

_____

[1]  Amended Complaint, docket entry # 29 at ¶ 2.

1

The Defendants are the City of Alexander ("City"), Chief Allen Spears ("Spears"), and Officer Tommy Leath ("Leath").  The Defendants, collectively, have filed a motion for summary judgment.  Plaintiffs have responded to the motion, and Defendants have filed a reply in further support of their motion.

**B.     The Parties**

At all time relevant to this lawsuit, Defendant Police Chief Allen Spears was the Chief of Police of the City of Alexander, and Defendant Officer Leath was a certified police officer employed by the City of Alexander.   The ten named Plaintiffs are all Hispanic males whose general appearance (including dark skin tone, hair and eyes) tends to identify them as persons of Hispanic origin.  The following facts are found in the summary judgment record.

**(1)     Plaintiff Arnoldo Giron**

On Saturday, May 5, 2007, Defendant Leath stopped Plaintiff Arnoldo Giron's vehicle. The stated probable cause for the stop was that Mr. Giron had a rosary hanging from rear view mirror.  For this alleged offense, Office Leath issued Mr. Giron a citation for windshield obstruction.  Defendants contend that two Arkansas statutes justified the stop, Ark. Code Ann. § 27-37-302 and Ark. Code Ann. 27-16-304.

During the stop, Plaintiff Giron could not produce a valid Arkansas driver's license. Officer Leath cited Arnoldo Giron for driving on a suspended or revoked driver's license and windshield obstruction.[2]  Allegedly because there was no passenger in the vehicle with a valid

_____

[2]  Plaintiffs' Addendum, docket entry # 57, at 49.  Court documents indicate that the charge of driving on a suspended license was punishable by a fine of $255.00, and the charge of windshield obstruction was punishable by a fine of $155.00.  Plaintiffs allege that Officer Leath purposefully and improperly cited Mr. Arnoldo Giron, and other Plaintiffs, for driving on a

driver's license,  Officer Leath contacted Metro Towing (hereinafter "Metro"), a tow company, to tow the vehicle from the scene of the traffic stop.

Plaintiff Arnoldo Giron was not able to get his vehicle back from Metro until Monday, May 7, 2007, because it was closed on Sunday.  In order to retrieve the vehicle, Plaintiff had to pay  approximately four hundred eighty dollars ($480.00) for towing and storage fees.  Plaintiff contends that the City of Alexander received a portion of the $480 as a "kickback" from the towing company.

Both charges against Plaintiff Giron were later nolle prossed.  Plaintiff Giron contends that he was actually stopped, charged, and had his vehicle towed because he is Hispanic.

### (2)    Plaintiff Juan Carlos Jauregui

On May 19, 2007, Officer Leath stopped Plaintiff Jauregui's vehicle.  The stated probable cause for the stop was that Mr. Jauregui had a bandana hanging from his rear view mirror.  During the stop, Plaintiff Jauregui could not produce a valid Arkansas driver's license.  Officer Leath cited Plaintiff Jauregui for driving on a suspended or revoked driver's license and windshield obstruction.  Allegedly because there was no passenger in the vehicle with a valid driver's license,  Officer Leath contacted Metro to tow the vehicle from the scene of the traffic stop.

Plaintiff Jauregui was not able to get his vehicle back from Metro until Monday, May 21, 2007, because it was closed on Sunday.  In order to retrieve the vehicle, Plaintiff had to pay approximately three hundred forty-four dollars ($344.00) for towing and storage fees.

---

suspended license when the correct charge was driving without a license, for which the fine ($161.00) was lower.

The charges against Plaintiff Jauregui were later nolle prossed.  Plaintiff Jauregui contends that he was actually stopped, charged, and had his vehicle towed because he is Hispanic.

### (3)      Plaintiff Edvin Giron

On April 23, 2007, Officer Leath stopped Plaintiff Edvin Giron's vehicle.  The stated probable cause for the stop was that Mr. Edvin Giron had a small paper air freshener (measuring approximately 4 and 1/2 inches by 2 and 1/2 inches in the general shape of a tree) hanging from his rear view mirror.  During the stop, Plaintiff Edvin Giron could not produce a valid Arkansas driver's license.  Officer Leath cited Plaintiff Edvin Giron for driving on a suspended or revoked driver's license and windshield obstruction.  Allegedly because there was no passenger in the vehicle with a valid driver's license,  Officer Leath contacted Metro to tow the vehicle from the scene of the traffic stop.

Plaintiff Edvin Giron retrieved his vehicle from Metro the next morning.  In order to retrieve the vehicle, Plaintiff had to pay  approximately three hundred six dollars ($306.00) for towing and storage fees

The charges against Plaintiff Edvin Giron were later nolle prossed.  Plaintiff Edvin Giron contends that he was actually stopped, charged, and had his vehicle towed because he is Hispanic.

### (4)      Plaintiff Roberto Giron

On May 5, 2007, Officer Leath stopped Roberto Giron's vehicle.  The stated probable cause for the stop was that Roberto Giron made a turn without activating his turn signal, which Mr. Giron denies.  Officer Leath issued Roberto Giron a citation for violation Ark. Code Ann.

27-51-403, which provides in relevant part that "[a] signal of intention . . . to turn right or left shall be given continuously during not less than the last one hundred feet (100') traveled by the vehicle before . . . turning."

During the stop, Plaintiff Roberto Giron could not produce a valid Arkansas driver's license.  Officer Leath cited Plaintiff Roberto Giron for driving on a suspended or revoked driver's license and defective turn signals.  Allegedly because there was no passenger in the vehicle with a valid driver's license,  Officer Leath contacted Metro to tow the vehicle from the scene of the traffic stop.  In order to retrieve the vehicle, Plaintiff Roberto Giron had to pay approximately three hundred fifty dollars ($350.00) for towing and storage fees.

Plaintiff Roberto Giron was later found guilty in Saline County District Court- Alexander Department of the defective turn signal charge.  The court dismissed the charge of driving on suspended or revoked drivers license.

Plaintiff Roberto Giron contends that he was actually stopped, charged, and had his vehicle towed because he is Hispanic.

### (5)    Plaintiff Jose Guitierrez

On May 16, 2007, Officer Leath stopped Plaintiff Guitierrez's vehicle.  The stated probable cause for the stop was that an air freshener and a small rosary hanging from Plaintiff's vehicle was obstructing his view.   During the stop, Plaintiff Guitierrez could not produce a valid Arkansas driver's license.  Officer Leath cited Plaintiff Guitierrez for having a suspended driver's license and no proof of vehicle insurance.

Allegedly because Plaintiff Guitierrez could not produce a valid Arkansas driver's license, Officer Leath contacted Metro to tow the vehicle from the scene of the traffic stop.  In

order to retrieve the vehicle, Plaintiff Guitierrez had to pay  approximately three hundred fifty dollars ($350.00) for towing and storage fees

Plaintiff Guitierrez contends that he was actually stopped, charged, and had his vehicle towed because he is Hispanic.

### (6)   Plaintiff Ruben Duarte

On April 22, 2007, Officer Leath stopped Plaintiff Duarte's vehicle.  The stated probable cause for the stop was that Mr. Duarte had two stickers, one depicting a Mexican flag and another depicting a Guatamalan flag, on the rear window of the van he was driving.[3]  The stickers were placed on the vehicle's rear window – one on each side.  For this alleged offense, Office Leath issued Mr. Duarte issued Plaintiff Duarte a citation for violating Ark. Code Ann. § 27-37-304 and Ark. Code Ann. 27-16-303.

The charges against Plaintiff Duarte were later nolle prossed.

During the stop, Plaintiff Duarte could not produce a valid Arkansas driver's license. There was no passenger in the vehicle with a valid driver's license.  Officer Leath contacted Metro to tow the vehicle from the scene of the traffic stop.  In order to retrieve the vehicle, Plaintiff Duarte had to pay  approximately three hundred six dollars ($306.00) for towing and storage fees

Plaintiff Duarte contends that he was actually stopped, charged, and had his vehicle towed because he is Hispanic.

---

[3]  Plaintiff states that the stickers were only 2 and 1/4 inch tall.

**(7)     Plaintiff Jose Llamas**

In May of 2007, Officer Leath stopped Plaintiff Jose Llamas' vehicle.  The stated probable cause for the stop was that a rosary hanging from Plaintiff's vehicle was obstructing his view.  Similar to the other Plaintiffs, Mr. Llamas was issued a citation.  However, his vehicle was not towed because his brother picked up the vehicle from the traffic stop.  Plaintiff contends that Plaintiff Llamas was still forced to pay the tow truck driver at the scene even though his vehicle was not towed.

The charges against Plaintiff Llamas were later nolle prossed.  Plaintiff Llamas contends that he was actually stopped, charged, and forced to pay the tow truck driver because he is Hispanic.

