**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**ARNOLDO GIRON, et al.**                                     **PLAINTIFFS**

**vs.**                          **CASE NO.  4:07-CV-00568 GTE**

**CITY OF ALEXANDER, ARKANSAS, et al.**                  **DEFENDANTS**

**MEMORANDUM OPINION**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**Table of Contents**

I.      OVERVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
II.     PROCEDURAL AND FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . .  4
III.    FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        A. The Setting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        B. Alexander's Financial Problems  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
                1. Lorraine Hatcher . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
                2. Pat Marshall . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
                3. Causley Edwards  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12
        C. The Citations Issued by Officer Tommy Leath . . . . . . . . . . . . . . . . . . . . . . . . . 13
                1. Witness Jamie Guardado . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
                2. Plaintiff Ruben Duarte . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
                3. Plaintiff Edvin Giron . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
                4. Plaintiff Roberto Giron . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
                5. Plaintiff Jose Gutierrez . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
                6. Plaintiff Francisco Arevalo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
                7. Plaintiff Florenico Villanueva . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        D. Leath Intentionally Targeted Hispanics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
                1. Direct Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
                        a. Joshua Hubbard  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
                        b. Cain Maxheimer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
                        c. Credibility Determination  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
                2. Numerical Evidence Regarding Citations  . . . . . . . . . . . . . . . . . . . . . . . . 36
                        a. The Numbers  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
                        b. Significance of the Numbers  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
        E. The City's Knowledge  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
        F. The Lawsuit and the City's Response  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
IV.     CONCLUSIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50
        A. Equal Protection  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
                1. Individual Liability  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
                        a. Defendant Tommy Leath . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
                        b. Defendant Allen Spears  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
                2. Municipal Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

B.  § 1981 Claim  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
C.  Fourth Amendment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
      1. Windshield Obstruction Traffic Stops   . . . . . . . . . . . . . . . . . . . . . . . . . 66
      2. Turn Signal Traffic Stop  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
      3. Seizure at Residence   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
D.      Conversion and Trespass to Chattels   . . . . . . . . . . . . . . . . . . . . . . . . . . . . .79
V.      DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
      1. Compensatory Damages   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
      2. Punitive Damages   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
VI     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

## I.      OVERVIEW

*As a Law Enforcement Officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all men to liberty, equality and justice.*

**– Law Enforcement Code of Ethics, signed by Defendant Leath on January 8, 2007.  *See* Defendant's Exhibit 3.**

For the reasons explained below, the Court concludes that Defendant Alexander Police Officer Tommy Leath, contrary to his own sworn oath, violated the constitutional rights of each of the Plaintiffs whose claims were tried in this proceeding.  Officer Leath engaged in racial profiling prohibited by Arkansas statute, the Arkansas Constitution, the United States Constitution, and the City of Alexander's own written policy.  Officer Leath also illegally seized one of the Plaintiffs, thereby violating the Fourth Amendment of the United States Constitution and the Arkansas Constitution.  Chief Spears, who supervised Officer Leath and ran the Alexander Police Department ("Department"), was deliberately indifferent to ongoing and systemic racial profiling of which he was aware.  Additionally, municipal liability is imposed on the City of Alexander because it permitted Office Leath to establish and to carry out a custom and practice of engaging in racial profiling.

It is useful to define the term "racial profiling" as used in this case.  The term does <u>not</u> refer to a situation in which a person's race or ethnic characteristics are legitimately considered by an officer in deciding whether to apprehend an actual suspect in a known crime.[1]  Nor does it present the more difficult and complex issues arising when factors such as race, nationality, sex, religion, language, and certain personal characteristics – and reasonable inferences drawn therefrom – may rationally and reasonably be considered to narrow the focus of an investigation, or to help in the identification of likely suspects.  Assuming such factors have been validated by objective, scientifically or statistically based data, investigators in such situations are not required to close their eyes (or minds) to those facts and circumstances any rational investigator would consider, along with all other pertinent information, in preventing or solving crime.

Arkansas law reflects this dichotomy by defining the term "racial profiling" as follows:

(a)    For purposes of this subchapter, "racial profiling" means the practice of a law enforcement officer's relying to any degree on race, ethnicity, national origin, or religion in selecting which individuals to subject to routine investigatory activities or in deciding upon the scope and substance of law enforcement activity following the initial routine investigatory activity.

(b)    "Racial profiling" does not include reliance on the criteria in connection with other identifying factors when the law enforcement officer is seeking to apprehend a specific suspect whose race, ethnicity, or national origin is part of the description of the suspect and the description is thought to be reliable and locally relevant.[2]

This statute also prohibits all Arkansas law enforcement officers from engaging in racial profiling.[3]

---

[1]  Some commentators have dubbed such situations "criminal profiling" to distinguish them from racial profiling cases like the one before the Court.  *See, e.g.*, Anthony E. Mucchetti, Driving While Brown: A Proposal for Ending Racial Profiling in Emerging Latino Communities, 8 Harvard Latino L. Review 1 (2005).

[2]  Ark. Code Ann. § 12-12-1401.

[3]  Ark. Code Ann. § 12-12-204(a).

Here it is clear, based on the Court's findings, that Officer Leath's true objective was not to enforce traffic laws prohibiting people from driving with their vision obstructed or other minor infractions.  Rather, the neutral traffic laws were used as a pretext for harassing Hispanics (whether here legally or illegally),[4] for obtaining money through fines and towing charges for the financially troubled City of Alexander, and to provide an incentive for Hispanics to move out of the area – clearly illegitimate objectives.

## II.    PROCEDURAL AND FACTUAL BACKGROUND

The action was originally filed by ten Hispanic Plaintiffs.  Plaintiffs allege that they were victimized by the Defendants' "routine and continuing practice of race and national origin-based traffic stops, detentions, searches, charges, and discriminatory and oppressive vehicle towing policies."[5]  The named Defendants in the action are the City of Alexander ("City" or "Alexander"), Alexander Police Chief Allen Spears ("Spears"), and Alexander Police Officer Tommy Leath ("Leath").  Plaintiffs claim that Defendants violated the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution, 42 U.S.C. § 1981, the Arkansas Civil Rights Act of 1993, the Arkansas Constitution, and the Arkansas common law torts of trespass to chattel and conversion.  Plaintiffs seek compensatory damages against all Defendants, and also seek an award of punitive damages against Defendants Spears and Leath.   During the summary judgment phase, the Court granted Defendants' Motion for Summary Judgment on Plaintiffs' substantive and procedural due process claims, but permitted all other claims to proceed.[6]  The

---

[4]  Before the trial began (and when the case was still scheduled to be tried to a jury), the Court granted a motion in limine which excluded evidence regarding whether the Hispanics stopped by Leath for a traffic violation were here legally or illegally.

[5]  Amended Complaint, docket entry # 29 at ¶ 2.

[6]  See Memorandum Opinion filed September 11, 2009, docket entry # 70.

Court requested additional briefing on the Fourth Amendment claims.  In response, Defendants filed a Supplemental Motion for Summary Judgment.  The Court took the motion under advisement and did not resolve it before trial.[7]

The trial began with seven Plaintiffs:  (1) Edvin Giron; (2) Roberto Giron; (3) Jose Gutierrez; (4) Ruben Duarte; (5) Jose Llamas; (6) Francisco Arevalo; and (7) Florencio Villanueva.  Plaintiffs Arnoldo Giron and Juan Carlos Jauregui were non-suited on the first day of trial and dismissed without prejudice.[8]  Jose Llamas was dismissed without prejudice at the conclusion of the Plaintiffs' case after he did not appear for trial.[9]

Although the parties originally had requested a jury trial, shortly before trial they waived that right and asked that the case be tried to the Court.  The bench trial began on October 26, 2009, and concluded on October 28, 2009.[10]

At the conclusion of the trial, the Court took the case under advisement and requested additional briefing from the parties.  The Court left the record open for either party to submit additional information regarding the Hispanic population living or driving in Alexander and the surrounding area.  The Court asked Defendants to provide a list of all misdemeanor traffic violation laws or ordinances and associated fines which were in effect in 2007.

---

[7]  The motion has since been dismissed as moot.

[8]  Defense counsel stated that he knew that Arnoldo Giron had been deported, and that he believed, but could not confirm, that Juan Jauregui had been as well.

[9]  Plaintiffs' counsel stated that he believed that Llamas was too scared to appear in Court.

[10]  The three volume transcript of these proceedings appears in the record as docket entries # 92 (pages 1-227); # 93 (pages 228-396) and # 94 (pages 397-593).  Throughout this opinion, "Tr. __" references a page number(s) from the transcript.

Both parties have submitted proposed findings of fact and conclusions of law.  Neither party submitted additional information regarding the Hispanic population.  Defendants submitted the list of traffic violations and corresponding fines.[11]  In addition to the witnesses who testified at trial, the Court admitted the deposition of former Plaintiff Arnoldo Giron under Fed. R. Evid. 804.  Finally, the record also includes the deposition transcripts of all parties to this action.[12]

After a review of the parties' submissions and a full consideration of the record, the Court now sets forth its findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).

## III.   FINDINGS OF FACT

### A.      The Setting

 The events in question occurred in or near the City of Alexander, a small community in Saline County.  Alexander is located between the towns of Bryant (to the West) and Shannon Hills (to the East).   It also is bordered by Little Rock to the Northeast.

Shirley Johnson, Alexander's Mayor since 1991, represented the City at trial.  Mayor Johnson hired Police Chief Allen Spears in approximately 2004.[13]  In 2007, Chief Spears worked 39 hours a week and was considered a part-time officer.  Johnson delegated to Spears complete

---

[11]  The list is designated as Court's Exhibit 3.

[12]   Before the trial started the Court requested complete copies of the deposition transcripts of the parties.  At that time the Court still was considering Defendants' request for summary judgment as to the Fourth Amendment claims.  Although the Court did not grant summary judgment on those claims, it considers the deposition transcripts of all <u>parties</u> who testified at trial to be admissible evidence in the case.  This is within the Court's inherent authority.  *See, e.g.*, Fed. R. Evid. 614 (describing Court's authority to call and to interrogate witnesses).  In a bench trial, the Court often finds it useful to consider the deposition transcripts of the parties, particularly when, as in this case, the Court is required to make credibility determinations.

[13]  Tr. 233.

authority to operate the Police Department, including all hiring, disciplinary, and firing decisions.[14]

In August of 2004, Tommy Leath began working as an officer for the Alexander Police Department.[15]  From January through March of 2007, Leath attended the Arkansas Law Enforcement Training Academy ("ALETA") in Camden, Arkansas, to become a certified officer. During this time period, Leath did not work full-time as an Alexander police officer, although he did work some - - primarily on weekends.   On March 30, 2007, he graduated from ALETA and returned to his full-time duties as an Alexander police officer.

The Alexander Police Department, the mayor's office, and the Alexander courtroom are all located in the same building.[16]  The City operates as a small, closely knit organization in which City employees know one another and routinely interact.  Johnson and Leath's offices are two doors apart.

Originally, Metro Towing also was named as a defendant in this action; however, Plaintiffs settled all claims with Metro Towing before trial. The City had a written contract with Metro Towing for towing vehicles, and a copy of the contract was admitted as Plaintiff's Exhibit 13.  Metro paid the Alexander Police Department a "franchise fee" of 10% for every vehicle towed.  All such fees collected went directly to the Department.[17]   Since the standard towing charge was $130.00, each towed vehicle generated $13.00 for the Department.[18]

---

[14]  Tr. 243.

[15]  Tr. 7.

[16]  Tr. 241.

[17]  Tr. 254.

[18]  Plaintiffs had to pay between $306 and $350 to recover their towed vehicles. Presumably the additional charge was for storage, although this was not explained at trial.

The Department realized a total of $1600 from towing fees in 2007. That was a small fraction of its total revenue for the year of $289,488, which also included $56,892 from an allocated portion of the city sales tax, and annual appropriations of $230,996, from the Alexander city council.[19] While it appears that substantial revenue also was generated from fines and court costs from misdemeanor offenses, no evidence was presented at trial to quantify this sum or to show how much of it was allocated to the Alexander Police Department. It is clear, however, that this was an important source of revenue to the City and the Department. Additionally, in 2008, the City was sued by the State of Arkansas for back taxes.[20] Thus, it seems likely that the City was behind on its taxes when the events at issue in this lawsuit occurred.

The Department had no policy regarding the towing of vehicle. Chief Spears left the decision whether to tow a vehicle up to each individual officer. This gave Leath complete discretion in determining whether to require a stopped vehicle to be towed when the driver of the vehicle had no valid driver's license.

### B.    Alexander's Financial Problems

Alexander struggles financially.[21] This fact was well known to all Defendants. These financial problems provided a partial motive for Leath to issue traffic tickets. It also played a part in Mayor Johnson's decision to ignore a citizen's complaint about Leath, made in late April or early May of 2007. It also contributed to Spears's decision to turn a blind eye to Leath's unlawful targeting of Hispanics.

---

[19]  Tr. 290, 477.

[20]  Tr. 238.

[21]  *Id.*

At trial, Defendants argued that collecting $13 from Metro for each vehicle Leath had towed was not alone sufficient to have motivated Leath's conduct. This argument ignores the more significant revenue from the fines generated by the citations. This sum is significant. For example, the potential revenue can be computed using the citations issued by Leath and the list of fines for various offenses.[22] For the month of April of 2007, the potential revenue generated solely by the citations Leath issued to Hispanics was over $8,005.[23] Clearly, the revenue generated by Leath's ticket writing activities was not, as Defendants argue, insignificant.

Leath also charged any Hispanic who did not have a valid Arkansas driver's license with the offense of driving on a suspended license. Apparently, Leath determined that it was proper to charge them for this offense, even though they had no license that could be suspended. Leath testified that he did so because he understood that if they were not eligible to apply for an Arkansas driver's license, it would be the same thing as driving on a suspended license.[24] Leath's explanation is not credible.

The Court believes that Leath issued these citations to generate more money for the City. While the fine for driving with a suspended license was $200, the fine for driving without a license was only $106.[25] Even though the charge would be set aside if challenged in Court,[26]

---

[22] See Plaintiff's Exhibit 1 for April, 2007, and Court's Exhibit 3 (schedule of fines).

[23] And, this computation does not include costs of $50 to $75 for each and every fine imposed.

[24] Tr. 81.

[25] See Court's Exhibit 3.

[26] All Plaintiffs stopped for a traffic violation were cited for driving with a suspended driver's license and all had the charge dismissed when they appeared in Court.

Leath knew that at least some of those charged with a suspended license offense would simply pay the fine.

The testimony of two of the City's former prosecuting attorneys, Loraine Hatcher and Pat Marshall, and former Judge Causely Edwards, is relevant both to Alexander's financial situation and the importance of traffic citations as generators of revenue for the City. Their testimony is summarized below.

### 1.    Lorraine Hatcher

Lorraine Hatcher served as Alexander's prosecuting attorney from January to April or May of 2007, and handled all of the city court traffic cases.[27]

Hatcher noticed that at some point the docket was comprised predominantly of Hispanic defendants.[28]  Hatcher's observation was completely different than that of court clerk Newkirk, who testified that she did not notice there being many Hispanics during this time period.[29]  The Court credits Hatcher's testimony.  In Hatcher's experience, most of these Hispanics were not represented by counsel and many did not speak English.  The only interpreter usually available was an Alexander police officer, Jeff Garcia ("Garcia").  Hatcher also recalled that the majority of citations had been issued by Leath and Garcia.[30]

---

[27] Ms. Hatcher could not recall exactly when she left.  At various times in her testimony, she said it could have been March, April, or May.  From the testimony as a whole, the Court finds that she more than likely left in late April or May of 2007.

[28] Tr. 145, 148.

[29] Tr. 146.

[30] Tr. 148-149. .

Hatcher decided to resign as prosecutor because the City was not paying her promptly.[31]
When she went to advise Mayor Johnson of her decision, Johnson stated that she did not like the
fact that so many charges were being reduced or dismissed.[32]  As a result, Hatcher "had the
distinct understanding that the charges were not to be reduced or dismissed because the City
needed the revenue."[33]

### 2.      Pat Marshall

The City's next prosecutor was Pat Marshall.  She started work on approximately June 1,
2007.[34]  The first day of court, she was surprised by the large number of Hispanic defendants in
the courtroom.  She also noted a large backlog of cases.

When she arrived, the City was not using a Spanish language interpreter in court.  To
communicate with Hispanics, court personnel had to rely upon Garcia or, at other times, a family
member or someone else who could assist with the translating.[35]   At Marshall's suggestion, the
City began hiring interpreters.  After two or three months, this service was provided by
Arkansas's Administrative Office of the Courts.[36]

In connection with the windshield obstruction citations, Marshall concluded that she had
to have evidence as to what actually obstructed the driver's view in order to prosecute those
cases.  The citations did not provide this information.  Marshall recalled that Leath stood out as

---

[31]  Tr. 147.

[32]  Tr. 151.

[33]  Tr. 144.

[34]  Tr. 168.

[35]  Tr. 172.

[36]  Tr.  161.

the officer most involved in the windshield obstruction cases.  In visiting with Leath, she

determined that he generally could not remember what object or objects allegedly obstructed the

cited driver's view.[37]

Marshall dismissed many of the cases because the evidence was insufficient to

successfully prosecute.  After this lawsuit had been filed and after discussing the issue with Chief

Spears and Mayor Johnson, Marshall nol-prossed the windshield obstruction cases.[38]

Mayor Johnson sent Marshall a letter directing her not to "dismiss any more cases" and

threatening that the "loss of fines would come out of [her] pay."[39]

Marshall observed that Leath issued the largest volume of tickets.  She found him to be

very cooperative and his police reports and citations improved greatly after she spoke to him

about the need for improvement.[40]

Pat Marshall left employment with the City in March of 2009.[41]

### 3.     Causely Edwards

Causely Edwards was Alexander's city court judge from January to May of 2007 and

presided over misdemeanor traffic violations.  While a judge, Edwards "got the general

impression" that it was expected that every citation should result in a fine for the City.[42]  Edwards

noticed an increased number of Hispanic defendants appearing in court.