**(8)     Plaintiff Francisco Arevalo**

In April of 2007, Officer Leath pulled over a vehicle operated by Plaintiff Arevalo.  The stated probable cause for the stop was that Mr. Arevalo's vehicle had a defective brake light.  Officer Leath issued a citation to Plaintiff Arevalo and called Metro Towing to tow the vehicle.

Mr. Arevalo paid $360 to retrieve his vehicle from the towing company.

Mr. Arevalo went to court, plead guilty, and paid a fine for not having a brake light and for not having a valid driver's license.

Plaintiff Arevalo contends that he was actually stopped, charged, and his vehicle was towed because he is Hispanic.

**(9)     Plaintiff Florencia Villanueva**

On May 15, 2007, Officer Leath received a reckless driving call from dispatch.  He was given a vehicle description and an approximate location.  Officer Leath responded to the call and

found a vehicle matching the description parked at a residence in Alexander, Arkansas.  Officer

Leath made contact with an individual at the residence, later determined to be Plaintiff Florencia

Villanueava.  Officer Leath never saw Villanueva operating the vehicle.

There is a dispute of fact as to whether Plaintiff Villanueva was inside his residence or

outside on the porch when Officer Leath came to his home.  It is undisputed, however, that

Plaintiff Villanueava was on his own private property when Officer Leath came to his home.  It is

further undisputed that Officer Leath directed Plaintiff Villanueva to produce a driver's license.

Officer Leath issued citations charging Plaintiff Villanueva with drinking in public and

disorderly conduct.  At a trial on the merits, the Court dismissed the charges on summary verdict

following Officer Leath's testimony, and without any defense testimony.

Plaintiff Villanueva contends that he was charged with both offenses because he is

Hispanic.

### (10)   Plaintiff Alejandro Nunez

The First Amended Complaint contains only 2 paragraphs which mention Nunez.

Paragraph 37 states: "Plaintiff Nunez was likewise stopped in 2007 by an Alexander Police

officer without probable cause, and Nunez was illegally cited in a manner consistent with the

other plaintiffs herein."  Paragraph 38 states: "Plaintiff Nunez was actually stopped because he is

Hispanic."

Defendants move to dismiss Nunez pursuant to Fed. R. Civ. P. 12(b)(6) because he has

failed to state facts sufficient to state a cause of action.  Defendants further state that they have

been unable to depose Nunez, despite repeated requests to do so, and have otherwise been unable

to adequately conduct discovery on his claims.  Plaintiffs oppose the dismissal, stating that

Defendants are partly to blame for not securing a deposition from Nunez.  They state that his deposition was not completed because depositions were scheduled and rescheduled and because he was out of state when the depositions were finally taken.  Plaintiffs also point to the cumulative nature of the testimony in urging the Court not to dismiss his case summarily for failure to prosecute.

The First Amended Complaint contains only general information regarding Nunez.  It does not indicate why he was stopped, for what he was cited, or how the citation was resolved.  The Court finds that it is not fair to Defendants to force them to litigate a case when they have so little information concerning the specific facts giving rise to the claim.  Plaintiffs could have sought leave to make Nunez available for deposition after the discovery cut-off date.  Or, they could have provided Defendants with detailed factual information concerning the nature of Nunez' claim by affidavit until arrangements for deposition could be made.

The Court concludes that it must dismiss Nunez as a party Plaintiff.

### (11)    Defendant Officer Leath

Officer Leath graduated from the Arkansas Law Enforcement Training Academy on or about March 20, 2007.

Officer Leath acknowledged in his deposition that 75% of the citations he wrote for "windshield obstructions" were written to Hispanics.[4]  It further appears that in April and May of

---

[4] Plaintiffs' Addendum, docket entry # 58 at 86.  Plaintiffs have filed a 148 page Addendum in support of their response.  The Addendum is filed in three parts and may be found in the docket as entries # 57, 58 and 59.   From this point forward, citations to Plaintiffs' Addendum will be noted as "Pls.' Add. at __."

2007 nearly half of 100 citations (for all traffic violations) Officer Leath wrote were issued to Hispanics.[5]

During his deposition, Officer Leath acknowledged that he considered it unconstitutional racial profiling for an officer to target persons of a certain race or national origin for traffic stops, even if he was careful to only stop a person when good probable cause existed.[6]  Although Officer Leath denied targeting Hispanics for traffic stops, his testimony is contradicted by two different persons who rode along with him in his patrol vehicle and have offered Affidavits describing how he intentionally targeted Hispanics for traffic stops.

### (12)    Defendant Chief Allen Spears

Mr. Spears is the Chief of Police for the Alexander Police Department ("Department"). He has held that position since May 2002.  According to Alexander Mayor Shirley Johnson, Mr. Spears has complete authority to train, hire, and fire police officers in the Department.[7]

Mr. Spears has submitted an affidavit stating that he has "never received a completed grievance form from anyone including any of the Plaintiffs regarding Officer Leath's handling of traffic stops, unconstitutional treatment of Hispanic individuals, or any other related citations." Further, Mr. Spears states in his affidavit that the policies and procedures for the Alexander Police Department are adopted by the city council, which also votes on any amendments to existing policies and procedures.

---

[5]  Pls.' Add. at 95-96.

[6]  *Id*. at 91-92.

[7]  Pls.' Add. at109.

Mr. Spears and Mayor Shirley Johnson both testified that Mr. Spears created the "Alexander Police Departments Rules and Regulations Manual" for the Alexander Police Department.[8]  Mr. Spears stated that his policy is to investigate citizen complaints about officers, but only if a citizen is willing to come in and fille out a complaint form.[9]

During his deposition, Mr. Spears acknowledged that at some point in mid-2007, he learned that Hispanic persons were upset that they were being treated differently by the Alexander Police Department.  Mr. Spears testified that he investigated the allegation as follows: "I went and pulled the statistics on the citations that had been written and learned that it was untrue."[10]  Mr. Spears stated that because Officer Leath issued the largest percentage of citations to white males, he concluded that the allegations were not true.  Mr. Spears further testified that if in April of 2007, Officer Leath wrote 54 citations, 27 of which were written to Hispanics with the majority of the 27 citations being issued for obstructive windshield, then Officer Leath appeared to be following the department's training and policies.  He further testified that those numbers did not indicate a need for further investigation.[11]

Mr. Spears did nothing further to investigate the allegation of discriminatory police conduct toward Hispanics.  He did not interview anyone.[12]

---

[8]  Pls. Add. at 64, 112.

[9]  *Id.* at 65, 68-69.

[10]  *Id.* at 70.

[11]  *Id.* at 72-73.

[12]  *Id.* at 76.

The Alexander Police Department has no written or official towing policy.  Mr. Spears leaves it to the officer's discretion whether to tow a vehicle when a person does not have a driver's license.[13]  Plaintiffs have alleged that the City of Alexander has a contractual agreement with Metro for the storage and removal of vehicles when requested by the Alexander Police Department, and that the City receives a portion of the fees collected by Metro when a vehicle is towed pursuant to the contract.[14]  The contract is not a part of this record.  The Court presumes Plaintiffs intend to use this evidence at trial to show that such fees motivated the City and Chief Spears to turn a blind eye to Officer Leath's conduct.

## II.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);  *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554-55, 91 L.Ed.2d 265 (1986);  *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005).

The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553.  If the moving party satisfies this burden, the nonmoving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).  A genuine issue of material fact exists only if there is

---

[13]  *Id*. at 90.

[14]  Plaintiffs' Pretrial Disclosure, docket entry # 63 at 4.

sufficient evidence to allow a jury to return a verdict for the nonmoving party.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

## III.   LEGAL ANALYSIS

Plaintiffs pursue claims for violation of their constitutional rights pursuant to 42 U.S.C. §

1983.  Specifically, Plaintiffs claims that Defendants violated  their Fourth Amendment right to

be free from unlawful seizure as well as their Fifth Amendment right to equal protection and due

process, all of which may be enforced against the Defendant state actors through the Fourteenth

Amendment.  Plaintiffs also bring supplemental state law claims.  Because the only state law

claims challenged by Defendants on the merits are Plaintiffs' state law claims for the torts of

conversion and trespass to chattels, those are the only  state law claims discussed in this opinion..

The Court will first discuss separately each federal constitutional claim and, if necessary,

the corresponding issue of qualified immunity, before ending the opinion with a discussion of the

Plaintiffs' tort claims.

### A.   Equal Protection Claim

Plaintiffs bring a Fourteenth Amendment equal protection claim contending that  Officer

Leath engaged in constitutionally prohibited racial profiling by intentionally targeting Hispanics

for traffic stops.[15]  Selective enforcement of the law on the basis of race violates the Fourteenth

---

[15]  Plaintiff Florencio Villanueva was not stopped for the enforcement of a traffic
violation, but rather Officer Leath went to his home after concluding that he might be the person
who had been reported of reckless driving.  Though Villanueva is situated differently from the
other Plaintiffs, the Court will leave his equal protection claim pending as well because the
parties have not briefed the issue of whether the direct evidence of discriminatory animus might
also support Mr. Villanueva's equal protection claim..