---

[37]  Tr.

[38]  Tr. 167-168.

[39]  Tr. 159-160.

[40]  Tr. 166-67.

[41]  Tr. 155.

[42]  Tr. 171.

Mayor Johnson terminated Edwards's employment on May 11, 2007.   Her letter of termination reads:

> Dear sir: I've decided that our court needs to go in a different direction.  Effective immediately, you will no longer serve as judge for the City of Alexander.  Thank you.[43]

Mayor Johnson testified that her decision was influenced by complaints she received about Edwards from police officers and the City clerk.[44]

Edwards was not paid his full salary until several months after his termination.

### C.    The Citations Issued by Officer Tommy Leath

The parties stipulated that Officer Leath issued written citations to each Plaintiff but did not write a police report regarding any of the incidents giving rise to this lawsuit.[45]

The Court will first describe the experience of Jamie Guardado, who testified at trial regarding her experience with Leath.  Although Guardado is not a Plaintiff, she was an important witness for the Plaintiffs.  On April 22, 2007, Leath cited Guardado for a windshield obstruction violation.  Guardado subsequently complained to Mayor Johnson that Leath was harassing Hispanics.

The Court will then describe the traffic citations issued by Leath in chronological order. Plaintiffs Edvin Giron, Ruben Duarte, and Jose Gutierrez all were cited for windshield obstruction violations.  Plaintiff Roberto Giron was cited for failure to use a turn signal.  Plaintiff Francisco Arevalo was cited for a non-functioning brake light.[46]  Plaintiff Florencio Villanueva

---

[43]  Letter, Plaintiffs' Exhibit 8.

[44]  Tr. 240.

[45]  Tr. 12, 14.

[46]  An issue at trial arose as to whether Leath was the officer who stopped and cited Arevalo.  As discussed *infra*, absent additional evidence to show that Leath in fact issued the

was not pulled over and cited for a traffic offense, but rather was cited at his residence for public intoxication and disorderly conduct.

All of the citations Leath issued for windshield obstruction were dismissed.  All of the citations Leath issued for driving with a suspended drivers license were also dismissed.   The public intoxication and disorderly conduct citations issued to Plaintiff Villanueva were summarily dismissed after the prosecution presented its evidence.   Plaintiff Arevalo paid his fine after going to court two to three times.  Plaintiff Roberto Giron was found guilty of failing to use his turn signal but the suspended driving license charge was dismissed.

### 1.      Witness Jamie Guardado

Plaintiffs' first witness was Jamie Guardado ("Guardado").  A resident of Alexander for approximately five years, Guardado is White, but her husband is Hispanic.  She testified that she knows most of the Hispanics who live in Alexander and the surrounding area because most are from the same area in Mexico, and many are related. Because Guardado is fluent in both English and Spanish, she frequently is called upon to help Hispanic people in the Alexander area.  She helps them with many things, including but not limited to court appearances, getting tags for their vehicles, and doctor's appointments.  She estimated that there are 150-200 Hispanics in the Alexander area.

On April 22, 2007, Guardado received a telephone call from Raphael Alvalos, who is Hispanic.[47]  Alvalos told her that he had been pulled over because he had a tree air freshener hanging from his rear view mirror and that his vehicle had been towed.  He requested that she

---

citation to Arevalo, Arevalo must be dismissed from the lawsuit.

[47]  Alvalos is not a Plaintiff in this action.

come and pick him up, which she did.  When they arrived, the following exchange took place between Guardado and Leath:

> GUARDADO:  I had asked him [Leath] why would he stop him [Alvalos]  for one air freshener that is not obstructing your view.  Obstruction of view is when you cannot see out your window.  And I told him, I said, Tommy, as many times as I've stopped and I've talked to you at the gas station or wherever and you've never said anything to me about the stuff hanging in my mirror, you've never wrote me a ticket for it, you've never pulled me over for it.  And at that point, Tommy told me, you want a ticket, give me your driver's license.  And I handed him my driver's license and I told him, you know, what you're doing is wrong.  And he wrote me a ticket.[48]

Guardado received her "obstruction of view" ticket[49] at 6:17 p.m., approximately 10 minutes after Alvalos received his.   Guardado complained to Leath at the scene that he was targeting Hispanics.[50]  She also advised him that she was not going to pay the ticket and that she planned to call the mayor and tell her what was going on.

 Guardado also described an incident that occurred at the home of her brother-in-law,[51] George Higgins.  She testified that she was standing outside with her sister when Leath pulled up in his police car.  She heard Leath tell her brother-in-law that he was going to "get these fucking wetbacks out of here one way or another."[52]  Guardado could not pinpoint the exact date this occurred, but was certain that it was after April 22, 2007.[53]

---

[48]  Tr. 22.

[49]  Plaintiffs' Exhibit 3.  While the ticket issued to Guardado does not describe the items which allegedly obstructed her view, Guardado testified that she had at all times had the following hanging from her rear view mirror: a rosary, a couple of air fresheners, and a rope with a saddle in the middle.  Tr. 19.

[50]  Tr. 23.

[51]  Tr. 42.

[52]  Tr. 57.

[53]  Tr. 58.

On cross-examination, Defendants attempted to undermine Guardado's credibility by suggesting that she could not have known on April 22, 2007, that Leath was targeting Hispanics because only one Hispanic had been cited for a windshield obstruction violation before that date. That citation was issued the previous day, April 21, 2007, to Garcia Guerra.  Guardado testified that while she knows Guerra, he did not call her for ride or for assistance in recovering his vehicle.[54]

First, while the defense tried to narrow Guardado's complaints about Leath to windshield obstructions, Guardado testified that she told Leath on April 22nd he was "targeting Hispanics".[55] Her testimony indicated that she was not referring solely to Leath's stops for items hanging from their rear view mirrors.  Guardado stated: "It was around that time [April 22, 2007] because they were doing so much.  They were doing roadblocks and stopping them that way.  I mean, he was just randomly stopping Hispanics.  He was just doing a whole bunch."[56]

Second, Guardado consistently testified that she could not state whether the numerous calls she received from Hispanics stopped by Leath occurred before or after April 22, 2007.[57] She also testified that even before April 22, 2007, Leath would use windshield obstruction as an excuse to pull someone over and then cite them for something else.

Guardado was asked on cross-examination to identify all individuals who contacted her for help after Leath stopped them and towed their vehicles.  She named several individuals, some

---

[54]  Tr. 39.

[55]  Tr. 52.

[56]  Tr. 52.

[57]  Tr. 52 (Guardado testified:  "I cannot give you okay, yeah, there was 20 before and 20 after.  All I know is it was in that time period.").

by nicknames.  They included a Mr. Garcia (or "Gar"), Juan Carlos, and "Jose."[58]   Guardado did not know all of their last names.  The defense faults Guardado for not having a better memory of each and every person she assisted.  This criticism, in the Court's view, does not diminish Guardado's credibility.  In fact, the record of citations provides some support for her testimony.[59]

Finally, the record shows a dramatic increase in Leath's issuance of tickets to Hispanics after he completed his ALETA training and returned to work full-time.  For the first three months of 2007, Leath was in ALETA training.  During that period, he worked very little.  He only wrote 4 citations to Hispanics, 3 of which were written in January, 2007, and 1 in March, 2007.[60]

Leath stopped and ticketed more Hispanics in April of 2007 than any other month in 2007.  Twenty-six of the 54 tickets Leath wrote in April, or 48%, were issued to Hispanics.[61]

Before Leath stopped and ticketed Alvalos and then ticketed Guardado on April 22, 2007, he had written 7 tickets to Hispanics earlier that month.  The next Saturday, April 28th, Leath wrote 9 tickets in a row to Hispanics.  Consistent with this practice, Leath would have towed all of these vehicles.  The significant increase in the number of traffic stops and towed vehicles very likely was noticed in the close-knit Hispanic community and would have been called to the attention of Guardado due to the role she played in the Hispanic community.

---

[58]  Tr. 54.

[59]  For example, the record indicates that Leath stopped and cited Jose Gomez on April 5, 2007.  The ticket does not indicate why he was stopped, but Leath cited him for a suspended driver's license and, consistent with his practice, would have towed the vehicle.  See Defendants' Exhibit 1, Leath's 2007 Citations, Ticket No. 391434.  The record also indicates that Leath stopped and cited Juan Jauregui on May 19, 2007, and cited him for obstruction of view and a suspended driver's license.  See Defendants' Exhibit 1, Leath's 2007 Citations, Ticket No. 391699.  The Court, of course, has no way of knowing whether these were the individuals that Guardado personally assisted in retrieving their vehicles.

[60]  Defendants' Exhibit 13.

[61]  Defendants' Exhibit 13.

Defendants failed, in the Court's view, to impeach the veracity of Guardado's testimony. Minor discrepancies between dates in Guarado's testimony did not detract from her testimony as a whole.  The Court was impressed with her demeanor on the stand and the manner in which she told her story.

The Court concludes that by April 22, 2007, Guardado was aware that Leath was stopping Hispanics in increasing numbers.  By the time she complained to Mayor Johnson, approximately one week later, her knowledge of the situation was even greater.

### 2.    Plaintiff Ruben Duarte

Ruben Duarte, who lived in Little Rock, was stopped by Leath on April 22, 2007.  Duarte testified that Officer Leath said he stopped him for two stickers on the rear window of his vehicle.  The stickers were of the flags of Mexico and Guatemala, and were affixed on either side of his rear window, mid-way between the top and bottom of the window, one on the far left, one on the far right.[62]

While Duarte understands some English words, he does not speak English or comprehend spoken English.  After learning that his vehicle was going to be towed, he called a friend, Darwin Garza, to the scene.  Duarte asked Garza to ask Leath why he stopped him.  Duarte testified that Garza told him Leath said it was because of the stickers on the vehicle's rear window.

Leath issued Duarte a citation for obstruction of view and driving with a suspended license.[63]  Duarte paid $306 to get his car back from the towing company.

---

[62]  Plaintiffs' Exhibit No. 6.  Duarte drew a diagram indicating the position of the stickers. See Court's Exhibit 1.

[63]  Defendants' Exhibit 8.

Duarte had to go to Court two or three times, but won his case.  Duarte experienced fear in having to go to Court.  The entire experience made Duarte feel "less than the Americans."[64]

Even though Duarte now has a Texas driver's license, he is still afraid to drive and does not get out unless he can find a friend with a driver's license.[65]

Leath denied stopping Duarte for the stickers.[66]  The Court finds by a preponderance of the evidence that it is more likely true than not that Leath stopped Duarte because of the stickers. Leath's testimony that he had "never stopped anyone for stickers on their windows" was contradicted by Joshua Hubbard ("Hubbard").[67]  Hubbard testified that he was riding with Leath on another occasion when they observed a vehicle with a flag that looked like a Hispanic flag. Leath pulled the car over.  The flag turned out to be an Irish flag and the driver turned out to be "European."  Leath let the driver go without a citation.[68]

On cross-examination, the defense attempted to get Duarte to admit that it was possible that he also had something hanging from his rear view mirror that evening.  But Duarte's testimony about the reason for the stop on direct examination was clear, unequivocal, and believable.  The Court also notes the stop occurred at 9:14 p.m.  The Court takes judicial notice that on April 22, 2007, the sun set at approximately 7:47 p.m.  At that hour, the stickers on the rear windshield would have been easily observable, particularly from the rear, while items

---

[64] Tr. 334.

[65] Tr. 333, 339.

[66] Tr. 516.

[67] Tr. 129.

[68] Tr. 182-183.

allegedly hanging from the rearview mirror would have been much more difficult to see.[69]

Further, the Mexican and Guatamalan flags would have indicated to Leath that the individual

driving the car might be Hispanic, which would have made the vehicle a target for Leath.

     For all of these reasons, the Court has no hesitancy in concluding that Leath in fact

stopped Duarte because of the stickers on his rear windshield.

### 3.    Plaintiff Edvin Giron

     On April 23, 2007, at approximately 4:57 p.m., as Edvin Giron drove home from work,

Tommy Leath stopped Giron because he had an air freshener hanging from his rear view mirror.

The tree-shaped air freshener in question was admitted as Plaintiffs' Exhibit 16.  Giron had an

Arkansas identification card, but did not have an Arkansas driver's license.

     The traffic stop occurred very close – a two to three minute walk – from Giron's home.

Leath denied Giron's request to telephone his brother, who lived just minutes away, to come pick

up the vehicle.  Rather, he had the vehicle towed.  Giron walked the short distance to his home in

the nearby trailer park.

     Leath cited Giron for windshield obstruction and driving on a suspended license.  Giron

paid $306 to get his car out of storage.  He went to court in Alexander approximately three times

before getting both charges dismissed.  He also had to pay $100 to get his identification card

reinstated by the State of Arkansas.

     This experience with the legal system left Edvin Giron feeling bad and scared.

---

    [69] Joshua Hubbard, who frequently rode with Leath, testified that when it was dark they could not see items hanging from the rearview mirror.  Tr. 199.

### 4.      Plaintiff Roberto Giron

Roberto Giron, who lived in Alexander, was stopped by Leath on May 5, 2007, a Saturday.  The reason given by Leath for the stop was that Giron failed to use his turn signal.  Giron testified that he was turning right at an intersection when Officer Leath stopped him.  He further testified that Leath turned his blue lights on before he got to the intersection.  Leath cited Giron for failing to use a turn signal and driving with a suspended license.

Officer Leath had Roberto Giron's vehicle towed.  Since it was Saturday, Giron was not able to retrieve his vehicle from the towing company until Monday, when he paid $350 to retrieve his vehicle.

Roberto Giron went to trial in the Alexander court.  He was found guilty of failing to use a turn signal and fined $150.00.  The suspended license charge was dismissed.

Roberto Giron testified that he felt that the real reason he was stopped was because he was Hispanic.  He testified that the experience made him scared.  Asked how that made him feel, he stated:

> Well, you get scared, you know.  You come from another country to this country for a better future and you're confronted with the police and you're scared to call the police because they're not going to respond.  Well, I don't know how to say it, you're scared.[70]

### 5.      Plaintiff Jose Gutierrez

On May 16, 2007, Leath stopped Jose Gutierrez as he traveled on Highway 5, which divides Little Rock and Alexander.  The asserted reason for the stop was that Gutierrez had an air freshener and rosary beads hanging from his rear view mirror.  Gutierrez provided Leath with a

---

[70] Tr. 439.

Mexico driver's license, but did not have an Arkansas driver's license.  Although the vehicle was insured, Gutierrez could not find the paper to prove it.

Leath cited Gutierrez for windshield obstruction, driving with a suspended license, and no proof of insurance.[71]  Leath had the vehicle towed.  Gutierrez paid between $300 and $350 to get his car back from the towing company the next day.  Gutierrez went to court two or three times before all charges were dismissed.

Before this experience, Gutierrez had never been in trouble with the law, either in his home country or in the United States.[72]  This episode changed Gutierrez's view of the police.  He no longer feels like he can call on the police for protection.  He has also experienced what he described as a loss of freedom.[73]

### 6.    Plaintiff Francisco Arevalo

Although the parties stipulated at the beginning of the trial that Leath stopped Arevalo for a defective rear brake light and issued him a citation,[74] that stipulation is now in dispute.  During the trial, the Court, noted that Arevalo's citation was missing and asked the parties about the missing citation.  The following day, defense counsel advised that, contrary to the earlier stipulation which he had read into the record, there was no such citation.  Instead, Defendants asserted that another officer, Jeremy Brown, wrote Arevalo a citation for a defective brake light on November 4, 2007.  A copy of the citation was introduced as Defendants' Exhibit 12.[75]

---

[71]  Plaintiffs' Exhibit 9.

[72]  Tr. 352.

[73]  Tr. 346-347.

[74]  Tr. 13.

[75]  Tr. 521-523, 543.

Defendants argue that Arevalo's claims should be dismissed because there is no proof that Leath issued him a citation.  Plaintiffs argue that Defendants should be estopped to now deny that Leath issued Arevalo a citation.  Plaintiffs have a point.  Although Defendants represented during discovery that the citation had not been located, in their summary judgment motion papers, they asserted: "On or about April 2007, Officer Leath witnessed a vehicle with a defective brake light, that was been [sic] driven by Francisco Arevalo.  Officer Leath conducted a traffic stop and issued Arevalo a citation for violating Arkansas Traffic Law."[76]  At the beginning of the trial, defense counsel advised the Court that the parties stipulated:

> that Francisco Arevalo was stopped by Officer Leath during the relevant time period and that the reason Defendant Leath asserts that Arevalo was stopped was because he had a defective rear brake light, that Officer Leath issued a citation to Arevalo for an alleged violation of Arkansas Code Annotated 27-36-216, and that Officer Leath states that such violation was the probable cause for stopping Arevalo on the date in question.[77]

Defendants offer no explanation for why the November 4, 2007, citation was not produced until the third day of trial.  While the Court recognizes the prejudice to Plaintiffs, who justifiably relied on Defendants' representations concerning this issue in pursuing this claim, the Court is more concerned that the truth prevail.  Leath either was or was not involved in this traffic stop.  If he was, then the citation is suspect.  If he was not, Leath should not be held accountable for a citation issued by another officer.

The Court recognizes that Plaintiffs did not have adequate time to look into the facts to determine whether there is some other explanation.[78]  The Court concludes that the fairest

---

[76]  Defs.' Am. Stmt. of Material Facts, docket entry # 49 at ¶¶ 59-60.