Amendment's guarantee of equal protection under the law.  See *Whren v. United States*, 517 U.S. 806,  813, 116 S.Ct. 1769, 1774 135 L.Ed.2d 89 (1996).

The Supreme Court has explained that a claimant alleging selective enforcement of facially neutral criminal laws must demonstrate that the challenged law enforcement practice "had a discriminatory effect and that it was motivated by discriminatory purpose." *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985).

Defendants' argument for dismissal of the equal protection claim is that Plaintiffs have failed to prove that similarly situated individuals were treated differently.  Defendants argue that Plaintiffs can not prove an equal protection violation unless they prove that there is a group of similarly situated Caucasians (or another racial or ethnic group) who violated the Arkansas law[16] prohibiting windshield obstruction, but were not cited (in the case of the 8 Plaintiffs stopped for such offense).  While not specifically discussed, presumably they contend that in the case of Florencio Villanueva, Plaintiffs must present evidence of other races who acted similarly but were not seized and cited for public intoxication at their residence..

Defendants' motion fails to address the direct evidence presented by Plaintiffs.  Plaintiffs have presented affidavits from Joshua Hubbard ("Hubbard") and Max Cainheimer ("Cainheimer"), both of whom rode along with Officer Leath in his patrol car and observed him working patrol.  Cainheimer was employed with the Alexander Police Department from January 2007 to August 2007.  Hubbard rode along as an observer for several months in 2007.

---

[16]  Ark. Code Ann. § 27-37-304.  The statute is examined more closely in connection with Plaintiffs' Fourth Amendment claims.

Joshua Hubbard describes witnessing Officer Leath targeting Hispanics for traffic stops. Hubbard testifies that Officer Leath told him "that he had learned that many Hispanics did not have valid driver's licenses, and we were therefore able to tow their vehicles and write them expensive citations."[17]   Hubbard further states:

> While working patrol, Tommy [Leath] bragged to me that he liked to pretend he was on an MTV reality show called "Tow My Shit."  He specifically targeted Hispanics by their skin color, or sometimes he would see Mexican flags or other symbols that tended to identify the vehicle as belonging to a Hispanic person.
>
> . . .
>
> Sometimes, we stopped people who looked Hispanic, but they turned out to be Chinese, or some other national origin.[18]

Cain Maxheimer affidavit states in part:

> While working patrol with Tommy, he would intentionally target Hispanics for traffic stops.  He would usually stop Hispanics for having some item hanging from their rear view mirror, alleging that it was obstructing their view.  He stated to me that he had learned that many Hispanics did not have valid driver's licenses, and he was therefore able to tow their vehicles and write them expensive citations.  All of the patrolmen were urged to write citations to generate funds for the city.
>
> Tommy told me that he had come up with a new game at work called "Tow My Ride," where the objective was to see how many vehicles he could tow every shift.  He said he specifically targeted Hispanics because he felt it was more likely that he would be able to tow their vehicles.  He would identify Hispanics by their skin color, or sometimes he would see Mexican flags or other symbols that tended to identify the vehicle as belonging to a Hispanic person.
>
> . . .
>
> It was common knowledge around the police department that Tommy mostly only stopped Hispanics.  The Chief of Police knew that this behavior was taking place.  It was often a topic of discussion and humor at the department in the presence of the Chief of Police.

---

[17]  Hubbard affidavit, Pls.' Add. at 44.

[18]  *Id*. at 45-46.

15

. . .

> Tommy Leath actually found favor with the police department because of his activity.  At some point he was promoted to Assistant Chief.[19]

By focusing solely on Plaintiffs' alleged failure to present sufficient admissible evidence that similarly situated Caucasians were treated differently, Defendants ignore the significant direct evidence of Officer Leath's discriminatory intent, purpose and plan.  Such evidence clearly establishes the discriminatory purpose requirement and is arguably sufficient to also support a conclusion that Officer Leath's conduct had a discriminatory effect.

Neither party has cited an Eighth Circuit case where a plaintiff has been able to present direct evidence of an equal protection violation.  However, the Eighth Circuit, in the context of another case involving a racially motivated traffic stop, stated that it would assume that "a prima facie equal protection claim may also be proved by direct evidence of racial discrimination." *Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003).  Unlike this case, in *Johnson* the plaintiff alleged that she was stopped solely because of her race, but presented no other evidence to prove her claim.

The Court rejects Defendants' contention that Plaintiffs may not prevail on their equal protection claims unless they present evidence that a similarly situated group of individuals of another race was treated more favorably.  *See, e.g. Pyke v. Cuomo*, 258 F.3d 107,  (2d Cir. 2001) (clarifying that a plaintiff alleging that "a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner . . . is not obligated" to present evidence of better treated, similarly situated group of individuals of different race to prove equal protection claim).

---

[19]  Maxheimer affidavit, Pls.' Add. at 47-48.

It also appears that Plaintiffs may attempt to present some statistical information to bolster their claim.  Courts in other circuits have held that statistical evidence may be used to establish discriminatory effect.  For example, in *United States v. Duque-Nava*, the court, explaining that it is "virtually impossible to identify a 'similarly situated' individual who was not stopped" concluded that a defendant "challenging a traffic stop for selective enforcement, must be allowed to show discriminatory effect in some other way."  315 F.Supp.2d 1144, 1155-56 (D. Kan. 2004).  The court went on to consider how purely statistical evidence can be sufficient to establish discriminatory effect.

Plaintiff points to the fact that Officer Leath agreed that 75 percent of the people he cited for windshield obstruction were Hispanic.  Defendants have not disputed this statistic.  In fact, Chief Spears testified in his deposition that after receiving complaints that Hispanic persons felt they were being treated differently, he "pulled the statistics on the citations that had been written and learned that it [the claim of discriminatory treatment] was untrue."[20]  Based solely upon the fact that the majority of the total citations written were to white males, Chief Spears concluded that the allegation of discriminatory treatment could not be true.  In reaching this conclusion, it does not appear that Chief Spears factored in the comparative population of Hispanics in the area.  Chief Spears further testified that if Officer Leath in April of 2007 wrote 54 total citations, 27 of which were issued to Hispanics and the majority of the 27 citations written to Hispanics were for windshield obstructions, then Officer Leath would appear to be following the department's policies and that he would see no further reason to investigate.[21]

---

[20]  Pls.' Add. at 70.

[21]  *Id*. at 73.

Plaintiffs claim that they "can produce evidence that a disproportionately high number of the tickets that Officer Leath wrote were to Hispanic persons."[22]  The information before the Court is not sufficient to allow the Court to conclude that such statistical information is admissible to prove discriminatory effect.  At trial, Plaintiffs will have to present evidence of the total Hispanic population in the area to place such proof in context.[23]  Also, they must present evidence to show that any statistical analysis is statistically significant.  See *Adams v. Ameritech Services, Inc.*, 231 F.3d 414, 424 (7th Cir. 2000) ("Two standard deviations is normally enough to show that it is extremely unlikely . . . that the disparity is due to chance . . .").  Of course such evidence may be admissible to show what evidence Chief Spears considered in investigating allegations of discriminatory treatment made against Officer Leath.

In light of significant direct evidence Plaintiffs have presented, the Court rejects Defendants' theory that each and every Plaintiff must offer similarly situated evidence to be permitted to go forward with their equal protection claims.[24]

The Court now considers Plaintiffs' claims as to each particular Defendant.

---

[22]  Pls.' Br. at 24.

[23]  The Court notes that during the deposition of Mayor Johnson, Plaintiffs' counsel indicated that statistical information provided by the City indicated that the Hispanic population in Alexander was 2.3 percent.  (Pls.' Add. at 119).  The Court has not seen that information other than as it was described by Plaintiffs' counsel.

[24]  The Court notes that it appears Plaintiffs may offer some anecdotal evidence of similarly situated persons being treated differently.  For example, Plaintiff Carlos Jauregui testified that he has personally seen African American and white drivers with things on their rearview mirror drive by Officer Leath who were not stopped.  (Pls.' Add. at 138).  Plaintiff Francisco Arevalo describes witnessing non-Hispanic drivers with other violations (no mirrors, broken brake lights, etc.) in the vicinity of police officers who were not stopped.  (Pls.' Add. at 36-37).  The Court offers no opinion at this time on the admissibility and proper use of such evidence, but finds that such evidence is not necessary to prove an equal protection violation.

### (1)     Office Leath

Plaintiffs have presented evidence which, if believed, demonstrates that Officer Leath purposefully and intentionally targeted Hispanics because of their race.  The Court denies Defendants' motion for judgment as a matter of law as to the Plaintiffs' equal protection claims against Officer Leath in his individual capacity.