[77]  Tr. 13.

[78]  The Court notes that in reviewing what was represented to be the citations Leath wrote in 2006 there are several notations indicating that a particular citation was written by another officer.  One possible explanation for this would be that Leath and another officer were riding

solution under the circumstances is to permit Plaintiff Arevalo, at his election, to conduct additional discovery to determine whether Leath in fact stopped Arevalo's vehicle.[79]

Plaintiffs' counsel must notify the Court in writing within 10 days of this Order whether Arevelo wishes to conduct additional discovery on this issue.  If so, the Court will hold his claims in abeyance; if not, Franciso Arevalo's claims must be dismissed with prejudice.

### 7.    Plaintiff Florencio Villanueva

On May 15, 2007, Leath arrested Florencio Villanueva outside his residence and cited him for disorderly conduct and drinking in public.  Before his arrest, Villanueva had been inside his residence, but Leath summoned him outside, allegedly because he suspected him of driving while intoxicated.  The parties stipulated that Leath never saw Villanueva driving his vehicle. The charges were later dismissed after the prosecution presented its evidence.

On the day in question, Villanueva came home from work between 5:30 p.m. and 6:15 p.m. and began washing his truck and drinking beer.  Villanueva did not drive his truck any more that night.[80]

Leath came to the neighborhood in response to a call through  dispatch that there was a vehicle driving recklessly through the trailer park.  A copy of the incident report giving rise to the dispatch call was introduced at trial as Defendants' Exhibit 11.

The incident report indicates that an unidentified male caller reported the following on May 15, 2007, at 7:39 p.m.:

---

together and the other officer completed the ticket.

[79]  The expense of any such discovery will be paid by Defendants.  This cost is imposed as a sanction for Defendants' lack of diligence during discovery.  Plaintiffs should have been able to rely on Defendants' representation that Leath issued Arevalo a citation.

[80]  The testimony did not clearly establish exactly when Villanueva arrived at his home.

HE ADVISED THERE IS A CHEVY SILVERADO THAT IS FLYING UP AND DOWN THE
ROADS IN THE MOBILE HOME PARK.  WANTS TO SEE AN OFFICER.

Leath arrived at the trailer park, at 7:51 p.m.[81]  Leath saw a Chevy Silverado truck parked

at one of the trailers.  He began asking around to determine who owned the truck.

An older gentleman indicated that Villanueva owned the truck and that he was inside his

home.[82]  Leath asked the gentleman to have Villanueva come outside.[83]  The gentleman

delivered Leath's request, and Villanueva came outside.

The Court credits Villanueva's testimony that he did not come outside with a beer in his

hand.[84]  However, because Villanueva had consumed 7 or 8 beers, he likely would have smelled

of beer.  After Villanueva came outside, he stood in his driveway on his own property.[85]

Villanueva confirmed to Leath that he owned the truck.[86]  Leath asked Villanueva for his driver's

license.  Villanueva did not have a valid Arkansas drivers' license.  Since he had been in his

house, Villanueva asked why Leath wanted it, which made Leath angry.  Even though Villanueva

---

[81]  Leath's arrival is noted on the incident report.  See Defendants' Exhibit 11.

[82]  Tr. 106.  Defendants state in their post-trial submission that this gentleman "advised
[Leath] that the driver was in the house."  Defendants' brief, docket entry # 97 at ¶ 49.  This
statement, coming right after the allegation that Leath had arrived at the trailer park to investigate
a report "regarding a Chevy Silverado flying up and down the roads in the mobile home park"
could be construed to leave the mistaken impression that the gentlemen identified Villenueva as
the person driving the Chevy Silverado recklessly.   So that the record is clear, there is no
evidence that this gentleman so identified Villanueva or Villanueva's truck as the vehicle about
which someone complained.

[83]  Tr. 109.

[84]  Tr. 380.

[85]  Tr. 109.

[86]  Tr. 371.

produced his identification within two minutes of Leath's requesting it, Leath concluded that

Villanueva was not cooperating.[87]

      Leath handcuffed Villanueva, put him in the patrol car,and left him there for about 20

minutes.[88]  Leath then cited Villanueva for drinking in public and disorderly conduct.

      During trial, Leath explained the disorderly conduct charge as follows:

| | | |
|---|---|---|
| Q. | | And what was the basis of the disorderly conduct charge? |
| A. | [Leath]: | Not wanting to cooperate. |
| Q. | | And how did he not want to cooperate? |
| A. | [Leath]: | He didn't want to give me his identification. |
| Q. | | And how do you know that? |
| A. | [Leath]: | Because I was asking for it. |
| Q. | | And you agree that there was a language barrier? |
| A. | [Leath]: | Yes. |
| Q. | | And you agree that a young person had to come and translate between you? |
| A. | [Leath]: | Yes. |
| Q. | | And you agree that it's possible that this didn't go on for more than 120 seconds? |
| A. | [Leath]: | I don't remember how long it went on. |
| Q. | | But if the plaintiff says that it was less than two minutes, you can't disagree with that, right? |
| A. | [Leath]: | I don't remember. |
| Q. | | Okay. |
| A. | [Leath]: | I can't agree or disagree. |
| Q. | | Okay.  And so him [Villanueva] not being able to understand what you wanted from him was disorderly conduct.  Is that correct? |
| A. | [Leath]: | Yes.[89] |

      Villanueva challenged the ticket in court, and paid an attorney $500 to represent him.[90]

Both charges were dismissed on a directed verdict after the prosecution presented its case.[91]

---

[87]  Tr. 110.

[88]  *Id.*

[89]  Tr. 109-110.

[90]  Tr. 372.

[91]  Tr. 374.

The experience made Villanueva feel ashamed.  It also made him feel like a criminal.  On cross-examination, the defense established that Villanueva had a prior conviction for driving while intoxicated, suggesting that his prior criminal history undercut his claim that the experience caused him distress.

### D.    Leath Intentionally Targeted Hispanics

Leath testified that he was reminded at ALETA of the windshield obstruction law.  He stated that he was told in ALETA lectures that anything hanging from the mirror would be a violation of Arkansas law.[92]  Although he had written a few tickets for windshield obstruction before attending ALETA classes, he testified that it "had just slipped his mind" that he could stop vehicles for that infraction.[93]

Leath testified that it was pure coincidence that during the relevant time period approximately 70 % of the tickets he issued for windshield obstruction and more than half of all the tickets he issued were given to Hispanics.[94]  He acknowledged, however, that he knew it would be illegal profiling to selectively apply the traffic laws to Hispanics, that is, to target Hispanics for traffic stops, even if they were guilty of the infraction for which they were stopped.[95]

---

[92]  Tr. 510.

[93]  Tr. 526.  All the citations Leath issued for the two year period beginning in January of 2006 were admitted into evidence as Defendants' Exhibit 1.  Tr. 496.  During 2006, Leath wrote a total of 5 citations for the offense of windshield obstruction.  Only 1 of these 5 citations was written to a Hispanic.  It is not possible to determine from a review of the citations the cause of the alleged obstruction charges or whether they involved any item hanging from the driver's rear view mirror.

[94]  Tr. 526-527.

[95]  Tr. 136-137.

Compelling evidence supports the Court's conclusion that Leath used his police powers to purposefully target Hispanic drivers for traffic stops and that such conduct was not motivated by legitimate law enforcement objectives.  His chief motives were: prejudice against Hispanics ("wetbacks" as he called them), his stated intent to run them out of the area, and his desire to bolster the coffers of the financially strapped City of Alexander.

### 1.    Direct Evidence

Plaintiffs presented direct evidence that Leath intentionally targeted Hispanics for traffic stops through the testimony of Joshua Hubbard and Cain Maxheimer ("Maxheimer").  After observing both men and their demeanor while testifying, the Court credits the critical substance of their testimony.

### a.    Joshua Hubbard

To put Joshua Hubbard's testimony in context, it is helpful to understand the relationship among Hubbard, Leath, and Jennifer Newkirk ("Newkirk"), all of whom testified in the case. Hubbard was married to Newkirk when the events at issue in this case occurred.  Newkirk and Leath were, and are, employed by the City of Alexander.   Newkirk is the Alexander court clerk and handles the entire criminal docket.[96]   Hubbard and Newkirk are no longer married.  Newkirk and Leath are now engaged.

Hubbard met Leath through Newkirk, his wife at the time.[97]  Hubbard and Leath became friends.  After Leath returned from his ALETA training, Hubbard began riding with Leath in his patrol car.[98]  Hubbard was interested in becoming a police officer and hoped to eventually work

---

[96]  Tr. 528.

[97]  Tr. 177-178.

[98]  Tr. 178-179.

for the Alexander Police Department.[99]  Hubbard had no authority to stop vehicles or issue

citations,[100] but was in a position to observe Leath while he carried out his duties.  Hubbard rode

with Leath more than 25 times.[101]

Leath told Hubbard that he had learned at ALETA that if a driver had any object hanging

from the car's rear view mirror, that could be used as a legitimate reason to stop him/her.[102]

Leath began using this as a pretext to target Hispanics.  Leath explained to Hubbard that the

majority of Hispanics in Alexander probably did not have drivers licenses, and if he could stop

them, it would be "an easy ticket and an easy tow."[103]

Leath knew that many Hispanics lived in a trailer park in Bryant, just off Bivens Loop.

Even though Bivens Loop was in Bryant – outside Leath's jurisdiction –  Leath would park at the

Dollar Store in Bryant and wait for vehicles to pull out of the trailer park.[104]  This made it easier

to find Hispanics to stop.

Hubbard and Leath came up with a game to describe what was going on: "Tow my Shit."

They fantasized about it as their own private "make-believe reality show."[105]  The game came

---

[99]  Tr. 183-184.

[100]  He sometimes filled out the towing slips for vehicles Leath had directed to be towed.

[101]  Tr. 184.  Hubbard could not recall the exact number of times he rode with Leath.  He testified that he did so "as much as possible."  Leath recalled that Hubbard rode with him more than 25 times and Hubbard agreed that was true.  Tr. 185.

[102]  Tr. 220.

[103]  Tr. 182, 203.

[104]  Tr. 221-222.

[105]  Tr. 180.  "Pimp My Ride" is the name of a reality show that airs on MTV.  Tr. 88.

about because they towed so may vehicles in such a short period of time.  Hispanics were Leath's favorite targets.

The Court credits Hubbard's story about the game and rejects Leath's testimony that "Tow My Ride" or "Tow My Shit" was something that Hubbard invented on his own and only mentioned to Leath on one occasion.[106]

Hubbard described how Leath targeted Hispanics:

Q. [Plaintiffs' attorney]: Did you have the opportunity to observe whether Mr. Leath targeted any particular group?
A. [Hubbard]:  Yes, sir.

Q.  And tell the Court about that.
A. [Hubbard]:  It was Hispanic, mainly.  We would sit around and we'd look, and if they looked Hispanic, we'd try to find probable cause to pull them over, and most of the time it was something hanging down from the rearview mirror, or something like that, and pull them over for obstruction of view.

Q. Okay.  So first – let me get this timeline because it's very important.  First, you would pick a person you wanted to stop, without – before there was any decision as to whether there was a reason to stop them, you would identify a person that y'all wanted to stop?
A. [Hubbard]:  Yes, sir.

Q.  Okay. And did you ever hear Tommy, or Mr. Leath, did he ever give a reason why he liked to stop Hispanics?
A. [Hubbard]:   He knew that most of them didn't have their driver's license and that would be an easy ticket and easy tow.

Q.  It'd be an easy ticket and an easy tow, and that would make the tow-my-shit game more fun.  Is that right?
A. [Hubbard]:   Yes, sir.

Q.  Did it ever happen that you picked people to stop because you thought they were Hispanic and then come to find out, when you stopped them, they weren't?
A. [Hubbard]:  Yes, sir.

Q.  So what would happen?  Would you go ahead and write them a citation sometimes or - -

---

[106]  Tr. 88.

A. [Hubbard]:  Very seldom.  It was a warning ticket or just a check and run their driver's license, and if everything came out, he'd let them go.[107]

In a previous affidavit, which was admitted as an exhibit without objection,

Hubbard testified:

The drivers for Metro Towing were good friends with Tommy [Leath], and they would praise him for stopping so many vehicles.  The wrecker drivers thought it was funny that we stopped so many Hispanics.  There was a lot of talk and humor about this.  Sometimes, Metro Towing Wrecker drivers would arrive at the scene of the traffic stop and simply collect money from the Hispanics and then allow them to drive the vehicle away, and the vehicle was never towed; but the wrecker drivers still collected the cash.  Tommy Leath saw this happen, but he took no action; he would just point out that we would get to tow the vehicle again next time we saw it and fine them some more.  If the people did not have enough cash on them, the vehicle got towed.

It was common knowledge that if any police officers needed the wrecker service to tow a city vehicle or a personal vehicle of a city employee, it was often free of charge.  Once, Metro Towing responded to pull my vehicle out of a ditch, and did not charge me.[108]

The Court concludes, based on Hubbard's testimony as well as the totality of the evidence, that it was common knowledge around the Department, which is a very small, close knit group, that Leath was stopping large numbers of Hispanics.[109]   Hubbard testified that he and

---

[107]  Tr. 181-182.

[108]  Hubbard Affidavit, Plaintiffs' Exhibit 10.  Tr. 225.

[109]  Tr. 185.  In making this finding the Court has specifically considered the testimony of Brad Williams, an African-American officer, that he never observed Leath's unlawful activities. Williams was a probationary employee who had been working six or seven months at the time of the events in question.  Williams was still on probation when he testified at trial.  He considers Leath, Spears and Johnson to all be his bosses.  Because Williams works the midnight shift, he had very little contact with Leath.  He has never ridden with Hubbard or Maxheimer.  Tr. 457-458, 462, 462-465.

the other officers laughed and joked about it.[110]  Hubbard specifically recalled laughing and

joking with Leath, Jeff Garcia, and Cain Maxheimer.[111]   Hubbard was present when Leath

discussed his targeting of Hispanics in the presence of Chief Spears.  Hubbard testified that

Spears acted like he did not want to hear about it and walked the other way.[112]

At some point, Hubbard learned that Leath's ex-wife and daughter were Hispanic.  Leath

said he would use the fact that his ex-wife and daughter are of Hispanic descent as a defense if he

were ever accused of stopping large numbers of Hispanics because of his dislike or prejudice

against them.[113]

Hubbard was caught off-guard when Newkirk filed for divorce around the end of October

of 2007.[114]   Hubbard learned at this time that his wife was or had been seeing Leath.  He

complained to Spears about Leath and even threatened Leath.[115]

In addition to pointing out that Hubbard was bitter about the divorce, the defense also

attacked Hubbard's testimony that on one weekend, Leath stopped and towed 40 vehicles, many

of which were stopped for windshield obstructions.[116]   The defense pointed out that the most

citations Leath ever issued during a weekend occurred on the Friday and Saturday nights in the

---

[110]  Tr. 185.

[111]  Tr. 209-210.

[112]  Tr. 185-186.

[113]  Tr. 186-187.  Maria Jones, Leath's ex-wife, was called as a witness by the defense.
Jones and Leath were married in 1992, for 2 1/2 years.  They have 2 children together.  Jones was
raised by her mother, who is White, but her father is Hispanic.  She has never met her father.  Tr.
544-46.

[114]  Tr. 196.

[115]  Tr. 224.

[116]  Tr. 200.

last two weekends in April (weekends of April 21st and 28th).  Leath issued a total of eleven

citations on these weekends.[117]  Plaintiffs' counsel pointed out that Defendants failed to include

Friday or Monday in their numbers.  However, a review of Leath's citations shows that the most

citations issued by Leath during a three day period including Saturday and Sunday occurred

between Saturday, April 28th and Monday, April 30th, when Leath wrote 17 citations.  It is clear

that Hubbard exaggerated on this point.  However, the Court finds that this exaggeration was

simply a misrecollection that does not detract from the basic substance of his testimony.

### b.    Cain Maxheimer

Cain Maxheimer clearly was not eager to come to federal court to testify.  After

Plaintiffs' process server was unable to serve Maxheimer, and following a presentation of facts

suggesting that Maxheimer might be avoiding service, the Court directed the U.S. Marshal to

serve a subpoena on Maxheimer.  The Marshal was successful and Maxheimer testified on the

last day of trial.

Maxheimer was an Alexander Police Officer from approximately January through August

of 2007, when he was terminated because he did not perform satisfactorily during his

probationary period.[118]  Leath signed Maxheimer's termination letter.  Maxheimer viewed Leath

as his boss.[119]

Maxheimer sometimes rode with Leath in the same patrol car.  Other times Maxheimer

rode alone.  Maxheimer testified that he observed that Officer Leath made more traffic stops on

Hispanics.  He also learned about the game "Tow My Ride" when Leath and Hubbard told him

---

[117]  Tr. 549-550.

[118]  Tr. 406.

[119]  Tr. 425.

about it.  This occurred during a conversation at the Department as the three stood outside

smoking.  Leath and Hubbard laughed about their new game and described it as an alternative to

the real-life game, "Pimp My Ride," a program on MTV. [120]  It was Maxheimer's understanding

that the purpose of the game was to stop and tow the vehicles of as many Hispanics as

possible.[121]

To discredit Maxheimer's testimony, the defense attempted to create inconsistencies

between how often Maxheimer and Hubbard talked on the phone or saw one another.[122]  It was

difficult to determine from the testimony whether the witness and counsel were talking about the

same thing.  But, to the extent any real inconsistencies were established, the Court concludes that

they were only innocent misrecollections regarding small details and no reflection on the veracity

of Maxheimer's core testimony.