### (2)     Chief Spears

Chief Spears was Officer Leath's supervisor.  Plaintiffs contend that Chief Spears knew or should have known that Officer Leath was targeting Hispanics but failed to do anything about it.  They further contend that Chief Spears failed to properly train Leath, failed to properly supervise him, and failed to take corrective action.

Chief Spears acknowledges that he learned about the allegation that Officer Leath was racially profiling Hispanics from Plaintiffs' counsel shortly before the lawsuit was filed.  His "investigation" consisted solely of looking at the total number of citations issued, after which he concluded that because the majority of citations issued were issued to white males, the allegations could not be true.  Chief Spears discussed the allegations with Officer Leath, but did not interview any other person as part of his investigation.  Chief Spears also discussed "the numbers" with Shirley Johnson, Alexander's mayor.[25]   Shortly after his investigation, Chief Spears promoted Officer Leath to Assistant Chief of Police.  Plaintiffs will presumably introduce such evidence at trial to demonstrate that his "investigation" was fundamentally flawed and to support their theory that Chief Spears turned a blind eye to  Officer Leath's discriminatory treatment of Hispanics.

---

[25]  Pls.' Add. at 76.

Significantly, this is not the only evidence presented in support of Plaintiff's supervisory liability claim against Chief Spears.[26]   Plaintiffs have also presented evidence that Chief Spears was aware of Officer Leath's targeting of Hispanics while it was occurring.  Cain Maxheimer states in his Affidavit, that "[i]t was common knowledge around the police department that Tommy [Leath] mostly only stopped Hispanics" and that it "was often a topic of discussion and humor at the department in the presence of the Chief of Police."[27]   This evidence, if believed, is sufficient to support a jury finding that Chief Spears failed to adequately supervise Officer Leath to prevent him from violating

Defendants have not disputed this evidence or challenged whether it could have proximately caused the constitutional violations of any of the Plaintiffs.  Because there is a question of fact as to Chief Spears' supervisory liability, the Court can not grant judgment as a matter of law on this claim.

### (3)    City of Alexander

Defendants correctly assert that the City may not be held liable under 42 U.S.C. § 1983 for the unconstitutional actions of Officer Leath or Police Chief Spears based on theories of respondeat superior.  "[A] municipality may not be found liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389 (8th Cir. 2007) (quotations omitted).  The existence of a municipal policy may be established in a variety of different ways.  It appears that Plaintiffs may be relying on at least

---

[26]   Because of this additional evidence, it is unnecessary to address the Defendants' contention that Chief Spears did not find out about the allegations in time to take any corrective action.

[27]   Pls.' Add.. at 48.

three.  First, if Chief Spears is considered a final decision-making authority then his acts alone might establish municipal liability.  Second, an official policy may be established by a government policy of inadequate training or supervision.  Third, an official policy may be established by a "custom."

(a)        **Municipal Liability - Based on Chief Spears' Conduct as Final Policymaker**

The Court will first determine whether Chief Spears may be considered a final policymaker such that his actions (or omissions) alone – without any further proof – may be considered the actions of the City.  Defendants argue that Plaintiffs have failed to provide evidence to permit such a finding.  The Court agrees.

In some circumstances a single act or decision by a final policymaker within his area of authority may be considered official policy of the municipality.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).  In this area of the law there is a distinction between "delegating final policymaking authority to an official, for which a municipality may be held liable, and entrusting discretionary authority to that official, for which no liability attaches."  *Williams v. Butler*, 863 F.2d 1398, 1402 (8th Cir. 1988) (discussing *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988)).  "A clear message from *Praprotnik* is that an incomplete delegation of authority- i.e., the right of review is retained - will not result in municipal liability, whereas an absolute delegation of authority may result in liability on the part of the municipality."  *Id*.

Chief Spears states in an affidavit that the "policies and procedures for Alexander Police Department are adopted by the city council for the City of Alexander."[28] (Exh. 2 to Defs.' reply). Further, he points out that any changes or modifications to existing policies and procedures must be considered, reviewed and voted on by the city council before they may be implemented.

Arkansas statutory law provides that in cities of the First Class, like the City of Alexander, the final policymaking authority shall be vested solely in the city counsel. Ark. Code Ann. §§ 14-43-502, 504 (Michie 1987 & Supp. 1993). Arkansas law also provides that "in cities of the first class, the duty of the chief of the police and other officers of the police department shall be under the direction of the Mayor." Ark. Code Ann. § 14-52-203.

Mayor Johnson testified in her deposition that she delegated to Chief Spears all hiring, firing, and training decision. However, by statute she retained the right to review such decisions, whether she exercised it or not. Because the Mayor of the City of Alexander has the final authority to dictate the official policy of the Alexander Police Department, the Court concludes that Chief Spears, while a policymaker, may not be considered a <u>final</u> policymaker such that his acts alone amount to acts of the City.

This finding does not end the analysis, however, because there are other ways to establish municipal liability.

(b)     **Municipal Liability  – Custom established by accepted pattern**

The Court first considers whether a custom has been established for which the City may be held liable. "A municipal custom is a practice of municipal officials that is not authorized by written law, but which is 'so permanent and well-settled . . . as to [have] the force of law."

_____

[28] Exhibit 2 to Defendants' Reply, docket entry # 65..

*Harris v. City of Pagedale*, 821 F.2d 499, 504 n.7 (8th Cir. 1987) (quoting *Monell*, 436 U.S. at 691). "To establish a constitutional violation resulting from such a custom, a plaintiff must show that his alleged injury was caused by municipal employees engaging in a widespread and persistent pattern of unconstitutional misconduct that municipal policymakers were either deliberately indifferent to or tacitly authorized." *Russell v. Hennepin County*, 420 F.3d 841 (8th Cir. 2004) (citing *Larson v. Miller*, 76 F.3d 1446, 1453 (8th Cir. 1996) (*en banc*). *See also Britton v. Maloney*, 901 F.Supp. 444, 450 (D. Mass. 1995) ("Unlike a 'policy', which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up. Thus, the liability of the municipality for customary constitutional violations derives not from its creation of the custom, but from its tolerance of or acquiescence in it.").

Under a municipal custom theory, the evidence viewed as favorably as possible for Plaintiffs will support a finding that Officer Leath carried out a persistent pattern of violating citizens' constitutional rights by engaging in racial profiling; that Chief Spears, the police chief, was aware of this unconstitutional police misconduct; that Chief Spears was deliberately indifferent or tacitly authorized the unconstitutional acts by failing to take remedial steps after learning that Officer Leath was engaging in unconstitutional acts; and finally, that as a direct result, one or more of the plaintiffs was injured. Proof of these four elements, in the context of a police officer's propensity to commit assault, has been held sufficient to establish municipal liability. *See Parrish v. Luckie*, 963 F.2d 201, 206 (8th Cir. 1992).[29]

---

[29] While there is authority for the proposition that municipal liability may be imposed when a custom is established whether or not official policymakers had actual knowledge of the practice, it is unclear whether the Eighth Circuit agrees with that proposition. *See e.g., Baron v.*

Defendants suggest that Chief Spears never received a "completed grievance" from anyone including any of the Plaintiffs regarding Office Leath's alleged unconstitutional conduct. But, that statement begs the question, at what point did he learn of Officer Leath's alleged practice of targeting Hispanic drivers, whether such knowledge came from a verbal complaint, common knowledge around the office (as Maxheimer states in his affidavit), or any other source? As the Court has already discussed, evidence has been presented which, if believed, will permit a jury to find that Chief Spears knew that Officer Leath was targeting Hispanics, but failed to take corrective action.

Defendants suggest that Officer Leath's conduct could not have occurred over a sufficient period of time to constitute the longstanding and widespread practice necessary to create a custom. Officer Leath completed his law enforcement training on or about March 20, 2007. The alleged violations occurred in April and May of 2007. This lawsuit was filed on June 13, 2007.

The Court rejects this suggestion.[30] Case law instructs that the determination of whether a pattern of conduct existed is specific to the facts of the particular case. In a town the size of

---

*Suffolk County Sheriff's Dept.*, 402 F.3d 225, 242 (1st Cir. 2005) ("Although [S]heriff Rouse may not have had actual knowledge of the custom, however, municipal liability can also be based on a policymaker's constructive knowledge – that is, if the custom is so widespread that municipal policymakers should have known of it.); *Fairley v. Andrews*, 430 F.Supp.2d 786 (N.D. Ill. 2006), aff'd 482 F.3d 897 (7th Cir. 2007) (Plaintiffs need not show that Sheriff . . . had actual knowledge of the danger concerning the code of silence to establish their claim under *Monell*."). The parties have not addressed this issue. Prior to trial, Plaintiffs will have to indicate whether they believe they can establish liability without proving that Chief Spears knew about Officer Leath's practice.   If so, the Court would like Plaintiffs to brief this issue.