### c. Credibility Determination

Leath denies intentionally targeting Hispanics for traffic stops.  However, Hubbard and

Maxheimer's testimony establishes that Leath intentionally targeted Hispanics because of their

race or national origin, and that he selectively enforced race neutral traffic laws.  There is no way

to reconcile the testimony of Leath with that of Hubbard and Maxheimer.  Rather, the Court is

confronted here with a situation in which either Leath is lying, or Hubbard and Maxheimer are

lying.  Leath testified at trial that Hubbard, Maxheimer, and Jamie Guardado all lied.[123]

---

[120] Tr. 402.

[121] Tr. 402-403, 418.

[122] Tr. 411- 413.

[123] Tr. at 527.

The defense did not deny that the game "Tow My Ride" or "Tow My Shit"[124] existed, but suggested that Leath was not involved in creating or playing the game. Leath testified that he did not learn about the game "Tow My Ride" or "Tow My Shit" until he overheard Hubbard telling Newkirk about it over the phone. Leath stated that this occurred in August 2007, after this lawsuit was filed.[125] Newkirk, called by the defense, testified that she first heard about the game in August of 2007. She stated that she was in Oregon visiting a friend and had called home to speak with Hubbard when he told her he had come up with a new game called "Tow My Shit."[126]

Hubbard testified that he told Newkirk about the game in April or May of 2007. Maxheimer testified that he heard Leath and Hubbard talking and laughing about the game. This necessarily must have occurred before Maxheimer's termination in August 2007.

The Court credits the testimony of both Hubbard and Maxheimer on this point. Leath and Newkirk's testimony that they knew nothing about the game until August is not credible. First, by August of 2007, Leath had ceased writing tickets for windshield obstruction. Second, Leath was writing significantly fewer total citations. For the entire month of August, Leath issued only sixteen total citations. Only three of those sixteen citations were issued to Hispanics. In stark contrast, in April or May of 2007, Leath issued 54 and 39 total citations, respectively. Of those 93 citations, 42 were issued to Hispanics.[127] The documentary evidence – in the form of the citations that Leath issued – proves that Leath's citation writing pattern changed significantly after June 16, 2007, following the filing of this lawsuit. While the "game" was in full swing in

---

[124] Both terms were used to refer to the same game.

[125] Tr. 518.

[126] Tr. 535.

[127] The Court discusses these numbers more specifically, *infra*, in considering whether the numerical evidence provides evidentiary support for Plaintiffs' claims.

April and May, it was over by August.  It seems much more likely that Hubbard would have told

his wife about the game he and Leath were playing while it was being played rather than over six

weeks after it ended.

Additionally, Leath's testimony that Hubbard made up the game "Tow my Ride" without

any input from Leath is incredible.  Hubbard had no police powers himself.  A game targeting

Hispanics – and that is what the evidence supports actually happened – could not have been

played without Leath's full knowledge, participation and, most, importantly, his police powers.

The fact that Hubbard's ex-wife, Newkirk, left him for Leath certainly gave Hubbard a

motive to dislike Leath.  The fact that Leath's name was on Maxheimer's termination letter also

gave Maxheimer a motive to dislike Leath.  However, such circumstances do not establish that

their testimony is not true.  Indeed, Leath had an equal, if not greater, motive to lie.

The Court believes, and credits, the substance of Hubbard and Maxheimer's testimony.

Additionally, and importantly, their testimony was corroborated by other evidence, including the

citations that Leath issued and the testimony of Guardado.   The Court has no hesitation in

concluding that Leath was not telling the truth when he testified about the key issues in this

lawsuit.

## 2. Numerical Evidence Regarding Windshield Obstruction Citations Issued to Hispanics

### a. The Numbers

Starting on April 21, 2007, Leath began issuing traffic citations for the charge of

windshield obstruction, also referred to as "obstruction of view."  Before then, very few citations

had been issued for that charge.  The parties stipulated that between 2005 and 2007, all

Alexander police officers combined, excluding Leath, wrote six citations for obstruction of

view.[128]  In 2006, Leath wrote five citations for obstruction of view.  Between April 21, 2007,

and June 16, 2007, Leath wrote 44 obstruction of view citations.  Thirty of these 44 citations, or

68.2%, were issued to Hispanics.

For the period during which Leath was issuing citations for windshield obstruction

violations, between April 21 and June 16, 2007, the numbers are as follows:

| CITATIONS ISSUED BY LEATH (4-21 thru 6-16-2007) | Hispanics | Non-Hispanics | Total Citations | % to Hispanics | % to Non-Hispanics |
|---|---|---|---|---|---|
| Obstruction of View Citations | 30 | 14 | 44 | 68.2 % | 31.8 % |
| Total Citations | 61 | 54 | 115 | 53 % | 47 % |

Defendants do not refute these numbers, but argue the Court should instead consider the

total number of citations Leath issued between January and June of 2007, or between January

2006 and June of 2007.  Defendants introduced Exhibit 13, which breaks down the total number

of citations Leath issued by race for each month from January of 2006 through June of 2007.

The Court rejects this argument.

Numerical evidence of the citations issued by Leath before April 2007, while useful for

comparison purposes, does not refute the statistical significance of Leath's citations during the

period in which he was engaged in illegal profiling.[129]  The evidence supports Plaintiffs' theory

that Leath started his pattern of racial profiling after returning from his ALETA training.  The

record indicates that this unlawful pattern started, at the latest, on April 21, 2007, and continued

through approximately June 16, 2007.

---

[128]  Tr. 391.  Again, it is unknown whether any such citations were for objects hung from the rearview mirror.

[129]  Defendants would like to use numerical evidence of all the citations Leath wrote between 2006 and June of 2007, to generate the total percentage of citations Leath issued to Hispanics, thereby reducing the percentage to 23%.  Defendants' Exhibit 13.

After June 16, 2007, Leath abruptly quit writing windshield obstruction tickets.  For the remainder of the year, no more windshield obstruction tickets were issued to Hispanics, and only two were issued to other drivers.[130]  The number of citations Leath issued to Hispanics for any offense also dropped dramatically at this point.  The documentary evidence indicates that between July and December of 2007, Leath issued only 3 citations to Hispanics.

This timing is consistent with the commencement of this lawsuit on June 12, 2007.  The lawsuit was filed on June 13th.  Spears was served with the lawsuit on June 18th.  Spears stated that he told Leath about the allegations when he was "looking into" the allegations at Mayor Johnson's request, which would have occurred sometime between June 12th and June 18th. Hubbard, who did not know that a lawsuit had been filed, knew that "someone was upset," and testified that Leath told him "he had to quit."[131]

The Court concludes that Leath abruptly stopped the unlawful conduct because this lawsuit was filed.

### b.       Significance of the Numbers

The significance of the numerical evidence also depends on the population of Hispanics in the area.  In other words, what, if anything, does the fact that Leath issued 68% of all windshield obstruction tickets to Hispanics during the relevant period tell us?  Does it matter that 53% of all the citations Leath issued, for any offense, were written to Hispanics?  Is this, as Leath argues, merely happenstance?  Or does it, as Plaintiffs contend, help prove their claim that Leath selectively enforced the law based on race?

---

[130]   The citations were written on October 19, 2007, and November 14, 2007.  See Citations, Defs.' Exhibit 1.

[131]   Tr. 214.

The answer depends, at least to some extent, on how many Hispanics were living in and operating vehicles in the area.  Plaintiff sought to have the Court take judicial notice of the contents of documents establishing population data, by race, in Alexander.  Specifically, Plaintiff requested that the Court take judicial notice that the population and racial data contained in those documents likely reflects the percentage of Hispanics operating vehicles in the surrounding area.  Defendants objected, contending that Plaintiffs had the burden to specifically demonstrate the percentage of Hispanics driving vehicles in the Alexander area during the dates in question.   The Court indicated that it was interested in obtaining the best evidence available on this topic.

For that purpose, Plaintiffs introduced several exhibits:

Plaintiffs' Exhibit 13[132] is census data for 2000 showing the following racial breakdown: 71.5% Caucasian, 26.7% African-American, and 2.3% Hispanic or Latino.

Plaintiffs' Exhibit 14 is a printout from a City-Data.com website for Alexander.  The document indicates that as of July 2005, Alexander had a population of 622, of which 2.3% was Hispanic, 26.7% was African-American, and 68.75% was Caucasian.

Plaintiffs' Exhibit 17 is a U.S. Census Bureau estimate[133] for Little Rock, Arkansas, for 2007.  The document indicates that Little Rock's Hispanic population in 2007 was 5.9%.[134]

Defendants did not introduce any evidence of racial demographics in the Alexander area.  Defendants argued, however, that if Alexander had only 614 citizens and if witness Jamie Guardado's estimate that approximately 200 Hispanics resided in the overall area, that would

---

[132]  Exhibit 13 was produced by Defendants during discovery.  Tr. 294.

[133]   While the Census Bureau conducts an actual census every ten years, it provides estimates annually.

[134]   The estimate has a margin of error of +/- 0.9%.

indicate that approximately 30% of the population is Hispanic.  This percentage, calculated using the wrong population and Guardado's spontaneous estimate, is not reliable.

On June 26, 2006, as a result of a boundary adjustment, Alexander's total population increased to 2,171.  The Court took judicial notice of this fact in its summary judgment ruling and attached a copy of a certified statement from the U.S. Census Bureau.[135]  Plaintiffs introduced the same document at trial as Plaintiffs' Exhibit 15.  Thus, Defendants' argument that the Hispanic population in the area at the time was as much as 30% is clearly flawed.

At the conclusion of the trial, the Court invited the parties to present any additional relevant population evidence they wished the Court to consider.  None was submitted.

The Court has looked into this issue further, solely for the purpose of determining what information, if any, would be appropriate for judicial notice.  The U.S. Census Bureau prepares annual population estimates of the Hispanic population.  The Court takes judicial notice that the relied upon census data meets the requirements of Fed. R. Evid. 201 in that it is "not subject to reasonable dispute" because it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."[136]

In making this finding, the Court specifically finds that the data is reasonably accurate for the purpose for which it is being used.  The Court rejects Defendants' argument that the Census

---

[135]  See Order, docket entry # 70, Exhibit A.  This certified statement was obtained by the Eighth Circuit librarian at the Court's direction.  The Court had noticed the large disparity in Alexander's population (from approximately 600 to approximately 2000) from different sources and sought an explanation.

[136]  See *United States v. Esquivel*, 88 F.3d 722, 726 (9th Cir. 1996) (noticing 1990 census data on the number of Hispanics eligible for jury service for challenge to jury pool); *United States v. Bailey*, 97 F.3d 982, 985 (7th Cir. 1996) (taking judicial notice of census information with respect to life expectancy).

Bureau's inability to accurately count the Hispanic population requires the Court to completely disregard this evidence.  First, an exact count of Hispanics in the Alexander area patrolled by Leath is not necessary in this particular case.  Even if the relied upon Census Data undercounts Hispanics to some degree, the data remains relevant and probative.   Second, Defendants have not offered any evidence of their own.  They simply suggest that Plaintiffs have the burden to conclusively establish the population of Hispanics in the area and failed to do so.

In conclusion, the Court accepts the limitations of the Census Bureau data, but such limitations do not prevent the Court from considering the information in this particular case. Even assuming that the population estimates have a margin of error greater than that acknowledged by the Census Bureau, the numbers still support Plaintiffs' theory that the large numbers of Hispanics stopped and cited by Leath during the relevant time period was the result of something other than race-neutral application of the traffic laws.

### D.      The City's Knowledge of Leath's Targeting of Hispanics

The record indicates and the Court finds that City policy-makers Mayor Johnson and Chief Spears knew that Leath was targeting Hispanics but took no action to stop him.  By their silence, they both condoned his conduct and allowed it to continue.  Spears conducted a sham investigation, determined that it was plausible to deny that Leath had acted unlawfully, and continued to deny that any wrongdoing had occurred, even though he knew what Leath had done. Rather than discipline or correct Leath for his conduct, Spears promoted him and put him in charge of training for the Department, which included responsibility for conducting training on racial profiling.

The Court rejects Mayor Johnson's testimony that she did not learn of the racial profiling allegations until June 12, 2007, when Plaintiffs' counsel, Reggie Koch, complained to her and

put her on notice that a lawsuit was possible.  As the Court has already found, Johnson had been advised previously by Guardado, by April 29th, that Leath was targeting Hispanics for traffic stops.  This occurred very shortly after Leath began his pattern of targeting Hispanics.  Johnson took no action, however, until the City was threatened with a lawsuit, at which time she did nothing other than ask Spears to look into the matter.

The Court also rejects Chief Spears's testimony that the first time he had any idea of Leath's alleged wrongdoing was when Johnson told him about Koch's allegations on June 12th. The Court finds that Spears actually knew that Leath was targeting Hispanics intentionally for traffic stops and that he failed to take any action to stop him.  Even Leath testified that it was common knowledge in the Department that he was writing obstructive view tickets and that he discussed the fact that he was writing those tickets with Spears.[137]  Leath's testimony is corroborated by the testimony of Hubbard and Maxheimer, both of whom testified that Leath's ticket writing activities were common knowledge around the Department.  Additionally, Hubbard and Maxheimer expanded the scope of what was commonly known around the Department to include the fact that Hispanics were Leath's favorite target.  And Maxheimer testified that comments about Leath's activities were made in Spears presence, but all Spears did was walk away.[138]  While the Court believes that Spears actually knew what was going on in his Department, he, at a minimum, turned a blind eye to Leath's obviously illegal and unconstitutional conduct.

The Court further finds that Spears, whose office was located in the same building as the court where the traffic citations were adjudicated, would have noticed or been advised of the

---

[137] Tr. 137.

[138] Tr. 404.

large influx of Hispanics coming to court – especially since one of his officers, Jeff Garcia, was called upon to act as interpreter.  It is simply not believable on the evidence and reasonable inferences arising therefrom that Spears knew absolutely nothing about what was going on, as he claimed.

In considering what the City knew about Leath's conduct and how they reacted to it, it is important to consider Leath's role and authority in the Department.  While Leath worked 60 to 70 hours per week, Spears, although the "Chief," worked 39 hours a week and was considered "part-time."  Spears considered Leath to be the most knowledgeable officer in the Department.[139] Maxheimer, who was employed between January and August of 2007, viewed Leath as his boss.[140]  All indications are that even before Spears formally promoted Leath to Assistant Chief of Police in July of 2007, he gave Leath free reign in the Department, effectively delegating to him responsibility for day-to-day operations of the Department.  The Court concludes that Spears deferred to Leath in large part because Leath wrote so many tickets and brought in so much money for the City, and because Leath was the dominant and authoritative presence in the Department.

In conclusion, the Court finds that the City, through Mayor Johnson and Police Chief Spears, actually knew that Leath was illegally targeting Hispanics for traffic stops.  Alternatively, they should have known it or, with the exercise of reasonable diligence, would have known it.

---

[139]  Tr. 275-276.

[140]  Tr. 425.

**E.      The Lawsuit and the City's Response**

Mayor Johnson testified that she did not believe the allegations against Leath were true when she heard them.[141]  Even though no inquiry or investigation had been made, Johnson was certain that she would have known about it had Leath engaged in discrimination.[142]   After being advised of the allegations on June 12, 2007, the only action that Johnson took was to ask Spears to look into it.  This was consistent with her policy to delegate to Spears all decision-making authority over the Alexander Police Department.[143]  After the lawsuit had been filed, Johnson "didn't see the point to investigate anymore."[144]

Chief Spears also stated that he did not believe the allegations against Leath could be true.  As Spears testified in his deposition and acknowledged at trial, "I just know he [Leath] wouldn't do that."[145]  Spears informed Leath about the allegations and potential lawsuit on the evening of June 12th.  The conversation was informal and lasted no longer than two minutes.  It consisted of Spears asking Leath one question: "Are you profiling Hispanic people?" to which Leath replied, "No."  Spears did not ask Leath any other questions.[146]

Spears did one more thing to complete his "investigation."  Even though Leath was the only officer alleged to have engaged in racial profiling, Spears "ran the numbers" on citations

---

[141]   Although Johnson testified she did not hear about the allegations until June 12, 2007, her acknowledged response is completely consistent with Guardado's description of Johnson's response when Guardado complained to Johnson several weeks earlier.  This adds further credibility to Guardado's testimony.

[142]   Tr. 470-471.

[143]   Tr. 249-250.

[144]   Tr. 479.

[145]   Tr. 261, 265.

[146]   Tr. 70, 266.

issued by all officers in the Department, had them categorized by race (Hispanic, African-American or Caucasion) and reviewed them.  Spears concluded, without looking at Leath's citations separately, that no racial profiling was occurring and that no further investigation was necessary.[147]

Spears did not write anything down about his investigation of the allegations.  He did not open a case file, and he made no effort to contact Koch for additional information.[148]  Asked what additional information he needed to conduct a real investigation, Spears replied:

> All I had was alleged allegations.  I didn't have no names that I could go on and speak with.  There's several factors that you must consider when investigating something like this.[149]

Despite the serious and more detailed allegations in the Complaint, with which Spears was served on June 18, 2007, Spears conducted no further investigation of the allegations.  Spears never disciplined, counseled, or reprimanded Leath for the incidents giving rise to this lawsuit.[150]  Quite the contrary.  Instead, Spears promoted Leath to Assistant Chief of Police, approximately thirty days after the lawsuit was filed, effectively rewarding Leath for his conduct.[151]  Spears testified that Leath's dedication to the City influenced the promotion.[152]  Chief Spears also put Leath in charge of all training for the Department.[153]

---

[147]  Tr. 263, 494-495.

[148]  Tr. 264.

[149]  Tr. 263-264.

[150]  Tr. 256, 269.

[151]  Tr. 246.

[152]  Tr. 286.

[153]  Tr. 270.