[30]   The Court notes that this issue, like many others in the case, has not been adequately briefed by the parties.

Alexander,[31] the number of racially motivated stops appears more than sufficient to establish a pattern. *Brown v. City of Margate*, 842 F.Supp. 515, 518 (S.D. Fla. 1993) ("While the six incidents of alleged excessive use of force in *Carter [v. District of Columbia*] may not have been statistically significant in Washington, D.C., three such incidents may be sufficient to establish a pattern in Margate.").

Plaintiffs may proceed on this theory of municipal liability.

### (c)   Municipal Liability – Based on Failure to Train or Supervise

To successfully impose § 1983 liability based on a failure to train theory, Plaintiffs must demonstrate that the City's failure to train amounts to deliberate indifference to the rights of persons with whom the policy come into contact." *City of Canton v. Harris*, 489 U.S. 378 (1989). "Deliberate indifference may be shown in one of two ways. First, a municipality shows deliberate indifference when it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation. . . . Second, a municipality shows deliberate indifference if it fails to provide further training after learning of a pattern of constitutional violations by the police." *Dunn v. City of Elgin*, 347 F.3d 641, 646 (7th Cir. 2003). Here, it appears that Plaintiffs may be pursuing the second option for demonstrating deliberate indifference.[32]

---

[31]  Neither party has offered evidence regarding the population of Alexander. The Court takes judicial notice that Alexander is listed by the U.S. Census Bureau as having a population of 2,171. A copy of the statement from the U.S. Census Bureau so stating is attached to this Order as Exhibit A.

[32]  Plaintiffs have presented no evidence that the initial training Officer Leath received was inadequate or that the City failed to provide instruction in an area where there was an obvious need for training.

Defendants argue that to prevail on this claim Plaintiffs must show that City officials were deliberately indifferent to the consequences of Officer Leath's unconstitutional action through continued adherence to a training approach "that they knew or should have know has failed to prevent tortuous conduct by employees."  Bryan County, 117 S.Ct. at 1389.  In this case, there is proof that City officials failed to provide any additional training, correction or supervision despite learning that Officer Leath was intentionally targeting Hispanics.  While there will likely be issues at trial regarding Chief Spears (and perhaps other City officials) degree of knowledge and how much opportunity existed for training or supervision, those are trial issues that may not be resolved adversely to Plaintiffs on summary judgment.

In the context of this particular case, it is not clear to the Court whether there is any meaningful difference between a deliberate indifference failure to train or supervise theory and the custom established by pattern of unlawful conduct theory discussed in the previous section. This problem is magnified by the parties' briefs, which do not adequately distinguish and discuss the various theories for establishing municipal liability.  The Court directs the parties to address this issue in their trial briefs and to provide legal support for their respective theories.  It specifically directs Plaintiffs to state exactly which theory or theories of municipal liability they intend to pursue at trial and to specify the elements of such theories.

Additionally, the Court also directs the parties to consider and address the issue of causation in their trial briefs.  That is, can the City's acquiescence in or deliberate indifference to a pattern of unconstitutional conduct be said to have caused the injury sustained by one or more of the Plaintiffs?  The record has not been developed, and the parties have not addressed the issue

of which Plaintiffs, if any, were stopped <u>after</u> Chief Spears had notice (whether actual or

constructive)[33] of Officer Leath's conduct.

Defendants have failed to satisfy their burden to establish, as a matter of law, that the

evidence presented can not support imposing liability on the City for the constitutional torts

committed by Officer Leath and/or Chief Spears.

### (4)    Qualified Immunity for Equal Protection Claims

The Court must determine whether Officer Leath or Chief Spears are entitled to qualified

immunity on Plaintiff's equal protection claims.  Qualified immunity protects a state actor

performing a discretionary function from suit, so long as the alleged conduct does not violate

clearly established federal rights of which a reasonable person would have known.  *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).  The test is

objective, rather than subjective.  *Id*. at 818-19, 102 S.Ct. 2727.

In determining whether an official is entitled to qualified immunity, the Court asks: (1)

whether, taken in the light most favorable to the party asserting the injury, the facts alleged show

that the official's conduct violated a constitutional right; and (2) whether the right was so clearly

established that a reasonable official would understand that his actions violated the injured [or

aggrieved] party.  *Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272

(2001);  *Buckley v. Rogerson*, 133 F.3d 1125, 1128 (8th Cir. 1998).

The Court has already found that the conduct allegedly committed by Officer Leath and

Chief Spears, viewed in a light most favorable to Plaintiffs, is sufficient to demonstrate a

---

[33]  If Plaintiffs contend constructive notice is sufficient then they shall so state in their
trial brief and provide legal support for this contention.

violation of their constitutional right to equal protection.  Thus, the sole issue before the Court is whether a reasonable official in the shoes of Officer Leath and Chief Spears would understand that their actions violated the Plaintiffs' constitutional rights.  It was well established prior to the events in question that the Equal Protection Clause of the Fourteenth Amendment proscribes selective enforcement of the law based upon race.  *See Wren*, *supra*, 517 U.S. 806.  Officer Leath acknowledged in his deposition that he was taught in a racial profiling class at the police academy that it would be illegal to stop a person because they are Hispanic, even if some probable cause could be articulated for the stop.  He acknowledged that such conduct would violate the constitutional rights of the person stopped.[34]

The Court rejects Officer Leath and Chief Spears' claim for qualified immunity as to the equal protection claim.

### B.    Unlawful Seizure - Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  An officer's stop of a vehicle is considered a seizure within the meaning of the Fourth Amendment.  *United States v. Stachowiak*, 521 F.3d 852, 855 (8th Cir. 2008) (citation omitted).  As such, the officer making the stop must have "at least articulable and reasonable suspicion" of illegal activity to stop a motor vehicle.  *Id*. (citing *Delaware v. Prouse*, 440 U.S. 648, 663).

The Supreme Court has held that random stops for driver's license checks are unreasonable under the Fourth Amendment.  *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed. 2d 660 (1979).  It has also held that probable cause that a driver has committed any

---

[34]  Pls.' Add. at 90-92.

traffic violation, no matter how minor, provides sufficient justification under the Fourth Amendment to stop a vehicle.  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L. Ed. 2d 549 (2001).

Plaintiffs have presented evidence sufficient to permit a jury to find that Police Officer Tommy Leath knowingly and intentionally targeted persons of Hispanic origin, including the named Plaintiffs in this action, for traffic stops and that he used pretextual reasons, *i.e.*, alleged violations of the law, to justify such stops.  Defendants correctly point out that Leath's subjective intent plays "no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996).  Accordingly, the Court may not consider the ample evidence of Officer Leath's discriminatory motive in assessing whether he violated the Plaintiffs' Fourth Amendment rights.

The Court must assess whether Officer Leath's stated probable cause for stopping the Plaintiffs' vehicles or for seizing Plaintiff Villanueava at his home is reasonable.

Here, Plaintiffs dispute that Officer Leath had reasonable cause to stop any of the five Plaintiffs stopped for hanging items from their rearview mirror, to stop Plaintiff Duarte from displaying a 2 and 1/4 inch sticker on his rear window, to stop Plaintiff Francisco Arevalo because one of three brake lights was out, or to stop Plaintiff Roberto Giron for failure to display a turn signal.   The Court will address each situation separately.

### (1)  Probable Cause Based on Windshield Obstruction

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."   *Whren*, 517 U.S. at 816.

In the *Wren* case, it was undisputed that the officer in question had probable cause to believe that various traffic offenses had been committed.

Plaintiffs Arnoldo Giron, Edvin Giron, Jose Gutierrez, Juan Carlos Jauregui, and Jose Llamas were stopped because they had items hanging from their rear-view mirrors (either rosary beads, a bandana, or an air freshener).  Plaintiff Duarte was stopped because he had two stickers, each two and one-fourth inches tall, attached to the rear window of his vehicle.  Plaintiffs argue that probable cause was lacking for all of these stops.   Defendants contend that Officer Leath had probable cause to stop these vehicles out of concern that the vision of the drivers was being obstructed by these items.  Even though all of the charges were later nolle prossed, Defendants argue that the charges "could theoretically" have led to a guilty verdict for violating Ark. Code Ann. § 27-37-302 and 27-37-304.

Section 27-37-302 states that:

> [N]o person shall drive any motor vehicle with any sign, poster, or other nontransparent material upon the front windshield, sidewings, side, or rear windows of the vehicle other than a certificate or other paper required to be displayed by law if it obstructs the operator's view or the safe operation of the vehicle.