The Court concludes that Spears failed to conduct a legitimate investigation of the complaints of racial profiling.  In sum, Spears's "investigation" was a sham.  He looked at some citations solely to establish a basis for his predetermined conclusion that no racial profiling had occurred.  Spears made no effort to even go through the motions of a real investigation.  But why should he?  He actually knew about Leath's unlawful conduct.  By looking at the overall citations, he reassured himself that he could plausibly deny the charges and at the same time create the appearance that some action had been taken in response to these serious allegations.

The Court's conclusion is further supported by evidence of how Spears reacted to less serious allegations against other officers.  During his testimony, Spears acknowledged how he responded to a citizen's complaint that an officer had shot his dog.  Spears took numerous witness statements and obtained relevant documents, including previous complaints and police reports about the dog.  Spears then compiled all of the materials into a case file that was just under a half-inch thick.[154]  Considering this, Spears clearly knew how to conduct real internal investigation; he simply elected not to conduct one in this case, realizing just what such an investigation would bring to light.

The evidence also suggested that Spears supervised Leath using a different, more lenient standard than he applied to other officers.  Johnson and Spears both testified that the City imposes a standard of conduct on its employees which requires them to avoid even the appearance of impropriety.[155]  As an example, Spears fired police officers Cynthia Hood and Patrick Duvall for inappropriate behavior while on duty.   Johnson explained that it was reported that Hood and Duvall spent the night together in the fire department and asked others to leave the

---

[154]  Tr. 260-261.

[155]  Tr. 249, 268.

building so they could be alone.[156]  In Hood's termination letter, Spears wrote that even though

he had found no evidence of inappropriate activities, the incident had "brought discredit" on the

Alexander Police Department.[157]  Spears further advised Hood that she had violated the

Department's rule which states that:

> NO OFFICER OF THE ALEXANDER POLICE DEPARTMENT SHALL ACT OR
> CONDUCT HIMSELF/HERSELF EITHER PRIVATELY OR IN AN OFFICIAL
> CAPACITY IN SUCH A MANNER TO BRING DISCREDIT UPON HIM/HER OR
> TO THE DEPARTMENT.[158]

Asked why he did not apply the same appearance of impropriety standard to Leath, even

after reports of the lawsuit triggered national media attention, Spears explained, "The alleged

allegations had not been proven."[159]  Yet, the fact that no evidence was found to support the

allegations against Hood did not stop Spears from firing Hood for one isolated allegation of

inappropriate behavior.

In addition to demonstrating that Spears did not hold Leath to the same standard as other

officers, this evidence also supports the conclusion that Spears did not consider racial profiling to

be a serious matter.  When a citizen's dog was shot, it merited a full scale investigation.  But, a

report that an officer was racially profiling Hispanics brought no formal investigation.  Spears

attempted to justify the lack of a formal investigation by stating that he required a formal written

complaint in order to conduct an investigation.  The Court rejects this explanation as an

---

[156]  Tr. 248-249.

[157]  *Id.*

[158]  Plaintiffs' Exhibit 11, Termination Letter (quoting rule; emphasis in letter).  Tr. 267-268.

[159]  Tr. 269.

after-the-fact excuse, and a poor one, at that.  The City's apparent policy is that allegations of unconstitutional conduct against an officer will not be investigated unless and until an affected citizen files a complaint in writing.  Such a policy, particularly in the case of serious ethnic profiling allegations, is unacceptable.

Spears put together the Department's "Rules and Regulations Manual."[160]   While it includes a racial profiling policy, that policy was added later, after it was determined during a joint legislative audit that the Alexander Police Department lacked such a policy.[161]   Arkansas law requires all police departments in the state to adopt a written policy prohibiting racial profiling.[162]

Alexander's policy tracks the statutory requirement and states in part:

The Alexander Police Department shall be in compliance with ACT 1207 OF 2003 of the General Assembly of the States of Arkansas as relating to Racial Profiling . Bias Based Profiling:
. . .
This policy requires that Alexander Police officers have reasonable suspicion prior to a stop, arrest, ot [sic] detention.  Ensure that individuals are stopped for a valid reason, and that race, ethnicity, national origin, or religion are not a basis for stops for violations for which other non-group members would not be stopped.
. . .
Emphasis is based on fair and impartial application of Law Enforcement duties and responsibilities.  All stops and detentions will be based solely on reasonable suspicion and/or probable cause prior to initiating the stop/detention.

The Alexander Police Department will strive to create an atmosphere of trust and cooperation with the community we serve.[163]

---

[160]  Plaintiffs' Exhibit 12.  Tr. 281.

[161]  Tr. 281-282.

[162]  Ark. Code Ann. § 12-12-1403.

[163]  Plaintiffs' Exhibit 12.

Although the policy existed, it was  not enforced.  It is unclear whether Spears even understood racial profiling.  He testified that if the population of African-Americans in the areas was 2.3% and 100% of the persons an officer stopped for traffic violations were African-American, there would be no racial profiling as long as the officer had probable cause to make each stop.[164]

Spears made the decision to place Leath in charge of conducting state law mandated annual training on racial profiling for the entire Department.[165]  The record does not indicate whether Spears made this decision before or after the lawsuit was filed.  Regardless of when the appointment was made, it was made or allowed to continue without conducting any investigation into the merits of the racial profiling allegations against Leath.  With the serious issues of racial profiling pending in this lawsuit, Spears's decision to make Leath the Department's point person for racial profiling training exhibits a reckless indifference to the rights of the community.

Mayor Johnson also did not appear to understand racial profiling.  Part of this misunderstanding appeared to be due to the fact that Johnson did not appear to appreciate the distinction between probable cause for a traffic stop and applying the law in a non-discriminatory manner.  Asked about people stopped for speeding, she opined that anyone stopped by a police officer "must have done something wrong if they got stopped."[166]  She clarified her statement, "Well, I wouldn't think a police officer would stop someone if they

---

[164]  Tr. 279.

[165]  Tr. 273.

[166]  Tr. 485-486.

hadn't done something or had probable cause to stop them."[167]  Johnson then testified that if a person who complained about racial profiling was ticketed and was found guilty of the infraction, that would mean that there was no racial profiling.[168]

In conclusion, Spears and Johnson both evidenced a lack of understanding as to the meaning of racial profiling.  Johnson ignored early allegations that Leath was racially profiling Hispanics.  Although she later acknowledges asking Spears to look into the allegations, she failed to follow up to ensure that the allegations were investigated.   Spears knew that Leath was targeting Hispanics but failed to take any action to stop him or to reprimand him for his conduct.  By their acts and omissions, both of these city officials displayed a complete lack of understanding or concern regarding the City's compliance with constitutional minimum standards of conduct.

## IV.    CONCLUSIONS OF LAW

The six Plaintiffs now before the Court assert claims under: (1) the Equal Protection Clause of the Fourteenth Amendment and the Arkansas Civil Rights Act; (2) 42 U.S.C. § 1981; (3) the Fourth Amendment and the Arkansas Civil Rights Act; and (4) state law violations for conversion and trespass to chattel.  Before discussing the claims separately, the Court will discuss a few preliminary matters.

The parties agree that the state law claims under the ACRA mirror the federal Equal Protection and Fourth Amendment claims and are analyzed identically.  The ACRA provides a cause of action for damages for "the deprivation of any rights . . . secured by the Arkansas

---

[167]  Tr. 487.

[168]  *Id.*

Constitution."[169]   The statute further provides that, in construing, such a cause of action, "a

court may look for guidance to state and federal decisions interpreting . . . 42 U.S.C. § 1983."[170]

The parties, at trial and in their post-trial briefing, cite only federal cases interpreting federal

law.  Neither side argues that the ACRA requires separate analysis as to any aspect of the claims

under the Fourteenth and Fourth Amendments.  Accordingly, the parties have waived the right

to argue that the ACRA provides rights greater than, or lesser than, its federal counterparts.[171]

The Court therefore will not discuss the ACRA separately, but its rulings on Plaintiffs' § 1983

claims for violation of equal protection and unlawful seizure apply equally to Plaintiffs' ACRA

claims.

The only remedy Plaintiffs seek is money damages.  Plaintiffs have sued the individual

Defendants, Leath and Spears, in both their individual and official capacities.  They also have

sued the City of Alexander.  The Eleventh Amendment bars a suit against a state official in his

official capacity for monetary damages, since it would be paid from public funds in the state

treasury.[172]  Official capacity suits "generally represent only another way of pleading an action

---

[169]  Ark. Code Ann. § 16-123-105(a).  *See, e.g.*, Ark. Const. art. II, § 3 ("The equality of all persons before the law is recognized, and shall ever remain inviolate; nor shall any citizen ever be deprived of any right, privilege, or immunity, nor exempted from any burden or duty, on account of race, color or previous condition."); Ark. Const. art. II. § 15 ("[T]he right of the people of this State to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated.).

[170]  Ark. Code Ann. § 16-123-105(c).

[171]  See *Lewis v. Jacks*, 486 F.3d 1025, 1029-30 (8th Cir. 2007) (rejecting plaintiff's argument on appeal that ACRA and Arkansas Constitution provided more protection than federal claims under § 1983, noting that ACRA claim had been disposed of on summary judgment with federal claim even though there was no separate discussion of the state law claim).

[172]  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989); *Barkes v. State of Missouri*, 960 F.2d 63, 64 (8th Cir. 1992) (per curiam).

against an entity of which an officer is an agent."[173]  Because Plaintiffs have sued the City, their official capacity suits against Leath and Spears are redundant and may be disregarded.

With their individual capacity claims against Leath and Spears, Plaintiffs seek to impose personal liability upon both Defendants for their unlawful actions.  Such claims are not barred by the Eleventh Amendment.[174]

In considering Plaintiffs' federal claims, the Court first will consider all claims against Leath and Spears to be solely in their individual capacities.  As a general rule, "in order for municipal liability to attach, individual liability must be found on an underlying substantive claim."[175]  Thus, for any constitutional or federal violation committed by Leath or Spears, the Court will also consider whether a policy or custom of the City played a part in that violation to the extent that municipal liability should be imposed on the City.

### A.    Equal Protection

The Equal Protection Clause "provides that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'"[176]

Selective enforcement of the law on the basis of race violates the Fourteenth Amendment's guarantee of equal protection under the law.[177]  The Supreme Court has

---

[173]  *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (omitting internal quotations).

[174]  *Id.*

[175]  *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005).  But see, *Speer v. City of Wynne, Arkansas*, 276 F.3d 980, 986 (8th Cir. 2002) (recognizing that situations "may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation.").

[176]  U.S. Const. amend. XIV, § 1.

[177]  *Whren v. United States*, 517 U.S. 806,  813 (1996).

explained that a claimant alleging selective enforcement of facially neutral criminal laws must demonstrate that the challenged law enforcement practice "had a discriminatory effect and that it was motivated by discriminatory purpose."[178]

Inquiry under the Equal Protection Clause is separate and distinct from that under the Fourth Amendment.  That is, an officer's selective enforcement of the law may violate the right to equal protection while not offending the Fourth Amendment.

### 1. Individual Liability

#### a. Defendant Tommy Leath

Plaintiffs provided direct evidence that Leath targeted Hispanics.  The Court credited this evidence, finding that Leath intentionally targeted Hispanics in carrying out his patrol duties.  The direct evidence in this case was extensive.  It also included anecdotal evidence that Leath treated non-Hispanics more favorably.  For example, Hubbard testified that on one occasion he witnessed Leath stop someone he believed to be a Latino based upon a flag displayed on the rear window of the vehicle.  After making the stop, Leath realized he was mistaken and that the driver was actually of "European" descent.  Leath allowed the driver to go without issuing a ticket.

Plaintiffs also presented numerical evidence proving that during the relevant time period 53% of all the citations Leath issued were to Hispanics and 68.2% of the obstruction of view citations were to Hispanics.  The Court has rejected Defendants' argument that this evidence does not support the factual bases of Plaintiffs' claims.

Defendants appear to argue that, regardless of the other proof presented, Plaintiffs "must establish that other individuals of different races were not stopped, ticketed, or arrested for the

---

[178] *Wayte v. United States*, 470 U.S. 598, 608 (1985).

same crimes."[179]  The Court rejected this argument on summary judgment and rejects it again

now, since it suggests that demonstrating discriminatory effect may be accomplished in only one

way, *i.e.*, by identifying individuals of different races who were not stopped, ticketed, or arrested

for the same crimes.  A showing of discriminatory effect may be made in numerous ways.  "A

claimant can demonstrate discriminatory effect by naming a similarly situated individual who

was not investigated or through the use of statistical or other evidence which address[es] the

crucial question of whether one class is being treated differently from another class that is

otherwise similarly situated."[180]

Direct evidence of racially-motivated decision making is "other evidence" that can also

demonstrate discriminatory effect.  In this particular case, the substantial direct evidence of

Leath's racially motivated intent does double duty – it bears both upon his discriminatory

purpose and the resulting discriminatory effect.  In reaching this conclusion, the Court is

mindful that there are very few selective law enforcement equal protection cases where a

plaintiff is able to produce direct evidence.  However, the Eighth Circuit, in a case involving a

racially motivated traffic stop, stated that it would assume that "a prima facie equal protection

claim may also be proved by direct evidence of racial discrimination."[181]

---

[179]  Defendants' Post-Trial Brief, docket entry # 97, p. 15, ¶ 22.

[180]  *Farm Labor Organizing Committee v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2001) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 638 (7th Cir. 2001) (omitting internal quotes) (emphasis added).

[181]  *Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003) (the plaintiff alleged that she was stopped solely because of her race but presented no other evidence to prove her claim). Commentators have also suggested that direct evidence of intent may be sufficient alone: "The courts have divided on whether statistical evidence is sufficient to prove intentional discrimination, but where there is direct evidence of racial discrimination, the issue is clearly one for the jury."  M. Avery, D. Rudovsky and K. Blum, POLICE MISCONDUCT: LAW AND LITIGATION, § 2:6 "Racially Motivated Misconduct – Equal Protection Principles" (3d ed. 2008) ("POLICE MISCONDUCT").

But, here the Plaintiffs have presented more than direct evidence.  They have presented probative numerical and statistical information.  The Court need not resolve the issue of whether this numerical evidence alone, would suffice to discharge Plaintiffs' initial burden.[182]

Defendants contend that the disproportionate number of Hispanics stopped for windshield obstruction violations is due simply to the fact that Leath was reminded at ALETA that he could stop vehicles if anything was hanging from the rear view mirror.  The Court accepts that Arkansas laws permitting stops for windshield obstruction were discussed at ALETA and that Leath was reminded that the law could be used as a basis for probable cause for traffic stops.[183]  For this analysis, the Court disregards questions about whether Leath made a mistake of law in applying Arkansas's windshield obstruction laws.[184]  But, this explanation fails to provide a race-neutral explanation for the disproportionately large number of Hispanics cited by Leath during the critical time period.  The Court rejects Defendants' suggestion that pure coincidence explains the fact that almost 70% of all persons cited by Leath for obstruction of view were Hispanic.  In the Court's view, this data suggests something other than an officer carrying out his patrol duties without regard to the national origin of the drivers of the vehicles he chose to stop.

---

[182] Some have suggested that the three-part equal protection test from *Batson v. Kentucky*, 476 U.S. 79 (1986) would provide an appropriate framework for the analysis of such evidence.  See POLICE MISCONDUCT, supra, at 67.  This approach would permit statistical and other circumstantial evidence to create a "rebuttable, prima facie case" that race was a motivating factor, thereby, requiring the government to articulate a race-neutral explanation.  Then the party challenging the action would shoulder the "ultimate burden" of proving discrimination.  Here, Defendants have failed to provide a race-neutral explanation for the statistical evidence.

[183] The Court doubts that the law was misrepresented, as Leath stated at one point in his testimony, to prohibit the hanging of any object from a vehicle's rear view window.  This issue is discussed in more detail in connection with the Court's Fourth Amendment analysis.

[184] Again, this is discussed in connection with the Fourth Amendment analysis.

In the Court's view, the evidence clearly established that Leath intentionally and purposefully targeted Hispanics. He looked for any excuse to pull Hispanics over for a traffic stop so he could issue them a citation and tow their vehicles. Frequently, items hanging from the windshield provided the basis for a traffic stop. But, he looked for any reason. In doing so, Leath disproportionately applied neutral laws to a specific class of people -- Hispanics. The circumstance that Officer Leath may also have been motivated by other factors, such as his desire to find favor with his superiors and to assist the City in raising money, does not justify or diminish his ethnic animus, which was, the Court finds, a central and dominant motivation for his discriminatory conduct.

The Court concludes that Leath violated the Equal Protection Clause when he intentionally targeted Hispanics for windshield obstruction violations. The Court further concludes that Leath violated the Equal Protection Clause when he pulled over Roberto Giron for a turn signal violation and had his vehicle towed.[185]

The issue is slightly different with respect to Florencio Villanueva, but the Court concludes that Leath also violated his equal protection rights. The Court relies on the direct evidence of Leath's racially motivated conduct in targeting Hispanic drivers for traffic stops and the related numerical evidence demonstrating the statistical disparity in the number of citations Leath issued to Hispanics and non-Hispanics. The discriminatory effect found in the disparity in the total number of citations issued by Leath to Hispanics versus non-Hispanics applies equally to Villanueva. Leath's discriminatory animus toward Hispanics as a class applies equally to Villanueva. The Court concludes, based on the totality of the circumstances, that Leath's

---

[185] The Court's finding, *infra*, that Giron has not prevailed on his Fourth Amendment claim does not claim that he was targeted for a traffic stop because of his ethnicity.

conduct toward Villanueva was motivated by a discriminatory purpose.  In sum, Leath would not have arrested Villanueva and treated him as he did but for Villanueva's Hispanic origin.