Section 27-37-304, entitled "[o]bstruction of interior prohibited" reads in pertinent part:

> (a)(1)(A)   It is unlawful for any person to operate a motor vehicle which has any substance or material except rearview mirrors and decals required by law attached to the windshield at any point more than four and one-half inches (4 1/2 ") above the bottom of the windshield if the substance or material obstructs the operator's view or the safe operation of the vehicle.

> (B)      It is unlawful for any person to operate a motor vehicle which has any substance or material attached to the window of either front door except substances or materials attached by the manufacturer if the substance or material obstructs the operator's view of the safe operation of the vehicle.

(2)     The provisions of this section shall not apply to motorists driving motor vehicles registered in other states that have enacted legislation regulating the shading of windshields or windows of motor vehicles and who are driving on Arkansas roads and highways.

(b)     Nothing in this section shall prohibit the shading or tinting of windows of newly manufactured automobiles so long as the newly manufactured automobiles comply with all federal laws pertaining thereto.

(c)     Violation of this section shall constitute a Class C misdemeanor.

Both statutes address items, substances or materials affixed to a vehicles windshield or windows.  Additionally, the statutes are violated only if the item, substance or material affixed to the windshield or windows "obstructs the operator's view or the safe operation of the vehicle." Ark. Code Ann. §§ 27-37-302 and 304.  Initially, none of the items hanging from the rearview mirror were attached to the windshield or windows of the vehicle.  Technically, the statutes arguably do not apply to these violations.  With regard to the stickers attached to Plaintiff Duarte's rear window, the record is unclear whether such stickers were more than four and one-half inches above the bottom of the windshield.  If not, the statute by definition would not apply. In any event, in light of the fact that such stickers were only two and one-half inches tall, it seems extremely unlikely that such stickers could reasonable be deemed to have obstructed Plaintiff Duarte's view or the safe operation of the vehicle.

The Court must determine whether a jury could find that a reasonable police officer would have concluded that any of the items hanging from the rearview mirrors of Plaintiffs Arnoldo Giron, Juan Carlos Jauregui, Edvin Giron, Jose Guitierrez, and Jose Llamas or the two small flags displayed on the rear window of Plaintiff Duarte's vehicle could possibly have obstructed the operator's view or impeded the safe operation of the vehicle.

"Probable cause exists where an officer objectively has a reasonable basis for believing that the driver has breached a traffic law." *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996). The Eighth Circuit has held that a 7-3/4 inch air freshener provided sufficient probable cause for a traffic stop under Nebraska law. *United States v. Ramos-Caracalla*, 375 F.3d 797, 799 (8th Cir.2004). Neither party has cited or discussed the *Ramos-Caracalla* case.

Plaintiffs' brief opposing summary judgment on the Fourth Amendment claims contains references to Officer Leath's racial motivation. It appears that Plaintiffs may have believed that the racial motivation is a relevant consideration in assessing probable cause. Certainly, they have based their case primarily on the claim that Officer Leath intentionally targeted Hispanics and stopped them for traffic violations. Now that the record is clear that such racial motivation may not be considered by the jury to assess probable cause, the Court would like Plaintiffs to consider whether they still wish to pursue the Fourth Amendment claims based on allegedly unlawful traffic stops.[35] If so, the Court concludes that the record would benefit from a more thorough briefing of this issue. The Court notes that the parties have discussed the Plaintiffs as a group when the individual circumstances of each case will control the reasonableness of the stated probable cause. For example, while it seems unlikely that any reasonable officer could have concluded that the small stickers on the rear of Plaintiff Duarte's vehicle obstructed his

---

[35] The Court recognizes that the same evidence is relevant to both the equal protection and Fourth Amendment claims, which may present some challenges in instructing the jury should both claims go to trial. For example, a jury asked to consider both claims will have to be instructed, on one hand to disregard Officer Leath's subjective motivation in determining whether probable cause existed to make the traffic stops, while on the other hand, in considering the equal protection claims, they will be asked to determine whether he was motivated by race to make the traffic stops.

view, it might be more likely that a reasonable officer could have concluded that an air freshener

or bandana obstructed the view.

Assuming Plaintiffs wish to continue to pursue these Fourth Amendment claims, the

Court directs the parties to simultaneously brief the probable cause issues related to the traffic

stops for alleged violations of Arkansas' windshield obstruction law.  The parties shall address

the *Ramos-Caracalla* case and its impact, if any, on each particular Plaintiff's Fourth

Amendment claim, as well as qualified immunity.  The parties shall follow the briefing schedule

set forth at the conclusion of the opinion.

### (2)    Probable Cause for Failure to Use a Turn Signal

Plaintiff Roberto Giron was cited for failure to use his turn signal and driving on a

suspended drivers license.  At trial, he was found guilty of failing to use his turn signal, but

acquitted on the suspended license charge.  Defendants in their motion do not argue that Giron

should be collaterally estopped from denying that he in fact used his turn signal on the day in

question since he pled guilty to that offense in state court in which case he would not be able to

prove that probable cause was lacking for the stop.   The Court will therefore not consider the

issue. *But see Graham v. Hildebrand*, 203 Fed. Appx. 726 (7th Cir. 2006) (applying Illinois law)

(arrestee's conviction for resisting or obstructing peace officer collaterally stopped him from

asserting in subsequent civil rights action that officers did not have probable cause to arrest him

for that offense);  *Wood v. Kesler*, 323 F.3d 872 (11th Cir. 2003)(motorist convicted in state

court of speeding was collaterally stopped from claiming that he was not speeding in subsequent

§ 1983 action against ticketing officer);  *Young v. Kunde*, 698 F.Supp. 163 (E.D. Wis. 1988)

(traffic-court conviction of civil-rights plaintiff for operating vehicle without taillight preclude

claim that officer cited plaintiff without probable cause).  Compare *Davis v. Charleston*, 827

F.2d 317 (8th Cir. 317), on remand 715 F. Supp. 263, *rev'd on other grounds*, 917 F.2d 1502

(conviction for disturbing peace no bar to claim alleging illegal arrest on charge).

This is an issue that Defendants may waive.  Certainly, it would not be appropriate to

resolve it unfavorably to the Plaintiffs when Defendants failed to raise it or brief it in their

opening brief.   Still, because Defendants pled estoppel as an affirmative defense in their Answer

and because the issue is better resolved in advance of trial, the Court will permit Defendants to

be heard further on the issue.   Should they wish to be heard, they may argue the issue in their

opening supplemental brief, which is due on September 25, 2009, and Plaintiffs may respond.

If there is any further briefing on this particular Fourth Amendment issue (recognizing

that Plaintiffs must first indicate their desire to proceed with such claims), the parties shall

discuss the law and facts applicable to this particular Plaintiff rather than just discussing the law

and facts pertaining to those Plaintiffs stopped for alleged windshield obstructions.

### (3)   Probable Cause Based on Brake Light Being Out

Plaintiff Francisco Arevalo, who was allegedly stopped for having a brake light out, paid

his fine.  He testified in this deposition that he believes he was innocent on the charge because

two of his three brake lights were working properly, but concedes that one of his brake lights was

out.  He argues that Arkansas law only requires that vehicles be "equipped with at least two (2)

stop lamps" on the rear of the vehicle and since one stop lamp was working on each side, there

was no basis for the stop.  Ark. Code Ann. 27-36-21.   The Court can not determine as a matter

of law, on this record, that a reasonable officer would have concluded that one stop lamp being

out justified a stop. The parties simply have not focused their briefs on the law and facts

applicable to this particular Fourth Amendment claim sufficiently for the Court to grant summary judgment on the issue.  Also, Defendants have not presented a legal argument on qualified immunity with regard to his particular issue.

Finally, a collateral estoppel argument is lurking.  Like the Roberto Giron situation, Defendants' motion does not address the preclusive effect, if any, of the fact that Arevalo paid his fine in state court.  However, Arevalo, in his response brief, concedes that paying a fine results in a finding of guilty and that "after being adjudicated guilty one is normally collaterally stopped from re-litigating the issue."[36]   But Arevalo goes on to argue that his guilt in state court should be irrelevant to the merits of this case because he paid the fine for convenience, essentially arguing that he did not have a fair and full opportunity to litigate the issue.

Once again, Defendants have not addressed the estoppel issue.  They may choose to do so in their opening supplemental brief, to which Plaintiffs may respond.  The same caution applies regarding the requirement that the parties should frame any discussion of Arevalo's Fourth Amendment claim in terms of the law and facts applicable to his particular situation.

### (4)        Probable Cause to Seize Florencia Villanueva

Defendants argue in their motion that it is undisputed that Officer Leath approached Villanueva to investigate a report that a vehicle matching the description of a vehicle found parked nearby had been driving recklessly.  Office Leath contends that he asked Villanueva for his driver's license, that Villanueava adamantly refused to comply, and that he placed him in handcuffs and was going to arrest him when he received another call.  He then removed the

---

[36]  Pls.' Resp. Brief, docket # 56 at 10.

handcuffs and cited him for Public Intoxication and Disorderly Conduct.  The incident lasted approximately ten minutes.