### b.      Defendant Allen Spears

Having found that Leath violated Plaintiffs' equal protection rights, the Court may now answer the question of whether liability should be imposed on Spears for his failure to properly supervise Leath.  A supervisor may be held individually liable under § 1983 if he directly participates in the constitutional violation or if he fails to train or supervise the subordinate who caused the violation.[186]  The standard of liability for failure to supervise is "demonstrated deliberate indifference or tacit authorization of the offensive acts."[187]

Plaintiffs do not contend that Spears directly participated in Leath's unconstitutional conduct but rather that he failed to properly supervise Leath and to take corrective action.  To establish supervisory liability, Plaintiffs must show that Spears:

(1)      Received notice of a pattern of unconstitutional acts committed by [Leath];
(2)      Demonstrated deliberate indifference to or tacit authorization of the offensive acts;
(3)      Failed to take sufficient remedial actions; and
(4)      That such failure proximately caused injury to [Plaintiffs][188]

The Court specifically finds that Spears knew that Leath had embarked upon a practice of discriminatorily stopping and citing Hispanics.  Spears also knew that Leath's racial profiling was an ongoing, continuing pattern of illegal conduct, rather than a few isolated instances of

---

[186]  *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 673 (8th Cir. 2007) (omitting citation).

[187]  *Id.*

[188]  *Parrish v. Ball*, No. 08-3517, 08-3518, 2010 WL 445736 (8th Cir. Feb. 10, 2010).

misconduct.[189]   Spears learned about Leath's racial profiling while it was occurring, but failed to take any action to stop it.  He also attempted to cover it up, by conducting a "sham" investigation after being asked by Mayor Johnson to "look into" whether Leath was racially profiling Hispanics.  While he was aware that Leath was profiling Hispanics, Spears allowed Leath to occupy a position of leadership in the Department.  Shortly after this lawsuit was filed, Spears named Leath Assistant Chief of Police, thereby giving Leath a title to match the role he was already playing.  Spears also placed or left Leath in charge of conducting annual training on racial profiling for the Department.

Spears put together the Alexander Police Department's Rules and Regulations Manual.  Initially, he failed to include a provision addressing racial profiling.  Such a provision was only added later, after a legislative audit revealed that the Department, in violation of Arkansas law, had no written policy on racial profiling.  The evidence demonstrated that the written policy was nothing more than a piece of paper added to the Department's manual merely to satisfy a legal requirement.  Spears ignored the written policy prohibiting racial profiling.  He made no effort to see that the policy was enforced initially, and then, when it was clearly being violated, he took no remedial action.  By allowing Leath to establish a pattern and practice of targeting persons because of their ethnicity, in clear violation of the Department's written policy, Spears signaled that the written policy could be ignored.

While Spears did not participate directly in Leath's racial profiling, he was both deliberately indifferent to, and tacitly authorized, Leath's practice of racial profiling.  Spears knew of and acquiesced in the constitutional violations committed by Leath.  By his own acts

---

[189] *Marchant v. City of Little Rock*, 741 F.2d 201, 204-05 (8th Cir. 1984) (isolated instances of misconduct by subordinates do not give rise to supervisory liability where supervisor had no knowledge of or connection with improper acts).

and omissions, Spears proximately caused injury to Plaintiffs.  By purposefully disregarding Leath's actions, he condoned the conduct.  He could have taken easily available measures to remedy or diminish the harm Leath caused, but failed to do so.  As of the trial, Spears had not taken any remedial action, but still continued to deny that any wrong had occurred.

While the evidence did not pinpoint the precise date on which Spears learned of Leath's unlawful actions, the Court finds, from all of the evidence, that it happened early on.  The Court specifically finds that Spears could, and should, have acted to prevent the ethnic profiling of Plaintiff Roberto Giron on May 5, Plaintiff Florencio Villanueva on May 15, and Plaintiff Jose Gutierrez on May 16th.  The Court cannot so find with regard to Ruben Duarte and Edvin Giron, who were stopped on April 22 and 23rd, respectively.

Leath began his pattern of illegal profiling sometime in April, but it is difficult to pinpoint the precise date. The Court took a conservative approach to assess whether Leath purposefully targeted Hispanics, using the date of April 21, the date of the first windshield obstruction ticket and a definite point at which tickets to Hispanics noticeably increased.[190] Leath issued four other tickets to Hispanics in April, using as a basis for the stop defective brake light (2 stops), a broken windshield (1 stop), and not providing any basis for one of the stops.[191] Leath would more likely then not have towed their vehicles because he cited them all for the improper charge of driving with a suspended license.

So, the question arises:  can it be said that Spears's failure to supervise at least partially caused the constitutional violations that occurred on April 22nd and 23rd, including the natural

---

[190]  On April 21-22, 2007, a Saturday and Sunday, Leath issued a total of 8 citations to Hispanics.  During the same time, he issued only 3 citations to non-Hispanics.

[191]  Guardado testified that Leath would sometimes stop Hispanics for obstruction of view but write the citations for something else.  Tr. 42.

adverse consequences flowing therefrom?  The Court so finds.  Both Edvin Giron and Ruben

Duarte were stopped for alleged obstruction of view violations:  Giron for a three inch air

freshener and Duarte for two stickers on his rear window.  Both had to go to Court two to three

times before the charges were dismissed.[192]  Spears certainly could have spared Plaintiffs the

stress associated with having to go to Court multiple times to oppose the racially motivated

charges, neither of which could be sustained on their merits.

He could also have taken remedial action.  Once Spears became aware of Leath's

conduct, he should have taken action immediately not only to stop it, but also to remedy or

ameliorate the harm.  This failure to take remedial action is also a proximate cause of the total

harm caused by Leath's conduct.  Because Spears had the power and authority to alleviate the

consequences of the violations, his failure to do so affirmatively connects directly to Leath's

own personal unconstitutional conduct.

Alternatively, Spears's acts and omissions in this particular case are such that they

should be treated as ratifying Leath's conduct.  That is, Spears sanctioned the conduct to a

degree that he was complicit in, and may therefore be held responsible for, all the racial

profiling that Leath carried out during this time period.  After all, Leath was not just a

subordinate officer.  Spears had given Leath de facto control over the Department.  Additionally,

it was well known that Leath issued more citations than any other officer in the Department.  As

soon as Spears learned that Leath was targeting Hispanics, there was an imminent need for

preventative and remedial action to address the unlawful conduct.  By doing nothing, Spears

ratified and approved Leath's ongoing unlawful conduct, past, present and future.

---

[192]  It is not entirely clear whether Duarte and Giron's charges were included in the group
of charges dismissed by the City after this lawsuit was filed, or were dismissed individually in
court.

The Court recognizes that the concept of supervisory liability is currently somewhat in flux due to the Supreme Court's recent decision in *Ashcroft v. Iqbal*.[193]  Although the primary issue before the Court in *Iqbal* was whether plaintiffs had satisfied the pleading standards to impose supervisory liability, the opinion discusses the standard for imposing supervisory liability, albeit in a *Bivens* context.[194]  The Court rejected the argument that high-level supervisory  officials (Ashcroft and Mueller) could be held individually liable based on "mere knowledge of [a] subordinate's discriminatory purpose."[195]

The Eighth Circuit has not addressed the extent to which, if any, *Iqbal*, alters supervisory liability precedent in this circuit.  In a February 10, 2010, opinion, the Eighth Circuit determined that its finding that the defendant sheriff was entitled to qualified immunity made it unnecessary to address *Iqbal's* effect.[196]  Though the Eighth Circuit has not yet spoken on this issue, this Court has considered *Iqbal* in reaching its decision in *Parrish*.

The Court also rejects qualified immunity for Spears.  "The Supreme Court has generously construed qualified immunity protection to shield 'all but the plainly incompetent or those who knowingly violate the law.'"[197]  Spears clearly falls into one of these categories.  Because it is clearly established that selective enforcement of the law violates the Equal

---

[193]  129 S. Ct. 1937 (2009).

[194]  The four-member dissent argued that it was unnecessary to "*sua sponte* decide the scope of supervisory liability," pointing out that the issue had not been argued or briefed because the defendants had conceded that "a supervisor's knowledge of a subordinate's unconstitutional conduct and deliberate indifference to that conduct are grounds for Bivens liability."  *Iqbal*, 129 S. Ct. at 1956-1957 (Souter, J., joined by Stevens, J., Ginsburg, J., Breyer, J., dissenting).

[195]  *Iqbal*, 129 S. Ct. at 1949.

[196]  *Parrish v. Ball*, __ F.3d __, 2010 WL 445736, * 7-8 (8th Cir. February 10, 2010).

[197]  *Davis v. Hall*, 375 F.3d 703, 711-12 (8th Cir. 2004) (omitting citations) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.").

Protection Clause, Spears's deliberate indifference violated "clearly established statutory or constitutional rights of which a reasonable person would have known."[198]

### 2.    Municipal Liability Against the City of Alexander

To impose municipal liability upon the City, Plaintiffs must identify a governmental "policy or custom that caused [their injuries]."[199]  Plaintiffs have presented evidence to support the theory that the City permitted Leath to establish a municipal custom.

A municipal "custom or usage" is demonstrated by:

(1)    The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2)    Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3)    Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, *i.e.,* [proof] that the custom was the moving force behind the constitutional violation.[200]

Plaintiffs have established that Leath's pattern of unconstitutional conduct was continuing, widespread, and persistent.  The repeated instances of racial profiling, along with Spears's tacit authorization of the practice, established a custom in the City.  The fact that the pattern stopped after this lawsuit was filed does not alter this conclusion.

Chief Spears's acts and omissions, discussed in connection with his individual liability for failure to supervise, may also be considered in assessing municipal liability.  But, the Court may also consider the acts and omissions of Mayor Johnson, the presumed final policy maker in the City, whose acts alone are sufficient to subject the City to municipal liability.

---

[198]  *Whren*, *supra*, 517 U.S. at 513;  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[199]  *Brockington*, *supra*, 503 F.3d at 674.

[200]  *Ware v. Jackson County, Mo.*, 150 F.3d 873, 880 (1998) (quoting *Jane Doe A. v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990)) (alterations in original).

In late April, Mayor Johnson was specifically notified by a citizen, Jamie Guardado, of the allegation that Leath was racially profiling Hispanics.  Once advised of such a serious allegation, Johnson, at a minimum, should have reported the allegation to Spears and ensured that they were properly investigated.  She was deliberately indifferent not to so act.

Despite Spears's testimony that his practice was not to investigate complaints against officers unless the complaining party filed a written complaint, it would have been deliberately indifferent to ignore such serious allegations.  And, in this case, it would have taken so little effort, simply to look at Leath's citations and thereby confirm what he already knew: Leath was violating the law by illegally profiling Hispanics.

Plaintiffs have demonstrated that "city officials had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action."[201]  "When it becomes clear that a police force needs close and continuing supervision, 'the inevitable result' is a continuation of the misconduct."[202]

The evidence establishes without question that racial profiling was an on-going, accepted practice at the Alexander Police Department, and that Mayor Johnson and Police Chief Spears knew of, ignored, and, in effect, covered up the practice.  Because the Court concludes that their deliberate indifference and tacit authorization of Leath's conduct caused injury to Plaintiffs, municipal liability will be imposed.

The City has no good faith immunity defense.[203]

---

[201] *Parrish v. Luckie*, 963 F.2d at 204.

[202] *Harris v. City of Pagedale*, 821 F.2d 499, 508 (8th Cir. 1987) (omitting citation).

[203] *Owen v. City of Independence, Mo.*, 445 U.S. 622 (1980).

**B.      § 1981 Claim**

Plaintiffs allege that Defendants' racially discriminatory actions also violated 42 U.S.C. § 1981, which reads:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The Court rejected Defendants' summary judgment argument that § 1981 claims are limited to the making and enforcement of contracts.[204]  While much of the § 1981 jurisprudence concerns contracts in the employment context, the provision is not so limited.[205]

The Supreme Court has held that "purposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981."[206]  The Court has found that Leath was motivated by a racially discriminatory purpose in targeting Hispanics for traffic stops.[207]  Accordingly, by prevailing on their equal protection claims, Plaintiffs have also prevailed on the § 1981 claims against Leath in his individual capacity.

---

[204]  See Court's Order, docket entry # 70, at 43-45.

[205]  See, e.g., *Anita v. Thurman*, 914 F. Supp. 256 (N.D. Ill. 1996) (Section 1981 claim, as well as equal protection claim, stated by allegation that female motorist was arrested because of her Hispanic background);  *Alexis v. McDonald's Restaurant of Massachusetts*, 67 F.3d 341 (1st Cir. 1995) (decision by police to enforce criminal trespass statute against customer because of her race states Section 1981 violation);  *Grier v. Galinac*, 740 F. Supp. 338 (M.D. Pa. 1990) (improper arrest by police on racial grounds may be Section 1981 violation).

[206]  *Gratz v. Bollinger*, 539 U.S. 244, 275-76 n. 23 (2002) (citing *General Building Contractors Assn., Inc. v. Pennsylvania*, 458 U.S. 375, 389-390 (1982)).  While the *Gatz* case involved § 1981's "make and enforce contracts" clause, there is no reason to believe that the Supreme Court would apply different standards to different clauses of Section 1981.

[207]  See also *Devan v. City of Des Moines, Iowa*, 767 F.2d 423 (8th Cir. 1985).

The Court declines to impose supervisory liability on Spears under § 1981.  The parties have not addressed whether to do so the Court would have to find that Spears's acts and omissions were racially motived.[208]  The Court therefore does not resolve this issue.

Following the Supreme Court's decision in *Jett v. Dallas Independent School District*,[209] the limitations on municipal liability established for claims under 42 U.S.C. § 1983 established by *Monell v. Department of Social Services*[210] apply equally to claims against municipalities asserted under 42 U.S.C. § 1981.  Thus, to establish municipal liability for Leath's unlawful conduct, Plaintiffs must establish a custom and policy.  For the same reasons which established municipal liability for Plaintiffs' equal protection claim, municipal liability also exists under § 1981.

## C.    Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[211]  The Court must assess the reasonableness of Leath's stated probable cause for stopping the Plaintiffs' vehicles and for seizing Plaintiff Villanueva at his residence.  In analyzing Plaintiffs' claims that Leath violated their Fourth Amendment rights the Court must disregard Leath's subjective intent which plays "no role in ordinary, probable-cause Fourth Amendment analysis."[212]

---

[208]  See, e.g., *Hayes v. Kerik*, 414 F.Supp.2d 193, 209 (E.D.N.Y. 2006) (individual liability under 42 U.S.C. § 1981 requires proof that the individual defendant's actions were racially motivated).

[209]  491 U.S. 701 (1989).

[210]  436 U.S. 658 (1978).

[211]  U.S. Const. amend. IV.

[212]  *Whren*, 517 U.S. 806.

The Court will consider separately the windshield obstruction traffic stops, the traffic stop for failure to use a turn signal, and the seizure of Plaintiff Villanueva.

### 1.      Windshield Obstruction Traffic Stops

An officer's stop of a vehicle is considered a seizure within the meaning of the Fourth Amendment.[213]  As such, the officer making the stop must have "at least articulable and reasonable suspicion" of illegal activity to stop a motor vehicle.[214]   Probable cause that a driver has committed any traffic violation, no matter how minor, provides sufficient justification under the Fourth Amendment to stop a vehicle.[215]

It is undisputed that Leath stopped Plaintiff Edvin Giron because he had an air freshener hanging from his rear view mirror.  Leath stopped Plaintiff Jose Gutierrez because he had rosary beads and an air freshener hanging from his rear view mirror.  Despite Leath's testimony to the contrary, the Court finds that Leath stopped Plaintiff Ruben Duarte because he had a Guatemalan and Mexican flag on his rear window.

Still, Leath claims that he had probable cause to stop all three Plaintiffs based upon either Ark. Code Ann. § 27-37-304 or § 27-37-302.  The two statutes read:

**27-37-304.      Obstruction of interior prohibited.**
(a)(1)(A)  It is unlawful for any person to operate a motor vehicle which has any substance or material except rear-view mirrors and decals required by law <u>attached to the windshield</u> at any point more than four and one-half inches (4 1/2 ") above the bottom of the windshield <u>if the substance or material obstructs the operator's view or the safe operation of the vehicle</u>.
   (B)  It is unlawful for any person to operate a motor vehicle which has any substance or material attached to the window of either front door except substances or materials attached by the manufacturer if the substance or material obstructs the operator's view of the safe operation of the vehicle.

---

[213]  *United States v. Stachowiak*, 521 F.3d 852, 855 (8th Cir. 2008) (citation omitted).

[214]  *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 663).

[215]  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

(2)   The provisions of this section shall not apply to motorists driving motor vehicles registered in other states that have enacted legislation regulating the shading of windshields or windows of motor vehicles and who are driving on Arkansas roads and highways.

(b)  Nothing in this section shall prohibit the shading or tinting of windows of newly manufactured automobiles so long as the newly manufactured automobiles comply with all federal laws pertaining thereto.

(c)  Violation of this section shall constitute a Class C misdemeanor.

**27-37-302.      Windshields, etc., to be unobstructed**.

No person shall drive any motor vehicle with any sign, poster, or other nontransparent material <u>upon the front windshield, sidewings, side, or rear windows of the vehicle</u> other than a certificate or other paper required to be so displayed by law <u>if it obstructs the operator's view or the safe operation of the vehicle</u>.[216]

The Court questioned in its summary judgment Order whether the statutes even apply to items hanging from the rear view mirror, but did not resolve the issue.  The parties briefed the issue further in supplemental briefing.[217]

In resolving this issue, the Court first looks to Arkansas courts for guidance, but there appears to be no Arkansas law on point.  When there is no state law construing a state statute, a federal court must predict how the state's highest court would interpret the statute.  Alternatively, the Court could abstain from deciding the issue or certify it to the Arkansas Supreme Court for resolution.  For the following reasons, the Court concludes that neither certification nor abstention are appropriate.