Villanueva tells a different story.  According to Villanueva, he was inside his residence, a trailer, when Officer Leath approached.  Villanueva saw Leath approaching, came outside, and met him under an overhang at the front part of the trailer.  Officer Leath asked who the vehicle belonged to.  When Villanueva said that the vehicle was his, Officer Leath asked for his identification and immediately placed him in handcuffs.  Villanueva states that he had driven the vehicle straight home from work, where he had washed it while listening to music and drinking beer. He acknowledges that he had consumed eight beers when the incident occurred.  Villanueva states that he promptly provided Office Leath with his identification card, upon request, and he denies raising his voice.

Neither party has briefed whether the alleged dispatch call[37] reporting that a vehicle was being driven recklessly provided Officer Leath with reasonable suspicion that justified his seizing Villanueva at his residence.   The vehicle was not being driven at the time Officer Leath located it.  No violation other than alleged reckless driving had been reported.  Officer Leath argues that he suspected drunk driving might have been to blame for the reckless driving.  However, there was no driver present when Officer Leath found the vehicle, no witness who said someone had been driving the vehicle, and no other evidence suggesting the vehicle had been recently operated.   assuming that the driver of the vehicle could not be arrested for drunk driving or reckless driving in his own home, Officer Leath's conduct in going to Villanueava's residence,

---

[37]   No details about the dispatch call have been provided.  It would be interesting to note exactly when the call cam in, what was reported, and the actual description of the vehicle.

invading his private property, asking him for identification and immediately handcuffing him is troublesome.

A person is "seized" by the police and thus entitled to challenge their action under the Fourth Amendment if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).  Defendants do not deny that Villanueva was seized, but they argue that Officer Leath's conduct was justified by reasonable suspicion and/or probable cause.  They contend that Officer Leath had reasonable suspicion to stop and detain Plaintiff to determine whether he was the person who had been driving the truck recklessly.

Defendants argue that Officer Leath's arrest of Villanueva should be considered constitutionally valid "even if the offense for which there was probable cause is not closely related to the offense stated by the arresting officer at the time of the arrest."[38]  Defendants cite the Supreme Court decision in *Devenpeck v. Alford*, 543 U.S. 146, 154-55, 125 S.Ct. 588, 594-95, 160 L.Ed.2d 537 (2004) for this proposition.  This is a correct statement of the law, but is not outcome determinative under these particular facts.

Defendant argues that even assuming Officer Leath had no probable cause to cite Villanueva for public intoxication and disorderly conduct, he would have had probable cause to cite him for obstructing governmental operations in violation of Ark. Code Ann. § 5-54-102.[39]  The basis for this charge is not entirely clear to the Court, but would apparently be that

---

[38]  Defendants' Reply Brief at 6.

[39]  Defendants do not reference any particular portion of the statute.  Presumably, they are relying on  the provision, at subsection (a), making it an offense to knowingly obstruct, impair, hinder the performance of any governmental function.

Villanueva failed to provide his identification quickly enough to satisfy Office Leath.  But, there is a question of fact as to whether Villanueva's conduct provided a reasonable basis for such a charge.

Officer Leath did not witness Villanueva driving the truck.  While he may have suspicioned drunk driving, the sole report was reckless driving, a misdemeanor offense.  Based solely on such report, Officer Leath went to Villanueva's home, asked him for identification, and placed him in handcuffs.  The reasonableness of a seizure under the Fourth Amendment is determined "'by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests.'"  *Hiibel v. Sixth Judicial Dist. Court of Nevada*, 542 U.S. 177, 188, 124 S.Ct. 2451, 2459   (2004) (quoting *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

The facts before the Court, viewed in a light most favorable to Villanueva, will not permit the Court to find as a matter of law that Officer Leath's seizure of Villanueva was objectively reasonable.  Defendants' motion as to Villanueva must therefore be denied and Plaintiffs' Fourth Amendment claim against Officer Leath may proceed.  Defendants have not, in the context of this particular constitutional tort, briefed the law or argued the facts sufficiently to permit any ruling on whether Officer Leath might be entitled to qualified immunity.

Finally, neither party has addressed the significance, if any, of the seizure's occurrence on private rather than public property.  "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980).  Villanueva was not seized inside his home, but was seized at his home on his own property, and cited for public

intoxication on a private residence.  The Court directs the parties to consider whether and if so, how, this impacts the Fourth Amendment analysis.

### C.      Due Process

The due process clause prohibits the states from depriving "any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV § 1.  Plaintiffs are pursuing claims under both the substantive and procedural components of due process.  Defendants challenge both claims.  For the reasons explained below, the Court agrees that these claims must be dismissed.

### (1)      Substantive Due Process

Although neither side has addressed it, there is authority for the proposition that when conduct is covered by a more definite provision of the Constitution, then such conduct may not be challenged as a substantive due process violation.  As the Supreme Court has explained:

> Because we have "always been reluctant to expand the concept of substantive due process," *Collins v. Harker Heights, supra,* at 125, 112 S.Ct., at 1068, we held in *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994).

*County of Sacremento v. Lewis*, 523 U.S. 833, 842, 118 S.Ct. 1708, 1714 (1998) (omitting some quotations).

Here, Plaintiffs are pursuing both equal protection and unlawful seizure claims, while also attempting to state a substantive due process for the same conduct.  Plaintiffs are attempting to recover under substantive due process principles for the same conduct that gives rise to their

equal protection claim.  In arguing against the dismissal of their substantive due process claim, Plaintiffs point out that "Plaintiffs allege that they were stopped by police because of their race and/or national origin and that the City of Alexander has failed to properly train, supervise, and investigate its officers."  (Pls.' br. at 19).  To allow Plaintiffs' substantive due process claims to proceed would run contrary to the Supreme Court's holding in *Lewis*.  In the Court's view, the application of these more specific constitutional protections makes the substantive due process claim unnecessary and unavailable as a matter of law.

The Court holds as a matter of law that Plaintiffs' substantive due process claims should be dismissed.  The Court recognizes that the parties have not briefed this issue.  Accordingly, if the Plaintiffs (or Defendants) have a different view of the applicable law, they may file a motion for reconsideration in order to be further heard on this issue.

### (2)        Procedural Due Process

Defendants argue, based on *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), that the sole focus should be on whether adequate post-deprivation remedies existed. In *Hudson* the Court held "that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available."  *Hudson,* 468 U.S. at 533;  *See also City of Los Angeles v. David*, 538 U.S. 715, 719, 123 S.Ct. 1895, 155 L.Ed.2d 946 (2003) (per curiam) (pre-deprivation hearing on decision to tow is impossible if city is to be able to enforce parking rules).

Plaintiffs concede this point and focus only on post-deprivation remedies. They argue that they were denied procedural due process due to the lack of any meaningful post-deprivation process for the recovery of the sums they paid for vehicle towing and storage. Thus, the focus is on whether the post-deprivation remedies provided to the Plaintiffs were constitutionally adequate.[40]

Defendants argue that Plaintiffs may not prevail on their procedural due process claims because Arkansas law provides several meaningful post-deprivation remedies. Defendants argue that Plaintiffs could have: (1) filed a written complaint with the Alexander Police Department; (2) filed a complaint with the Arkansas Towing and Recovery Board, the state agency which oversees towing businesses in Arkansas; or (3) filed a tort action for conversion.

Plaintiffs argue that the City's lack of a tow policy supports their claim. They contend that the City of Alexander denied Plaintiffs procedural due process because it failed to enact a policy for towing vehicles. They point out that Arkansas law requires that cities enact policies governing the towing of vehicles and that the City of Alexander acted in violation of this requirement. Arkansas law provides that "[a]ny law enforcement agency which directs the removal of unattended or abandoned vehicles shall adopt a written vehicle removal policy, the

---

[40] While it has not been raised in this case, there is authority for the proposition that the *Hudson* doctrine (also known as the *Parratt/Hudson* doctrine) does not apply when the deprivation is pursuant to established policy or custom of a local government entity, i.e. there is municipal liability because there the deprivation may not be considered random or unauthorized. *See Woodard v. Adrus*, 419 F.3d 348 (5th Cir. 2005) (because plaintiff "established that she was deprived of her property without due process of law through the custom or practice of a state agent acting under color of state law" *Parratt/Hudson* doctrine did not apply); *Wilson v. Civil Town of Clayton, Ind.*, 839 F.2d 375, 380 (7th Cir. 1988)("a complaint asserting municipal liability under *Monell* by definition states a claim to which *Parratt* is inapposite.").

provisions of which shall not be in conflict with this chapter."  Ark. Code Ann. § 27-50-107(a)(1).