Where a complaint raises federal claims which may be avoided by the state court's definitive ruling on a state law issue, a court may abstain.[218]  In *Robinson*, the Eighth Circuit described the two requirements that must be met for Pullman abstention to be appropriate:

---

[216]  Ark. Code Ann. § 27-37-304 or § 27-37-302 (emphasis added).

[217]  See Defs' brief, docket entry # 76 and Pls' brief, docket entry # 79.

[218]  *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (19419 (establishing equitable doctrine of "Pullman abstention"); see also *Robinson v. City of Omaha*, 866 F.2d 1042, 1043 (8th Cir. 1989) (court may *sua sponte* raise issue of appropriateness of Pullman abstention).

First, the controlling state law must be unclear.  Second, a tenable interpretation of the state law must be dispositive of the case.  In other words, if a reasonable interpretation would render unnecessary or substantially modify the federal constitutional question then abstention is appropriate.[219]

Alternatively, most states, Arkansas included, have adopted certification procedures which allow federal courts faced with an unclear issue of state law to certify the question directly to the State's highest court for resolution.  In Arkansas, certification is only appropriate for "questions of Arkansas law which may be determinative of the cause then pending in the certifying court."[220]

Certification is usually preferable to abstention.[221]  Certification has clear advantages over abstention, including reducing delay, cutting cost, and increasing the likelihood of an authoritative response.[222]  The Supreme Court has held that it is "manifestly inappropriate to certify a question in a case where, as here, there is no uncertain question of state law whose resolution might affect the pending federal claim."[223]

The Court has concluded that state law clarification of the statutes in question will not make a federal court ruling unnecessary.  In sum, this is a case where both abstention and certification "would not only hold little hope of eliminating the issue [posed by the statutory construction issue] but also would very likely pose other constitutional issues for decision, a

---

[219] *Robinson*, 866 F.2d at 1043; see also *Beavers v. Arkansas State Bd. of Dental Examiners,* 151 F.3d 838, 841 (8th Cir. 1998) (describing five factors to consider).

[220] Ark. Sup. Court Rule 6-8.

[221] *Arizonans for Official English v. Arizona*, 520 U.S. 43, 75- 6 (1997) ("Certification today covers territory once dominated by . . . *Pullman* abstention.").

[222] *Id.* at 76.

[223] *City of Houston, Tex. v. Hill*, 482 U.S. 451, 471 (1987).

result not serving the abstention [and certification] - justifying end of avoiding constitutional adjudication."[224]

For the reasons discussed more particularly below, the Court makes two alternative holdings, both of which support the Court's decision to predict how the Arkansas Supreme Court would interpret the statutes in question so that it may resolve the constitutional question now before the Court.  First, the Court predicts that the Arkansas Supreme Court would hold that the statutes in question do not address items hanging from the rear view mirror.  Alternatively, if the Arkansas Supreme Court were to hold that the statute prohibits such conduct, the Court would find that the statute was unconstitutionally applied to those Plaintiffs stopped for hanging items from their rear view mirror.

The Court starts by predicting how the Arkansas Supreme Court would construe these statutes.  In doing so, the Court is guided by Arkansas law stating that criminal statutes must be strictly construed and all doubts resolved in favor of the accused.[225]

Technically, the statutes appear to be concerned only with items <u>attached</u> to the windshield or windows of the vehicle.  The relevant portion of Ark. Code Ann. § 27-37-304 is limited to substances or materials "attached to the windshield" and Ark. Code Ann. § 27-37-302 concerns only nontransparent material "upon the front windshield, sidewings, side, or rear windows of the vehicle."  Despite the lack of any specific prohibition on hanging objects from the rear view mirror, Defendants argue that these statutes prohibited Plaintiffs from <u>hanging</u> objects from their rear view mirror.

---

[224] *Baggett v. Bullitt*, 377 U.S. 360, 378 (1964).

[225] *Moseley v. State*, 349 Ark. 589, 596-97 (2002).

In the other cases considering whether items hanging from a vehicle's windshield provided an officer with sufficient probable cause for a traffic stop, the relevant state law clearly prohibited items hanging from the rear view mirror.  In *United States v. Ramos-Caracalla*,[226] the Court, applying Nebraska law, held that a 7-3/4 inch air freshener hanging from the rear view mirror provided probable cause for the stop.  The Nebraska statute in question made it unlawful "to operate a motor vehicle with any object <u>placed or hung in or upon such vehicle</u>, except required or permitted equipment of the vehicle, in such a manner as to obstruct or interfere with the view of the operator through the windshield or to prevent the operator from having a clear and full view of the road and condition of traffic behind such vehicle."[227]  While Defendants cite two other cases[228] in support of their argument, both cases involved the same Nebraska law.  In one of those cases, the Eighth Circuit held that Nebraska's windshield obstruction law was not unconstitutionally vague.[229]  Thus, in Nebraska, citizens are clearly on notice, both by statute and case law, that the law prohibits hanging any item from the rear view mirror which obstructs or interferes with the drivers view.

The same can not be said of Arkansas law.  Technically, the statutes appear to be concerned only with items attached to the windshield or windows of the vehicle.  The relevant portion of Ark. Code Ann. § 27-37-304 is limited to substances or materials "attached to the windshield" and Ark. Code Ann. § 27-37-302 concerns only material "upon the front windshield, sidewings, side, or rear windows of the vehicles."  The statutes do not specifically prohibit the

---

[226]  375 F.3rd 797, 799 (8th Cir. 2004).

[227]  *Id.* at 801 (quoting Nebraska statute) (emphasis added).

[228]  *United States v.* Barragon, 379 F.3d 524 (8th Cir.2004); *United States v. Arciniega*, 569 F.3d 394 (8th Cir. 2009).

[229]  *United States v. Arciniega*, 569 F.3d 394 (8th Cir. 2009).

hanging of objects or materials from the rear view mirror.  Defendants wants the Court to infer that the statutes prohibit such conduct, but this would enlarge the meaning of the statutes.

Arkansas law states that criminal statutes must be strictly construed and all doubts must be resolved in favor of the accused.[230]  The statutes, strictly construed, do not address items hung from the rear view mirror of a vehicle.  The Court predicts that the Arkansas Supreme Court would so hold.

Alternatively, if the Arkansas Supreme Court were to hold that the statutes make it unlawful to hang items from a vehicle's rear view mirror, the Court would have to determine whether the statutes were unconstitutionally applied to Plaintiffs in this case.  "A statute is vague when the conduct it forbids is not ascertainable.  [People] of common intelligence cannot be required to guess at the meaning of the enactment."[231]  "To defeat a vagueness challenge, a penal statute must provide adequate notice of the proscribed conduct, and second, not lend itself to arbitrary enforcement."[232]

Faced with this question, the Court would have to conclude that neither Ark. Code Ann. § 27-37-302 nor § 27-37-304 provides citizens with adequate notice that hanging rosary beads or an air freshener from their rear view violates the law.

Based on this analysis, the Court finds that neither abstention nor certification is appropriate in this case because resolution of the state law issue will not avoid the need to determine whether Plaintiffs' constitutional rights under the Fourth Amendment were violated.

The Court concludes that Officer Leath made a mistake of law rather than a mistake of

---

[230] *Moseley v. State*, 349 Ark. 589, 596-97 (2002).

[231] *Hill v. Colorado*, 530 U.S. 703, 774 (2000) (omitting citations and internal quotation marks).

[232] *United States v. Berger*, 553 F.3d 1107, 1110 (8th Cir. 2009).

fact when he issued citations for windshield obstruction.  In the Eighth Circuit, when a police officer "makes a traffic stop based on a mistake of law, the legal determination of whether probable cause or reasonable suspicion existed for the stop is judged by whether the mistake of law was an 'objectively reasonable one.'"[233]

The Eighth Circuit appears to be a minority of one on this issue.  All other Circuits to consider the issue hold that a police officer's mistake of law can never be objectively reasonable.[234]

The minority view has been criticized for numerous reasons.  First, such a rule removes any "incentive for police to make sure that they properly understand the law that they are entrusted to enforce and obey."[235]  Second, it is fundamentally unfair to hold citizens to "the traditional rule that ignorance of the law is no excuse" while allowing those "entrusted to enforce" the law to be ignorant of it.[236]  Finally, and prophetically in this case, "if officers are allowed to stop vehicles based upon their subjective belief that traffic laws have been violated

---

[233]  *United States v. Washington*, 455 F.3d 824, 827 (8th Cir. 2006).

[234]  *United States v. McDonald*, 453 F.3d 958 (7th Cir. 2006) ("We agree with the majority of circuits to have considered the issue that a police officer's mistake of law cannot support probable cause to conduct a stop."); *United States v. Tibbetts*, 396 F.3d 1132, 1138 (10th Cir. 2005) ("[F]ailure to understand the law by the very person charged with enforcing it is not objectively reasonable.:); *United States v. Chanthasouxat*, 342 F.3d 1271, 1279 (11th Cir. 2003) ("a mistake of law cannot provide reasonable suspicion or probable cause to justify a traffic stop"); *United States v. Twilley*, 222 F.3d 1092, 1096 (9th Cir. 2000) ("a belief based on a mistaken understanding of the law cannot constitute the reasonable suspicion for a constitutional traffic stop"); *United States v. Miller*, 146 F.3d 274, 279 (5th Cir. 1998) (where officer was mistaken about law "no objective basis for probable cause justified the stop").

[235]  *United States v. Lopez-Soto*, 205 F.3d 1101, 1106 (internal citation omitted).

[236]  *Chanthasouxat*, 342 F.3d at 1280.

even where no such violation has, in fact, occurred, the potential for abuse of traffic infractions as pretext for effecting stops seems boundless and the costs to privacy rights excessive."[237]

As strongly as this Court may believe that the majority view is sounder, it is obligated to apply the law of the Eighth Circuit.

The Court must therefore determine whether Leath's belief that Plaintiffs were violating the law was objectively reasonable.  In making such analysis, courts have focused on whether there is "any evidence of police manuals or training materials, state case law, legislative history, or any other state custom or practice that would create some objectively reasonable basis for the traffic stop."[238]  This list appears non-exhaustive.  "Where there is a basis in state law for an officer's action and some ambiguity or state custom that caused the officer to make the mistake, it may be objectively reasonable.  However, in the absence of such evidence, officers cannot act upon misunderstandings of clear statutes or, worse yet, their own notions of what the law ought to be."[239]

In *Washington*, the officer mistakenly believed that Nebraska's windshield obstruction law also prohibited driving with a cracked windshield.  The government conceded it did not and that there was no provision prohibiting driving with a cracked windshield.  The Eighth Circuit held that the officer's understanding of Nebraska law was unreasonable and that the traffic stop violated the Fourth Amendment.[240]

---

[237] *United States v. Lopez-Valdez*, 178 F.3d 282, 289 (5th Cir. 1999).

[238] *Washington*, 455 F.3d at 828.

[239] *Id.*

[240] *Id.* at 828.

In an earlier case, the Eighth Circuit held that an officer's belief that operating a vehicle with one non-functioning brake light violated a particular provision of tribal law was objectively reasonable.[241]  The Court appeared to base its decision primarily upon the fact that the statute in question was "counterintuitive and confusing."[242]

Leath testified that he was instructed at the police academy that Arkansas' obstruction of view statute[243] prohibits hanging anything from the rear view mirror.  He further testified that a tree shaped air freshener, similar to the one hanging from one of the Plaintiffs' vehicles was used as a specific example.  His testimony was not controverted.

Leath's subjective understanding of the statute, while not controlling of the Fourth Amendment analysis, demonstrates a complete disregard for a critical portion of the statute.  He testified that he was told at the academy that "you can't have anything hanging from your rear view mirror."[244]  His interpretation completely disregards § 27-37-304(a)'s requirement that the substance or material must "obstruct[] the operator's view or the safe operation of the vehicle."  It seems unlikely that instructors at an academy would ignore this portion of the statute.  Since no testimony was presented as to what instructors at the academy actually teach regarding what constitutes a windshield obstruction, the Court has no way of knowing exactly what was taught.

In light of the fact that Leath and other students at the academy were apparently trained that they could make stops on this basis, the Court concludes that it was objectively reasonable for Leath to believe that air fresheners hanging from the rear view mirror would provide probable

---

[241]  *United States v. Martin*, 411 F.3d 991, 1001 (8th Cir. 2005).

[242]  *Id.*

[243]  Ark. Code Ann. § 27-37-304.

[244]  Tr. 508-09.

cause for a traffic stop.  While it is greatly in doubt whether any reasonable officer could believe that a single strand of rosary beads could obstruct a driver's view, it is unnecessary to resolve that issue.  Although it is undisputed that Leath justified stopping former Plaintiffs Arnoldo Giron and Jose Llamas solely because they had rosary beads hanging from their rear view mirrors, their claims are no longer before the Court.

The Court has found that Leath stopped Ruben Duarte because of two stickers on his rear window.  The Court finds that Leath lacked probable cause to effect a stop of Ruben Duarte's vehicle.  The stop was objectively unreasonable and violated Duarte's rights under the Fourth Amendment and the Arkansas Civil Rights Act.  It does not appear that Leath is contending that a stop for this reason would be objectively reasonable under Arkansas law.

## 2.     Turn Signal Traffic Stop

Plaintiff Roberto Giron was stopped for failing to use a turn signal.  Leath cited him for failing to use a turn signal and for driving with a suspended license.  Roberto Giron challenged the citation in court.  He paid a $150 fine for failing to use a turn signal.  The driving with a suspended license charge was dismissed.

Defendants argue that he is collaterally estopped from his Fourth Amendment claim because he pled guilty to the offense.[245]   In their post-trial submissions, Plaintiffs concede that Officer Leath had probable cause to stop Roberto Giron.[246]  His Fourth Amendment claim must therefore be dismissed.

---

[245]  Defs' Trial Brief, docket entry # 97 at 13, ¶ 10.

[246]  Pls' proposed findings of fact and conclusions of law, docket entry # 96 at 3, ¶ 12.

### 3.      Seizure of Plaintiff Villanueva at His Residence

Leath testified that he had probable cause to cite Villanueva for public intoxication and disorderly conduct at his residence.  The Court disagrees.

Leath's testimony in the affidavit he submitted for summary judgment and his trial testimony conflicted on some key issues.  First, Leath stated in an affidavit he signed on January 30, 2009,  that he was given a vehicle description and approximate location during the dispatch call as a result of which he was able to identify Villanueva's vehicle upon his arrival at the trailer park.[247]

At trial, Leath testified that when he arrived at the trailer park, a lady on the first street in the trailer park pointed to the truck later determined to belong to Villanueva and identified it as the truck that had been driven recklessly through the park.[248]  The Court discredits Leath's trial testimony about the conversation with the unidentified lady.  The Court specifically finds that it is more likely than not that Leath made up this story after realizing that the dispatch call did not provide sufficient detail for him to conclusively identify Villanueva's truck as the truck referenced in the reckless driving report.

The record of the incident report indicates that the male caller did not identify the truck other than by make and model.  No color was given; no approximate model year was given; and no description of the driver was given.  Thus, Leath could not have been provided this information when he was dispatched to the scene.  Based on the dispatch call, which the Court finds was Leath's sole source of information before he confronted and seized Villanueva, Leath

---

[247]  Affidavit, Plaintiffs' Exhibit 7.

[248]  Tr. 106.

would only have known that a Chevy Silverado truck had been reportedly driven in a reckless fashion in the trailer park.

When Leath saw a Chevy Silverado truck he assumed that it was the correct vehicle. However, the Court, from all of the evidence, finds that it is more likely than not that Villanueva's vehicle was not the vehicle identified in the dispatch call.  No witness at trial identified Villanueva as driving the vehicle.  Villanueva testified that he had not driven the vehicle after he got home from work.  There is no evidentiary basis for finding that he was the driver of the vehicle complained of.  More importantly, there was insufficient evidence to provide Leath with a reasonable suspicion that he was that driver.

Defendants rely upon Eighth Circuit precedent that "where a defendant is arrested for the wrong offense, the arrest is still valid if probable cause existed to arrest the defendant for a closely related offense."[249]  Reliance on this case is misplaced because Leath had no probable cause to arrest Villanueva for any offense.  Leath did not witness Villanueva drive the truck, much less commit any traffic offense while driving it.  Leath was merely guessing that the truck was the truck referenced in the dispatch call.

During closing argument, defense counsel argued that Leath had probable cause to arrest Villanueva for DWI.[250]  The Court disagrees.  Leath did not have probable cause to charge Villanueva with drunk driving.  Leath did not see Villanueva driving the vehicle and did not have a witness who saw him driving the vehicle.  The Court has no doubt that Leath would have charged Villanueva with driving while intoxicated if he could have produced a witness who saw

---

[249] *United States v. Rambo*, 789 F.2d 1289, 1294 (8th Cir. 1986);   *United States v. Prouse*, 945 F.2d 1017 (8th Cir. 1991).

[250] Tr. 586.

him driving.  In the absence of such a witness, however, Leath had to manufacture some other charges.  He came up with public intoxication and disorderly conduct evidencing his bias and animus against Hispanics.

Leath did not have probable cause to cite Villanueva for public intoxication.  Under Arkansas law:

> A person commits the offense of public intoxication if he or she appears in a public place manifestly under the influence of alcohol . . . to the degree and under circumstances such that:
> (1)    The person is likely to endanger himself or herself or another person or property; or
> (2)    The person unreasonably annoys a person in his or her vicinity.[251]

The term "public place" is defined earlier in the chapter as "a publicly or privately owned place to which the public or substantial numbers of people have access."[252]  In a 1996 case, the Arkansas Supreme Court held that a woman drinking beer on the tailgate of a pickup truck was not in a  "public place" such that she could lawfully be cited for public intoxication.[253]

The Court holds that Villanueva did not appear in a public place when he came outside his home at Leath's request and stood in his driveway.  The Court further holds that Leath is not entitled to qualified immunity with regard to this charge.  In other words, no reasonable officer could have believed that Villanueva had committed the offense of public intoxication.