However, Arkansas law does not require such policies to address the issue of whether a citizen who alleges that his vehicle was wrongfully or unlawfully towed may recover the amounts paid to recover the vehicle.  The law mandates that vehicle removal policies contain only one provision, that is, such policies "shall provide that owner preference as defined by this subchapter shall be offered to the owner . . . [or his or her agent] . . . except in those instances where an emergency exists or where the immediate clearing of a public thoroughfare mandates an expedited towing service."  *Id*. at 27-50-107(2)(A).  Thus, even if Alexander had enacted a towing policy, there is no evidence before the Court that such policy would have benefitted the Plaintiffs in either avoiding having their vehicles towed or in obtaining reimbursement for the monies spent to recover them from the towing companies.  At most, it would have allowed Plaintiffs to choose the towing company selected to tow their vehicles.  There simply is no evidentiary basis for Plaintiffs' suggestion that a tow policy, if Alexander had adopted one, would have provided a procedure or means by which "innocent persons" could be reimbursed "for the large amounts they had to pay for vehicle towing and storage."  (Pls.' Br. at 18).  And, Plaintiffs do not alleged that their rights were violated because they were not permitted to select a towing company.

Further, the fact that the City may have violated state law "is neither a necessary nor sufficient condition for a finding of a due process violation."  *Stern v. Tarrant County Hosp. Dist.*, 778 F.2d 1052, 1059 (5th Cir. 1985).  *See also Gerhart v. Hayes*, 201 F.3d 646, 650, rev'd in part on other grounds, 217 F.3d 320 (5th Cir. 2000) ("The fundamental issue in due process

law is not whether state officials violated state law, but whether they provided the plaintiff with constitutional minima"); *Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157, 1164 (10th Cir. 2003) (A "violation of state law cannot give rise to a claim under Section 1983.").

Plaintiffs further complain that the relief provided by the Towing and Recovery Board was meaningless to Defendants because of the statutory 30 day time limit for challenging a vehicle removal as unlawful. Ark. Code Ann. § 27-50-1207(e)(1). Plaintiffs argue that because their charges had not been adjudicated within 30 days that this remedy was unavailable to them. In making this argument, Plaintiffs equate the filing of a claim with the resolution of a claim. There is no evidence to show that Plaintiffs could not have filed a timely challenge with the Board and then asked to stay consideration of the charge until the traffic charge was resolved.

Finally, Plaintiffs have filed a tort action for conversion in this very case. Plaintiffs have not explained why that remedy is inadequate. In *Ali v. Ramsdell*, 423 F.3d 810, 814 (8th Cir. 2005), the court noted with approval that the district court's holding that the plaintiff's procedural due process claim was foreclosed because "'plaintiff's state law conversion claim will provide her with an adequate remedy for her alleged injury.'"

The Court agrees with Defendants that Plaintiffs have failed to satisfy their burden to show that the available post-deprivation remedies are inadequate. Accordingly, Plaintiffs' procedural due process claims will be dismissed.

**D.     42 U.S.C. § 1981 Claims**

Plaintiffs allege that Defendants' racially discriminatory actions also violated 42 U.S.C. § 1981, which provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Defendants argue that Plaintiffs can not prevail on a § 1981 claim because they have failed to allege and can prove no facts to show that there was a contractual relationship or a contractual interest between Plaintiffs and any of the Defendants. Plaintiffs dispute that it is necessary to prove a contractual relationship between the Plaintiffs and one or more of the Defendants in order to prevail.

In support of their argument, Defendants cite two cases, *Green v. Dillard's Inc.*, 483 F.3d 533, 538 (8th Cir. 2007), and *Daniels v. Dillard's, Inc.*, 373 F.3d 885 (8th Cir. 2004). In both cases, the plaintiffs, customers of the retail chain, contended that Dillard's had discriminated against them on the basis of their race and thereby interfered with the making and enforcement of contracts. The "make and enforce contracts" clause is only one part of § 1981. Section 1981(a) protects not only the right "to make and enforce contracts" but also the right "to sue, be parties, give evidence, and to the full benefit of all laws and proceedings for the security of persons and property." 42 U.S.C. § 1981(a).

Plaintiffs are seeking to enforce the "full and equal benefit" clause of § 1981. Their theory is not that Defendants interfered with their right to make and enforce contracts, but rather that they denied them the full and equal benefit of the law because of their race. Accordingly, " a contractual relationship is not a prerequisite to a viable claim." *Moonblatt v. District of*

*Columbia*, 572 F.Supp.2d 15, 25 (D. D.C. 2008) (holding that former prison inmate's § 1981

discrimination claim against private contractor hired to run detention center fell under the "full

and equal benefit" clause and not the "make and enforce contracts" clause). Instead, they need

only prove that Officer Leath conduct was motivated by a racially discriminatory purpose.

*Devan v. City of Des Moines, Iowa*, 767 F.2d 423 (8th Cir. 1985).

The Court denies Defendants' motion for summary judgment on this claim.

### E.        State Law Torts of Conversion and Trespass to Chattels

Plaintiffs contend that because the Metro Towing is a contractual agent for the City, that

agency principles should apply and the City should be liable to the extent the tow company may

have unlawfully converted Plaintiffs' property or trespassed upon it. Defendants sole challenge

to the conversion claim is based on the assertion that Officer Leath acted lawfully when he

directed that their cars be towed. For this proposition, they rely on *Thompson v. State*, 333 Ark.

92, 966 S.W.2d 901 (1998).

Defendants' reliance on *Thompson* is misplaced. While *Thompson* reaffirmed the

authority of the police to impound and inventory a vehicle when the driver is physically unable to

drive the car and leaving it on the side of the road would create a safety hazard, it made clear that

such authority exists "only if the actions are taken in good faith and in accordance with standard

police procedures or polices." *Id*., at 97.

There is an issue in this case regarding Officer Leath's good faith. Additionally, the fact

that the City allowed its officers total discretion in determining whether to tow a vehicle raises

issues as to the standard policies and procedures used by the City.  The Court denies Defendant's motion as to these claims.

## CONCLUSION

For the reasons stated herein,

IT IS HEREBY ORDERED that Plaintiff Alejandro Nunez be dismissed as a party plaintiff without prejudice for failure to prosecute.

IT IS FURTHER ORDERED THAT the motion for (partial) summary judgment filed by Defendants City of Alexander, Allen Spears and Tommy Leath (Docket No. 46) be, and it is hereby, GRANTED IN PART AND DENIED IN PART.  The following claims are dismissed with prejudice: (1) all substantive due process claims; and (2) all procedural due process claims. The motion is denied with regard to the equal protection claims, the 42 U.S.C. § 1981 claims, the state law conversion and trespass to chattels, and the Fourth Amendment claim as to Florencio Villanueva.

The following briefing schedule is imposed.

**September 18, 2009** – Plaintiffs shall advise the Court and Defendants whether they still wish to pursue the Fourth Amendment claims or whether they consent to the dismissal of any or all of such claims.

**September 25, 2009** - Simultaneous briefs due on any remaining Fourth Amendment claims.[41]

---

[41]  In the event such briefs are filed, the Court will treat Defendants' brief as a supplemental motion for summary judgment.

**October 9, 2009** - Response briefs due.

IT IS SO ORDERED this __11th__ day of Sseptember, 2009.

_____Garnett Thomas Eisele_____
UNITED STATES DISTRICT JUDGE



**UNITED STATES DEPARTMENT OF COMMERCE**
**Economics and Statistics Administration**
**U.S. Census Bureau**
Washington, DC 20233-0001
OFFICE OF THE DIRECTOR

**MAR 0 4 2008**

FROM THE DIRECTOR
U.S. CENSUS BUREAU

This is an official statement of the Census 2000 population and housing unit counts for
Alexander city, Arkansas. These counts reflect boundary updates reported to the
U.S. Census Bureau effective as of June 26, 2006. These counts also reflect any changes
previously made to Census 2000 counts under the Census Bureau's Count Question
Resolution Program.

According to the official returns of the TWENTY-SECOND DECENNIAL
CENSUS OF THE UNITED STATES, on file in the U.S. Census Bureau,
the counts as of April 1, 2000, for Alexander city, Arkansas are:

Population ........................... 2,171
Housing Units ..................... 890

Sincerely,

Steve H. Murdock

---

The official counts are based on boundaries that the Census Bureau uses for data collection and tabulation
purposes only; their depiction and designation for statistical purposes do not constitute a determination of
jurisdictional authority or rights of ownership or entitlement.

January 1, 2000, was the official date for boundaries used to tabulate the April 1, 2000, Census 2000
counts.

The Census 2000 counts used for Congressional apportionment and provided for legislative redistricting
and Census 2000 data products will remain unchanged.

If you require additional information, please call the Census Bureau's Geographically Updated Population
Certification Program Staff on 301-763-2419.



U S C E N S U S B U R E A U
*Helping You Make Informed Decisions*

EXHIBIT
*A*