Leath also did not have probable cause to arrest Villanueva for disorderly conduct.  Under Arkansas law:

> (a)    A person commits the offense of disorderly conduct if, with the purpose to cause public inconvenience, annoyance, or alarm or recklessly creating a risk of public inconvenience,  annoyance, or alarm, he or she:

---

[251]  Ark. Code Ann. § 5-71-212.

[252]  Ark. Code Ann. § 5-71-101(6).

[253]  Weaver v. State, 326 Ark. 82 (1996).

(1)     Engages in fighting or in violent, threatening, or tumultuous behavior;
(2)     Makes unreasonable or excessive noise;
(3)     In a public place, uses abusive or obscene language, or makes an obscene gesture, in a manner likely to provoke a violent or disorderly response;
(4)     Disrupts or disturbs any lawful assembly or meeting of persons;
(5)     Obstructs vehicular or pedestrian traffic;
(6)     Congregates with two (2) or more other persons in a public place and refuses to comply with a lawful order to disperse of a lawful enforcement officer or other person engaged in enforcing or executing the law;
(7)     Creates a hazardous or physically offensive condition;
(8)     In a public place, mars, defiles, desecrates, or otherwise damages a patriotic or religious symbol that is an object of respect by the public or a substantial segment of the public; or
(9)     In a public place, exposes his or her private parts.[254]

Leath testified that Villanueva's disorderly conduct consisted solely of his delay in responding to Leath's request to produce a driver's license, but this in no way constitutes disorderly conduct.  And no officer of the law, acting reasonably, could have come to such a conclusion.

The Court concludes that Leath violated Villanueva's Fourth Amendment right to be free from unlawful seizure when he ticketed him for public intoxication and disorderly conduct, handcuffed him, and placed him in his patrol car for twenty minutes.

**D.     Conversion and Trespass to Chattels**

Plaintiffs contend that Leath unlawfully deprived Plaintiffs Edvin Giron, Roberto Giron, Ruben Duarte, Jose Gutierrez, and Francisco Arevalo of their private property when he towed their vehicles.

Neither party has attempted in their post-trial briefing to address these state law claims or to apply the facts to the law.  The Court therefore considers the claims to be abandoned.

---

[254]  Ark. Code Ann. § 5-71-207 (2007).  Disorderly conduct is a Class C misdemeanor.

## V.      DAMAGES

### A.      Compensatory Damages

All five Plaintiffs[255] have prevailed on their claims based on the contention that the laws were applied differently to them because of their ethnicity.  However, only Plaintiffs Duarte and Villanueva have also prevailed on their claims that they were illegally seized.  In awarding damages, the Court recognizes that each of the Plaintiffs' various claims for relief, whether couched in terms of the Equal Protection Clause, 42 U.S.C. § 1981, the Fourth Amendment, or parallel state law claims under the ACRA, resulted in the same or similar injuries.  In assessing the amount of compensatory damages, the Court must be careful to ensure that no Plaintiff recovers twice for the same injury.

"Compensatory damages may include not only out-of-pocket loss and other monetary harms, but also injuries such as impairment of reputation, personal humiliation, and mental anguish and suffering."[256]  Here, we encounter a situation in which the Court is convinced that each and every Plaintiff suffered actual harm, in addition to their out-of-pocket costs, in the form of inconvenience, humiliation, mental anguish and emotional distress.  Although Plaintiffs had difficulty expressing themselves, it was obvious in watching them testify that they were deeply troubled and upset by their individual confrontations with Leath.  Plaintiff Duarte summed it up for all Plaintiffs:  the experience made him feel "less than the Americans."[257]

---

[255]  Plaintiff Francisco Arevalo's claims have not been resolved.

[256]  *Coleman v. Rahija*, 114 F.3d 778 (8th Cir. 1997) (citing *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986)).

[257]  Tr. 34.

To this day, Duarte is afraid to drive in the area.  Even though he has a valid driver's license from the state of Texas, he does not like to drive unless a friend with an Arkansas license is available to drive.

Of course the "[t]he conclusory term 'emotional distress' defines a jumble of intangible injuries to a person."[258]  Nonetheless, the Court is convinced that each Plaintiff suffered some quantum of compensable emotional distress and humiliation as a result of Leath's unconstitutional conduct.  And, for those Plaintiffs stopped for a traffic violation it was not merely the unlawful stop that caused harm.  They were without their vehicles until they could recover them and then they had to go to Court to fight the citations issued by Leath.  Each of them testified they had to go to Court more than once, some as many as three times, before the citations were thrown out.

Leath used an intermediary to summon Villanueva from the privacy of his home.  Leath then handcuffed him and put him in his patrol car for twenty minutes.  Leath stated that he did so because Villanueva committed the criminal offense of failing to produce his identification fast enough to suit Leath.  Leath did so even though Villanueva was cooperative,  providing the requested identification promptly upon understanding Leath's request.  Then, confronted with the reality that there was no basis for holding Villanueva, Leath arbitrarily decided to cite Villanueva for disorderly conduct and public intoxication.  The Court finds that this was done both to justify Villanueva's unlawful detention and to harass him for his ethnicity and failure to understand English.

Based on the findings of fact and conclusions of law set forth above, the Court awards compensatory damages, against the Defendants, jointly and severally, as follows:

---

[258] *Hobson v. Wilson*, 737 F.2d 1, 61 (D.C. Cir. 1984) (omitting citation).

1.      Ruben Duarte -- $306 in out-of-pocket costs, plus $4,000 for inconvenience, humiliation, and emotional distress.

2.       Edvin Giron -- $ 306 in out-of-pocket costs, plus $3,000 for inconvenience, humiliation, and emotional distress.

3.      Roberto Giron -- $350 in out-of-pocket costs, plus $3,000 for inconvenience, humiliation, and emotional distress.

4.      Jose Gutierrez -- $310 in out-of-pocket costs, plus $3,000 for inconvenience, humiliation, and emotional distress.

5.      Florencio Villanueva -- $500 in out-of-pocket costs, plus $5,000 for inconvenience, humiliation, emotional distress, and improper detention.

**B.      Punitive Damages**

Plaintiffs also seek an award of punitive damages against Leath and Spears, both in their individual capacities.[259]  Federal law, rather than state law, governs the issue of whether punitive damages should be awarded under 42 U.S.C. § 1983 and § 1981.[260]

Punitive damages may be assessed in a § 1983 cases "when a defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."[261]  In assessing whether punitive damages should be awarded, the Court focuses on Spears and Leath's intent and whether their conduct is of the sort that calls for deterrence and punishment over and above that provided by compensatory damage awards.  While the Court finds that Leath was motivated by evil motive or intent, the evidence does not show that Spears shared that motive.  Rather, the case for punitive

---

[259]  Under § 1983 punitive damages are only recoverable against city employees sued in their individual capacities.  *Wilson v. Maricopa County*, 436 F. Supp. 2d 987 (D. Ariz. 2006).

[260]    While Arkansas law would, of course, govern any punitive damage award under the ACRA, the parties have not suggested that such standard differs materially from federal law.  Nor have they questioned the availability of punitive damages under the ACRA.

[261]  *Smith v. Wade*, 461 U.S. 30, 56 (1983).

damages against Spears is based on Spears's reckless indifference to Plaintiffs' federal rights.

The Eighth Circuit has held that for an award of punitive damages based solely on reckless

indifference, there must be evidence that Spears "knew that he was violating [Plaintiffs'] federal

rights or recognized that he might be doing so."[262]  And, the Supreme Court has instructed that

"[p]unitive damages should only be awarded if the defendant's culpability, after having paid

compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to

achieve punishment or deterrence."[263]

While it poses a close question, the Court declines to impose punitive damages on Spears.

Spears played a critical role in allowing Leath to continue to perpetuate his scheme.  And, Spears

certainly was recklessly indifferent to the rights of Plaintiffs, as well as of all Hispanics who

might be traveling through Alexander.  The Court reaches this decision with some hesitation

because, in the Court's eyes, the degree of Spears's deliberate indifference to known, ongoing

illegal conduct made him complicit with Leath.  However, the Court can not rule out the

possibility that Spears falls into the category of the "knowingly incompetent."

Leath, however, is another story.  The reprehensibility of his conduct is, in the Court's

view, extreme.  Leath admitted during his testimony that he knew it would be unlawful to

---

[262] *Swipies v. Kofka*, 419 F.3d 709, 718 (8th Cir. 2005).

[263] *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).
An Eighth Circuit jury instruction offers the following guidance in assessing whether the defendant's conduct was reprehensible:
> In this regard, you may consider whether the harm suffered by the plaintiff was physical or economic or both; whether there was violence, deceit, intentional malice, reckless disregard for human health or safety; whether the defendant's conduct that harmed the plaintiff also caused harm or posed a risk of harm to others; and whether there was any repetition of the wrongful conduct and past conduct of the sort that harmed the plaintiff.

8TH CIR. CIVIL JURY INSTR. § 4.50C (2008).

disproportionately apply the law to Hispanics.  He did it anyway, enthusiastically engaging in unconstitutional conduct and treating it as a game.

Hispanics were an easy target for Leath.  They were vulnerable for a number of reasons, including language barriers and the desire to avoid contact with the legal system, both of which substantially increased the likelihood that they would simply pay any citation that Leath issued. The evidence suggests that this vulnerability emboldened Leath.  For example, Leath pulled over Hispanics solely because they had a single strand of rosary beads hanging from their rear view mirrors.[264]  Leath pulled Duarte over for two bumper stickers on his rear window, positioned such that they could not have impaired his view.[265]  Leath arrested Villanueva at his private residence without probable cause to do so.  There is no evidence that Leath used his law enforcement power this aggressively against non-Hispanics.  Most importantly, the Court is convinced that in exercising the broad discretion granted police officers to enforce misdemeanor offenses, Leath intentionally used that power to single out and target Hispanics.

The defense argued that Leath ticketed any violation he saw, with no exceptions, and pointed to two specific examples.  He ticketed his uncle for a DWI, and he ticketed a state trooper from Texas for expired tags.  There was no dispute, however, that these individuals actually broke the law.  His uncle's blood alcohol measured 1.6 or 1.7, twice the legal limit.[266] Such evidence does not detract from, or mitigate, Leath's unlawful acts in this case.

---

[264]   Former Plaintiffs Jose Llamas and Arnoldo Giron were pulled over solely because a single strand of rosary beads hung from the rear view mirror of their vehicles.  Leath testified that rosary beads hanging from a rear view mirror obstruct the driver's view and are unlawful.  Tr. 102.

[265]   There is no evidence that Leath pulled over any other ethnic or racial group using such a flimsy pretext.

[266]   Tr. 512.

Here, however, Leath hunted for Hispanics to pull over.  He even left his jurisdiction to carry out his profiling activities.  The testimony established that he frequently left Alexander to patrol in Bryant, where he could readily observe a predominantly Hispanic mobile home park to look for people to stop.  And, he did treat non-Hispanics differently.  On at least some occasions, he pulled a driver over believing him to be Hispanic, found out he was wrong and then let the driver go without any citation.  The Court also is convinced that Leath harbored an actual desire to decrease the number of Hispanics in the community, as evidenced by his comment to Guardado's brother-in-law.

The Court recognizes that immigration is a controversial topic in our society.  Law enforcement officers, like all other citizens, have the right to hold, and express, views on political issues.  But law enforcement officers, like judges, must not permit their personal policy and political views to affect or bias them in the performance of their official duties.  Regardless of an officer's personal beliefs, he may not use the powers vested in him as a law enforcement officer to seek out and harass a certain ethnic group.  Leath, by singling out Hispanics for discriminatory treatment, deprived them of the equal protection of the laws required by the Constitutions of the United States and the State of Arkansas.

"Racially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal laws to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment."[267]

---

[267] *Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003) (citing, generally, William Nelson, *The Fourteenth Amendment: From Political Principles to Judicial Doctrine* 43-48 (1988); John Frank & Robert Munro, *The Original Understanding of "Equal Protection of the Laws*," 1972 Wash. U.L.Q. 421, 445-46.

Racial profiling hinders law enforcement . The Department of Justice describes it this way: "Racial profiling sends the dehumanizing message to our citizens that they are judged by the color of their skin and harms the criminal justice system by eviscerating the trust that is necessary if law enforcement is to effectively protect our communities."[268]

The Court concludes that punitive damages must be assessed against Leath. However, should the Court decide the amount of such damages on the basis of the present record? There is no evidence before the Court regarding Leath's financial condition. During the trial, the parties attempted, but were unable, to reach agreement on a stipulation regarding Leath's financial condition. To the extent that Leath contends the Court should take his financial condition and resources into consideration in assessing the appropriate amount of punitive damages, the burden is on Leath to present that evidence.[269] For that purpose, the Court will delay quantifying the punitive damage award to permit Leath, if he so chooses, to present evidence of his financial condition. The Court recognizes that Plaintiffs have asked for discovery on this subject. The Court concludes that the best approach is to require Leath's counsel to promptly notify Plaintiffs' counsel if he, Leath, desires to present such evidence to the Court. If so, then Plaintiffs should be given an opportunity to conduct limited discovery if they so desire for the purpose of ascertaining the validity of the financial information to be presented by Leath.

The Court would like to resolve this issue promptly. Accordingly, the Court directs the parties to confer forthwith and then, if possible, to file a joint report setting forth their suggested

---

[268]  Department of Justice, Fact Sheet on Racial Profiling (June 17, 2003), available at http://www.usdoj.gov/opa/pr/2003/June/racial_profiling_fact_sheet.pdf (last visited: March 5, 2010).

[269]  *Grabinski v. Blue Springs Ford Sales, Inc*., 136 F.3d 565 (8th Cir. 1998) (finding that defendant's failure to put on evidence of his net worth at trial waived the issue); *Kemezy v. Peters*, 79 F.3d 33 (7th Cir. 1996).

approach for resolving this issue.  If no agreement can be reached, then Plaintiffs and Leath will file their separate suggestions.  The joint and/or separate reports will be filed within ten days of the date of this Order.  The Court will then decide how to proceed.

## VI.   CONCLUSION

For the reasons stated herein, the Court concludes:

1.      That Plaintiff Francisco Arevalo's claims for violation of the Equal Protection Clause, 42 U.S.C. § 1981, and the Arkansas Civil Rights Act be held in abeyance and that he be directed to notify the Court in writing within ten days whether he wishes to present additional evidence on this issue.  If nothing is timely filed, all of his claims will be dismissed with prejudice.

2.      That Plaintiffs Ruben Duarte, Edvin Giron, Roberto Giron, Jose Gutierrez, and Florencio Villanueva have proven that Defendant Tommy Leath purposefully and unlawfully considered their ethnicity in exercising his discretion to stop their vehicle.  The Plaintiff Florencio Villanueva has proven that Defendant Tommy Leath purposefully and unlawfully considered his ethnicity in seizing, arresting and citing him for two criminal offenses.  Such conduct violated Plaintiffs' rights under the Equal Protection Clause of the United States Constitution, 42 U.S.C. § 1981, and the Arkansas Civil Rights Act.

3.      That Plaintiff Ruben Duarte has proven that Defendant Tommy Leath stopped his vehicle without probable cause, thereby violating the Fourth Amendment of the United States Constitution and the Arkansas Civil Rights Act.

4.      That Plaintiff Florencio Villanueva has proven that Defendant Tommy Leath seized him in violation of the Fourth Amendment of the United States Constitution and the Arkansas Civil Rights Act.

5.     That Plaintiffs have proven that Defendant Allen Spears should be held liable for failing to supervise Tommy Leath and for condoning his unlawful conduct solely in connection with the racial profiling.

6.     That Plaintiffs have proven that the City of Alexander should be held liable for permitting Tommy Leath to establish and implement a custom and practice of racially profiling Hispanic drivers.

7.     That all claims for trespass and conversion in violation of Arkansas state law be, and they are hereby, DISMISSED WITH PREJUDICE.

8.     That the Fourth Amendment and related Arkansas Civil Rights Act claims of Plaintiffs Edvin Giron, Roberto Giron, and Jose Gutierrez be, and they are hereby, DISMISSED WITH PREJUDICE.

9.     That compensatory damages should be awarded as follows:

   a.  Ruben Duarte, $306 in out-of-pocket costs, plus $4,000 in other damages.

   b.  Edvin Giron, $ 306 in out-of-pocket costs, plus $3,000 in other damages.

   c.  Roberto Giron, $350 in out-of-pocket costs, plus $3,000 in other damages.

   d.  Jose Gutierrez, $ 310 in out-of-pocket costs, plus $3,000 in other damages.

   e.  Florencio Villanueva, $500 in out-of-pocket costs, plus $5,000 in other damages.

10.     That punitive damages should be assessed and awarded against Defendant Tommy Leath.  The Court takes under advisement the determination of the appropriate amount of punitive damages to be awarded.  Ten days from the filing of this Order, the parties' joint and/or separate reports shall be filed as directed herein.

11.     That Judgment will be entered separately when the unresolved issues concerning Francisco Arevalo and the amount of punitive damages are resolved.

12.     That Plaintiffs shall be awarded their costs and attorney's fees incurred in this matter.  The Court will postpone consideration of that determination pending entry of Judgment. Pursuant to Fed. R. Civ. P. 54(d), Plaintiffs shall have fourteen days after entry of Judgment to file a motion for attorney's fees and costs.

IT IS SO ORDERED this _5th_ day of March, 2010.

_/s/Garnett Thomas Eisele_____
UNITED STATES DISTRICT JUDGE